**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION**

| | | |
|---|---|---|
| **SKY CABLE, LLC, <u>et al.</u>,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 5:11cv00048** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RANDY COLEY, <u>et al.</u>,** | ) | **By:  Michael F. Urbanski** |
| | ) | **United States District Judge** |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

This matter is before the court on various motions for summary judgment filed by the parties.  A hearing was held on December 20, 2012, at which time the motions were taken under advisement in light of a settlement conference scheduled for January 11, 2013.  The parties were unable to reach a resolution of this matter at the settlement conference, however, and these issues are now ripe for adjudication.  For the reasons set forth below, Kimberli Coley, Randy Coley and East Coast Cablevision, LLC's motion for summary judgment (Dkt. # 163) is **GRANTED in part** and **DENIED in part**; DIRECTV LLC's motion for partial summary judgment (Dkt. # 165) is **GRANTED in part** and **DENIED in part**; plaintiffs' motion for partial summary judgment (Dkt. # 170) is **DENIED**; plaintiffs are **DISMISSED** from this action; and this matter is set down for further proceedings.

**I.**

This case arises out of the receipt and unauthorized distribution of DIRECTV satellite programming to thousands of viewers at Massanutten Resort.

## A.

DIRECTV, LLC operates a direct broadcast satellite system, through which subscribing customers can receive hundreds of channels of digital television, sports, and other programming. Decl. of Keith Waite, Dkt. # 166-1, at ¶ 8.  At broadcast centers in Los Angeles, California and Castle Rock, Colorado, DIRECTV digitizes and compresses the programming into a signal that is then encrypted (electronically scrambled) by DIRECTV to prevent unauthorized viewing.  Id. at ¶ 9.  DIRECTV transmits the encrypted signal to satellites located in stationary orbits 22,300 miles above the earth.  Id.  The satellites relay the encrypted signal back to earth, where it is received by subscribers equipped with specialized DIRECTV receiving equipment.  Id. at ¶ 10. This receiving equipment consists of a small satellite dish, an integrated receiver/decoder, and a DIRECTV access card that is necessary to operate the integrated receiver/decoder.  Id.  The signal is received from the satellite by the small dish and transmitted by cable wire to the integrated receiver/decoder.  Id.  The integrated decoder/receiver is a box the size of a DVD player that acts like a computer to process and decrypt the incoming signal using the DIRECTV access card that is loaded into the integrated receiver/decoder.  Id.  Each integrated receiver/decoder and access card is assigned a unique serial number, which is used by DIRECTV to activate the satellite receiving equipment and ensure the equipment decrypts DIRECTV programming in accordance with the subscriber's authorized programming package and pay-per-view purchases.  Id. at ¶ 11.

DIRECTV provides satellite programming services to qualifying residential properties with multiple dwelling units, such as hotels, hospitals or college dormitories, pursuant to a Satellite Master Anntenna Television (SMATV) system.  In a SMATV system, a master antenna or satellite dish is mounted onsite and receives programming that is distributed to individual

units within the building.  Id. at ¶ 12.  Each integrated receiver/decoder is dedicated and used to receive and decode a single channel of programming that is then distributed through the SMATV system; for example, a SMATV property that offers 25 channels of DIRECTV programming will have 25 DIRECTV integrated receivers/decoders onsite and will use those integrated receivers/decoders to provide decrypted television programming to the property residents.  Id. at ¶¶ 13-14.  While the satellite signal comes from DIRECTV, the television programming accessible by residents may be displayed without channel guides, logos, or any other information that would identify DIRECTV as the source of the programming.  Id. at ¶ 14.

In a SMATV system, the subscriber or customer of DIRECTV programming is the property, not the individual residents of that property.  DIRECTV charges monthly subscription fees to its SMATV customers based on a rate schedule published by DIRECTV.  The monthly fees are determined by the type of programming ordered by the SMATV customers and the number of individual units with access to DIRECTV programming ("subscriber units").  Id. at ¶ 15.  SMATV customers are required to sign a SMATV Service Private Viewing Agreement and agree to the terms and conditions therein.  Id. at ¶ 16.  Prospective customers must supply information identifying the location of the property to receive DIRECTV programming, certifying that the property qualifies as a multiple dwelling unit eligible to receive DIRECTV programming, and declaring the number of subscriber units that will have access to that programming.  Id.  The SMATV Service Private Viewing Agreement prohibits the reception or viewing of DIRECTV SMATV programming at any location other than the property approved by DIRECTV.  Id. at ¶ 17.  It also prohibits the SMATV customer from charging property residents for DIRECTV programming and prohibits any reselling, retransmitting or re-broadcasting DIRECTV programming outside the designated property.  Id.

SMATV customers who wish to make programming changes or changes to unit counts may do so by contacting DIRECTV Customer Service either by way of the phone number provided on each monthly bill or by faxing in a change form.  Id. at ¶¶ 36, 37.

### B.

Randy Coley is the sole member and manager of East Coast Cablevision, LLC.[1] Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 6.  This limited liability corporation was formed in February 2001 and has conducted business under the names East Coast Cable, Resort, Resort Cable, LLC and Resort Cable.[2]  Id. at Ex. 2, Ex. 3 at ¶ 6.  Prior to the LLC formation in 2001, Randy Coley operated a business called East Coast Cablevision.  Id. at Ex. 1 at 108.  Indeed, for over 25 years, Randy Coley has been engaged in the business of operating cable television systems across the country, and specifically has constructed cable television systems for hotels and resorts.  Id. at Ex. 5 at ¶ 3.  In the late 1990s, Coley entered into negotiations with Massanutten Resort[3] to install and operate a cable television system.  Id. at  Ex. 5 at ¶ 4.  An agreement between the parties was reached in 1999.  Id. at Ex. 5 at ¶¶ 5.1, 5.2, 5.3.

To secure television programming for Massanutten Resort, Randy Coley established a DIRECTV SMATV account in the name of Massanutten.[4]  A SMATV Service Private Viewing

---

[1] As described in detail, infra, plaintiffs and DIRECTV argue that Randy Coley's wife Kimberli is a co-conspirator in the scheme to illegally provide DIRECTV programming to Massanutten residents.

[2] These entities will be referred to herein as "East Coast" unless otherwise noted.

[3] Massanutten Resort is a four-season mountain resort located in McGaheysville, Virginia, which includes hotels and condominiums owned and/or operated by Great Eastern Resort Management, Inc. (GERM), in addition to numerous dining and recreational facilities.  A timeshare condominium complex managed by the Mountainside Villas Owners Association (MVOA), as well as single family homes that are independently owned but managed by the Massanutten Property Owners Association (MPOA), are also located at Massanutten Resort.

[4] Coley, acting on behalf of a sole proprietorship identified as East Coast Cable, entered into a DIRECTV SMATV Affiliate Agreement on July 11, 2000.  Decl. of Keith Waite, Dkt. # 166-1, at ¶ 19, Ex. A; see also Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 6.  As a SMATV affiliate, East Coast Cable was authorized to solicit and sell DIRECTV SMATV programming services.  Decl. of Keith Waite, Dkt. # 166-1, at ¶ 19.  Coley established the SMATV account at Massanutten prior to becoming an authorized DIRECTV SMATV affiliate, however.

Agreement was executed on behalf of Massanutten Resort on June 3, 1999.  Decl. of Keith

Waite, Dkt. # 166-1, at Ex. C.  DIRECTV activated the Massanutten SMATV account, account

no. 8810346, based on subscriber information forms filled out and submitted to DIRECTV by

either Randy Coley or Bladen Hadley, both agents of East Coast.[5]  Jamnback Decl., Dkt. # 166-

8, at Ex. 1 at 15, Ex. 6 at ¶ 6, Ex. 7 at ¶ 3; Decl. of Keith Waite, Dkt. # 166-1, at ¶ 22.  These

forms indicated:  (a) that this was a new DIRECTV customer; (b) that the property name was

"Massanutten Resort;" (c) that the property type was "Hotel/Motel Guest Rooms;" (d) that the

property address was "289 Ranier Road, Massanutten, VA 22480;" and (e) that the billing

address was "P.O. Box 153, McGaheysville, VA 22840."  Decl. of Keith Waite, Dkt. # 166-1, at

Ex. C.  The forms certified that 168 subscriber units at the property would be receiving

DIRECTV programming.  Id.  The forms were signed by Bladen Hadley as "Authorized Property

Owner or Manager," and by Randy Coley as "Authorized Installer."  Id.  However, Bladen

Hadley was not the property owner or manager of Massanutten Resort.  Jamnback Decl., Dkt.

# 166-8, at Ex. 1 at 17.  Moreover, there is no hotel with 168 units located at 289 Ranier Road.

Nor was this the location of the SMATV system "headend" containing DIRECTV receiving

equipment, the place at which the DIRECTV signal is received and then redistributed to

locations where programming is to be viewed.  See id. at Ex. 1 at 164-67.  Rather, 289 Ranier

Road is the address of a house rented by East Coast to house its employees, which Coley

describes as East Coast's "base of operations."  Id. at Ex. 1 at 146, Ex. 6 at ¶ 13; Decl. of Keith

Waite, Dkt. # 166-1, at ¶ 29.  Post Office Box 153, listed on the subscriber information form as

the billing address for Massanutten, was actually a post office box leased and controlled by East

---

[5] In one set of responses to requests for admission, Coley admitted Bladen Hadley was a contractor and managing agent of East Coast but denied Hadley was an employee, Jamnback Decl., Dkt. # 166-8, at Ex. 6 at ¶ 6, but in another set of responses, Coley admitted that Hadley was an employee or agent of East Coast.  Id. at Ex. 7 at ¶ 3.

Coast.  Jamnback Decl., Dkt. # 166-8, at Ex. 6 at ¶ 9.  For his part, Coley asserts that DIRECTV instructed him as to how to fill out the subscriber information forms.[6]  See, e.g., id. at Ex. 1 at 145.

According to Coley, the Massanutten SMATV account was initially set up to provide programming to 168 units at Mountainside Villas, a timeshare condominium complex.  Id. at Ex. 1 at 154, 168.  Coley asserts that at the time, East Coast supplied all other areas of Massanutten Resort with programming obtained through a company called WS-Net.  Id. at Ex. 5 at ¶¶ 6-7.  After WS-Net ceased operations at some point in 2004, East Coast began supplying other units at Massanutten with DIRECTV programming.  Id. at Ex. 1 at 36, 70.  As the Massanutten Resort expanded, Coley and East Coast connected the additional buildings with DIRECTV programming obtained through Massanutten SMATV account no. 8810346, using the same headend[7] that was used to supply programming to the initial 168 units at Mountainside Villas.  Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 148, 181.  Additionally, Coley testified that he provided DIRECTV programming to bars, the golf shop, the waterpark, and lobbies/reception areas at Massanutten, free of charge, using this headend.  Id. at Ex. 1 at 234-38.

As of May 2011, Coley was providing DIRECTV programming to 2,353 subscriber units at Massanutten managed by GERM using Massanutten DIRECTV SMATV account no. 8810346.  Id. at Ex. 6 at ¶ 28; see also id. at Ex. 1 at 227.  Coley was receiving monthly payments from GERM of approximately $37,648 for this DIRECTV programming.  Id. at Ex. 6 at ¶ 29.  Coley also was providing DIRECTV programming via the Massanutten SMATV account to 168 Mountainside Villas subscriber units and receiving monthly payments of

---

[6] The court notes that this was not the first time Coley had set up a SMATV system.  See Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 150.

[7] The headend containing the DIRECTV receiving equipment was located on Killy Court, down the street from 289 Ranier Road.  Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 148.

approximately $2,800 from MVOA.  <u>Id.</u> at Ex. 6 at ¶ 24.  Additionally, Coley provided

DIRECTV programming from the same SMATV account to no fewer than 40 independently

owned homes managed by MPOA, and he individually billed each of these MPOA homes on a

monthly basis.[8]  <u>Id.</u> at Ex. 6 at ¶¶ 25, 27; <u>see also</u> <u>id.</u> at Ex. 1 at 200.

  Yet from the time the Massanutten DIRECTV SMATV account was established in 1999

through June 2011, it maintained a subscriber unit count of 168.  Decl. of Keith Waite, Dkt. #

166-1, at ¶¶ 32, 35.  DIRECTV billed Massanutten Resort approximately $2,078 per month

(including tax), the cost of 34 channels of programming for 168 subscriber units.  <u>Id.</u>  Coley

received these bills, which were sent to Post Office Box 153, a box leased and controlled by East

Coast, and paid the amount due.  Jamnback Decl., Dkt. # 166-8, at Ex. 6 at ¶¶ 8-9.  Payments to

DIRECTV for the Massanutten SMATV account in 2011 were made by checks which list the

payor as "Resort" with an address of "P.O. Box 153, McGaheysville, Virginia."[9]  Decl. of Keith

Waite, Dkt. # 166-1, at ¶ 35, Ex. F.

  Coley testified that he called DIRECTV's customer service line numerous times—"more

than twelve, less than 100"—from 1999 through 2012 in an attempt to notify DIRECTV that the

subscriber unit count had increased.  Coley Dep. Oct. 17, 2012, Dkt. # 180-4, at 33; <u>see also</u>

Coley Dep. Sept. 18, 2012, Dkt. # 180-3, at 185.  He contends that DIRECTV's response was

always that it would have "dealer services get in touch with [him]," but they never did.  Coley

Dep. Oct. 17, 2012, Dkt. # 180-4, at 33-34; <u>see</u> Coley Dep. Sept. 18, 2012, Dkt. # 180-3, at 185.

Coley also asserts that he sent "several" written communications to DIRECTV by mail with

---

[8] As previously noted, Coley also provided DIRECTV television programming to various commercial areas such as bars, reception areas, the golf shop, and the waterpark, but did not charge Massanutten for providing these areas programming.  Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 236.

[9] Coley explains that he used the trade name "Resort" in dealings with Massanutten because a now-defunct company named "Resort Cable" had previously provided cable services and he "thought the customers at Massanutten would be more comfortable with this name."  Jamnback Decl., Dkt. # 166-8, at Ex. 5 at ¶ 5.3.

respect to the subscriber unit issue.  Coley Dep. Oct. 17, 2012, Dkt. # 180-4, at 36.  Coley has

evidence of only two such written communications.[10]  One is a typewritten paragraph attached to

an invoice dated May 12, 2005 from DIRECTV to "Massanutten Resort SMV" for programming

services.  It reads in full:

> To Direct Tv Commercial Dept
> account # 08810346
> whom it may concern,
> I contacted you guys at your customer service number a few
> months or so ago, and informed you of changes made to the system
> at Massanutten Resort in Virginia.  As of this billing the subscriber
> numbers are still not correct, however we are remitting to you the
> total amount invoiced $ 1616.16 with check # 2048, please contact
> us as soon as possible to clear this matter up.  Randy Coley system
> operator [telephone number]
> with Respect
> East Coast Cablevision

Ex. 6 to Waite Dep., Dkt. # 180-7, at 2.  According to Coley, this communication was "stapled to

a check" and sent in with the bill.  Coley Dep. Sept. 18, 2012, Dkt. #180-3, at 190.  The second

communication is dated December 6, 2006 and states:

> To Direct TV
> customer commercial support
> P.O. Box 5392
> Miami FL 33152-5392
>
> This is concerning our conversation I had with your support team
> 11-13-2006 via phone call.  I am concerned again about the lack of
> support, your Dealer Services has given us with the operation of
> the Massanutten Resort system in Virginia.  Further more we have
> requested a system upgrade in our channel line ups as well as
> getting our subscriber counts updated and the method to do so.
> As to Date, We have not been contacted, what so-ever, with the
> dealer you have in this area, Please have the dealer in our area, or
> another area, help support our venture with the Resort.  As right
> now, we have no way of upgrades, other than dealing with your
> local dealer, that is not helping us in anyway.

---

[10] Coley testified that he only has these two communications available because he "considered it unfinished
business."  Coley Dep. Sept. 18, 2012, Dkt. # 180-3, at 190, 193.

With Respect

_____ [11]
East Coast Cablevision
Randy Coley
account # 008810346

Ex. 7 to Waite Dep., Dkt. # 180-7, at 3.  DIRECTV asserts it has no record of any request made to Customer Service, either by phone or by fax, to increase or otherwise update the unit count for the Massanutten SMATV account from June 1999 through June 2011.[12]  Decl. of Keith Waite, Dkt. # 166-1, at ¶¶ 36, 37.

Coley testified that he never notified DIRECTV of the specific number of units to which he was providing DIRECTV programming, either in writing or by phone.  Jamnback Decl., Dkt. # 166-8, at Ex. 1 at 196-97.  He stated:  "I don't think I ever mentioned a specific number other than I've got more units out here and someone's not helping us out.  And they never came out.  DIRECTV never came out."  Id.  Coley claims he understood that "to change anything on a commercial agreement with DIRECTV if it has a current dealer, that dealer is the one that has to make the changes."  Coley Dep. Sept. 17, 2012, Dkt. # 180-3, at 194, 195.  Yet he never called Sky Cable or Robert Saylor, the DIRECTV SMATV affiliate dealer assigned to the Massanutten

_____

[11]  Although the document contains a signature line, it is unsigned.

[12]  Requests for account changes are recorded in the Subscriber Transaction Management System (STMS) and maintained by DIRECTV.  Decl. of Keith Waite, Dkt. # 166-1, at ¶ 36.  The STMS records for the Massanutten account from 1999 through 2011 show calls made to Customer Service concerning programming changes and other technical issues, but no requests to update unit counts.  Id.  Additionally, DIRECTV has no record of receiving a fax request for a unit count change for the Massanutten SMATV account during the relevant period, although it did receive such requests from Coley for account changes to other accounts.  Id. at ¶ 37.  Nor does DIRECTV have evidence of any other written communications allegedly sent by Coley.  See Waite Dep. Sept. 17, 2012, Dkt. # 180-6, at 91.

9

account, to report the need to increase the subscriber count.[13]  Jamnback Decl., Dkt. # 166-8, at Ex. 6 at ¶ 36.

Notwithstanding any efforts he might have made to notify DIRECTV that the subscriber unit counts had changed, the fact remains that Coley did not wait to receive authorization from DIRECTV to expand the number of units at Massanutten receiving DIRECTV programming; he just went ahead and hooked them up.  Nor did he pay DIRECTV for the additional 2,353 subscriber units managed by GERM, at least 40 homes managed by MPOA, and the various bars, lobbies and recreation areas to which he was providing DIRECTV programming.  Coley acknowledges that he knew DIRECTV's programming charges for the Massanutten SMATV account were based on the programming packages selected and the number of subscriber units reported.  Id. at Ex. 6 at ¶ 15.  He further acknowledges he knew how to change unit counts and programming packages, id. at Ex. 1 at 187, as he was himself an authorized SMATV affiliate. Coley Dep. Sept. 17, 2012, Dkt. # 180-3, at 187.  Indeed, DIRECTV has records of change forms and other written documents Coley faxed to Customer Service to make account changes for other accounts, Decl. of Keith Waite, Dkt. # 166-1, at ¶ 37, presumably those for which he served as authorized DIRECTV SMATV affiliate.  See footnote 4, supra.

## C.

Robert Saylor is the principal member and manager of Sky Cable, LLC.[14]  See Saylor Dep., Dkt. # 164-3, at 4.  On or about January 21, 1998, Sky Cable and DIRECTV entered into a SMATV Affiliate Agreement, through which Sky Cable became a DIRECTV SMATV affiliate

---

[13]  It appears Coley knew how to get in touch with Sky Cable, however, as Robert Saylor testified in his deposition that he had spoken with Coley on the telephone "a couple of times over several years."  Saylor Dep. Sept. 19, 2012, Dkt. # 164-3, at 72, 73.

[14]  Plaintiffs Robert Saylor and Sky Cable will be referred to herein collectively as "Sky Cable."

dealer.  Suppl. Decl. of Keith N. Waite, Dkt. # 181-4, at ¶ 1.  As a DIRECTV SMATV affiliate

dealer, Sky Cable was authorized to solicit and sell DIRECTV SMATV programming.  Id. at

Ex. 1 at ¶ 2.1.  Sky Cable also was obligated under the agreement to provide customer service

and maintenance to affiliate properties.  Id. at Ex. 1 at ¶ 2.5.  In return for its services, Sky Cable

received certain commissions from DIRECTV on fees received by DIRECTV on SMATV

accounts that were opened by Sky Cable.  Id. at Ex. 1 at ¶ 2.2(a).

　　　　Although Sky Cable did not solicit and open the Massanutten SMATV account, it

nevertheless was assigned the Massanutten account by DIRECTV.  DIRECTV's practice for

accounts such as the Massanutten SMATV account, which was opened directly through

DIRECTV without the assistance of an authorized SMATV affiliate, was to assign accounts to

the authorized SMATV affiliate in the geographical area.  The assigned authorized SMATV

affiliate would assume responsibility for providing services for the account as specified in the

SMATV Affiliate Agreement and would receive commissions on the account, just as if it had

opened the account.  Id. at ¶ 6.  On this basis, Sky Cable was assigned the Massanutten SMATV

account and was entitled to receive certain commissions on fees received by DIRECTV on that

account.[15]  Id. at ¶ 7; see also Saylor Dep., Dkt. # 181-3, at 107.

---

[15] Sky Cable attempts to draw a distinction between an "authorized DIRECTV affiliate" and an "authorized
DIRECTV SMATV affiliate," arguing in its summary judgment brief:

> At the time that the Plaintiff, Sky Cable, became a SMATV dealer of
> DIRECTV, it became eligible to receive commissions upon the installations of
> DIRECTV which it, **itself**, installed.  In approximately July or August of 1998
> the Plaintiff, Sky Cable, became an "Authorized DIRECTV Affiliate."  It is
> important for this court to understand that there is a significant difference and
> distinction between a "DIRECTV SMATV Affiliate" and an "Authorized
> DIRECT[V] Affiliate." . . .  A DIRECTV SMATV affiliate is entitled to receive
> commissions only from the properties which it installs itself, whereas the
> "Authorized DIRECTV Affiliate," is assigned various SMATV accounts, which
> have been activated and it is duty bound to service these accounts whenever
> there are problems or questions relating to the respective accounts.  Accounts

Saylor testified, however, that Sky Cable never received service calls from Coley concerning the Massanutten SMATV account: "[I]n the case of an account like this as Mr. Coley testified yesterday, he had vast experience in operating systems and it wasn't surprising that we never got calls for assistance. And we didn't." Saylor Dep. Sept. 19, 2012, Dkt. # 164-3, at 107. Indeed, Saylor stated he had not met Coley prior to this litigation, although he spoke with Coley on the phone "a couple of times over several years." Id. at 72, 73. Saylor only went to the Massanutten SMATV headend one time—to conduct a "card swap" for DIRECTV at some point between 2001 and 2004. Id. at 77. Saylor testified that as the dealer assigned to the Massanutten SMATV account, he was responsible for taking new access cards sent by DIRECTV and swapping them out for the old access cards in each of the integrated decoder/receivers being used. Id. at 77-79. When he first contacted the company he knew as Resort Cable about the card-swap, Saylor testified:

> [S]ome person called me back a couple of times and said well hey card swap yeah, just we'll have somebody go by your office and pick them up. And I said nah, I said I can't do that. DIRECTV won't let me just hand them out to anybody. And I said, you know, actually I have to have my people go up there and actually change the cards out and get them reactivated for the associated content that they're supposed [to] decode. And they said oh that's not necessary. We have way more expertise than we'll ever need to get that done. And so we went back and forth over several business days, probably took a two week period, and ultimately I prevailed where they were hey we're going to—and myself and my employees, we were just dying to see the mystery headend. And

---

assigned to an "Authorized DIRECTV Affiliate" are not required to have been installed by said affiliate.

Pl.'s Mem. in Support of Partial Summ. J., Dkt. # 171, at 2. Sky Cable offers no evidence in support of its argument that it held a status of "authorized DIRECTV affiliate" separate and apart from its status as "authorized DIRECTV SMATV affiliate." Sky Cable acknowledges there is no written agreement through which Sky Cable gained any such status, and in the Supplemental Declaration of Keith Waite, DIRECTV flatly disputes that any such status exists apart from the "authorized DIRECTV SMATV affiliate" status created by virtue of the parties' written agreement. Supp. Decl. of Keith Waite, Dkt. # 181-4, at ¶ 4. Without evidence to support Sky Cable's contention, the court declines to recognize any separate status Sky Cable believes it held based on an unwritten agreement with DIRECTV.

> people, my employees that had been up, we all knew that it was a
> rip-off that was underway.
>
> …
>
> We knew it was only being billed for 168 units and we knew that
> probably they were delivering services to a heck of a lot more than
> 168 units.

Id. at 79-80.  Because Saylor was "pretty sure there was an ongoing fraud," id. at 81, he

"mentioned it to people [he] knew at DIRECTV. . . ."  Id. at 82.  Specifically, Saylor testified

that he told a woman named A.J. Clark that he suspected underreporting associated with the

Massanutten SMATV account, but stated "[t]here was no real discussion or anything."  Id. at

127.  Additionally, Saylor said the Sky Cable general manager met with someone named J.R.

Bresnig "in the first half of the 2000 decade" in Denver and that the underreporting at

Massanutten "was one of his talking points."  Id. at 129-30.  Saylor also personally told Maurice

Geyen, a "[Multi-Dwelling Unit] guy," that he believed there was an underbilling issue with the

Massanutten account.  Id. at 131-32.  Saylor never contacted DIRECTV's Customer Service,

however, to report his suspicions.  Id. at 133.

 After approximately 2003, Saylor testified that he did not report the underbilling to

DIRECTV again until he met with DIRECTV investigators in December 2010.  Saylor Dep. Oct.

17, 2012, Dkt. # 164-4, at 42; Saylor Dep. Sept. 19, 2012, Dkt. # 164-3, at 118.  An interview

report from the DIRECTV Office of Signal Integrity dated December 10, 2010 reveals Saylor

"provided information to investigators about a timeshare resort community in McGaheysville,

VA called Massanutten that he believes is underreporting its EVO, but may also be

retransmitting to more buildings or sites than authorized by DIRECTV."  Dkt. # 180-2, at 2.

DIRECTV asserts it has no evidence of any communication from Saylor or Sky Cable

concerning underreporting of unit counts at Massanutten prior to December 2010.  Waite Dep.

Sept. 17, 2012, Dkt. # 164-5, at 162, 165; <u>see also</u> Suppl. Jamnback Decl., Dkt. # 181-1, at Ex. 1 at 47.  After Saylor spoke to DIRECTV investigators, DIRECTV "went out to the resort and confirmed for [themelves] if the programming was being re-broadcasted to more units than what was on the account" in June 2011.  Waite Dep. Sept. 17, 2012, Dkt. # 180-6, at 53.  DIRECTV senior investigator Keith Waite:

> conducted field tests at 13 separate locations within the Massanutten Resort, and confirmed that each location was receiving DIRECTV programming from the Massanutten SMATV account that was supposed to be limited to a single 168 room hotel located at 289 Ranier Road.  These locations include and are not limited to condominiums, a deli & pizzeria, bar/lounges, gymnasiums, lobbies, snack shop, golf shop, recreation center, and the resort check-in building located at Massanutten Resort—none of which are located at 289 Ranier Road.

Decl. of Keith Waite, Dkt. # 166-1, at ¶ 30.

### D.

Claiming it had been denied commissions it was owed on the Massanutten SMATV account, Sky Cable filed suit against Randy Coley and his wife, Kimberli, alleging various federal and state causes of action in ten counts of an amended complaint.  Sky Cable also named DIRECTV in Count 11 of the amended complaint, claiming DIRECTV was liable for breach of contract and negligence.  In turn, DIRECTV filed an amended cross-claim against Randy and Kimberli Coley and a third-party complaint against East Coast Cablevision, LLC.

By Order entered March 23, 2012, the court dismissed Sky Cable's claim against DIRECTV in favor of arbitration and denied Kimberli Coley's motion to dismiss for lack of personal jurisdiction, allowing the parties to conduct sixty days of jurisdictional discovery.  By oral Order entered October 18, 2012, the court denied Kimberli Coley's renewed motion to

dismiss for lack of personal jurisdiction and dismissed four of Sky Cable's ten counts alleged against the Coleys.

This matter is now before the court on the parties' motions for summary judgment and partial summary judgment.  The issues raised in these various motions will be addressed in turn.

## II.

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Nguyen v. CNA Corp., 44 F.3d 234, 236-37 (4th Cir. 1995).  When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322.  Whether a fact is material depends on the relevant substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Nguyen, 44 F.3d at 237.  If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  "All reasonable inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion," but "[a] mere scintilla of evidence supporting a case is insufficient."  Nguyen, 44 F.3d at 237.

**III.**

Kimberli and Randy Coley[16] argue they are entitled to summary judgment because Sky Cable lacks standing to bring the claims alleged against them in the amended complaint.  The Supreme Court has recognized two types of standing, constitutional and prudential standing, both of which are "well-covered ground."  CGM, LLC v. BellSouth Telecomm., Inc., 664 F.3d 46, 52 (4th Cir. 2011).  Article III standing "ensures that a suit presents a case or controversy as required by the Constitution," and requires a plaintiff to show that "(1) she suffered an actual or threatened injury that is concrete, particularized, and not conjectural; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable decision."  Doe v. Va. Dep't of State Police, 713 F.3d 745, 753 (4th Cir. 2013) (citing Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006)), reh'g denied, 2013 WL 30698777 (June 20, 2013).  Federal courts also face "'judicially self-imposed limits on the exercise of federal jurisdiction.'"  Id.  (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).  This concept of prudential standing encompasses "'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'"  Id. (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12 (2004) (quoting Allen, 468 U.S. at 751)).

Additionally, the Fourth Circuit has recognized a less well-known concept of standing, statutory standing, which "concerns 'whether a statute creating a private right of action authorizes a particular plaintiff to avail herself of that right of action.'"  CGM, LLC, 664 F.3d at 52 (quoting Radha A. Pathak, Statutory Standing and the Tyranny of Labels, 62 Okla. L. Rev. 89, 91 (2009)).  The Fourth Circuit has "framed the statutory standing inquiry as whether the

---

[16] For purposes of this section, the court will refer to Randy and Kimberli Coley collectively as "the Coleys."

16

plaintiff 'is a member of the class given authority by a statute to bring suit . . . .'" Id. (citing In re Mut. Funds, 529 F.3d 207, 216 (4th Cir. 2008)).  This issue is one of statutory construction. "'[W]here the statutory language provides a clear answer, [the court's] analysis begins and ends with that language,'" but "[i]n the face of ambiguities, [the court] then look[s] to legislative intent."  Id. at 53 (citing Wilmington Shipping Co. v. New England Life Ins. Co., 496 F.3d 326, 339 (4th Cir. 2007)).

### A.

In Count 1 of its amended complaint, Sky Cable alleges that Randy and Kimberli Coley fraudulently purchased DIRECTV satellite programming for 168 units and then illegally redistributed those signals to numerous other units in excess of the 168 initial subscribers, in violation of 47 U.S.C. § 605(a).

> Section 605 defines what constitutes the unauthorized publication or use of electronic communications.  It includes such prohibited practices as the divulgence of wire or radio communications by persons authorized to receive them to others who are not so authorized, and the interception of any radio communication by a person not authorized to receive that communication from the sender.

National Satellite Sports, Inc. v. Eliadis, 253 F.3d 900, 907 (6th Cir. 2001), cert. denied, 122 S. Ct. 1127 (2002).  Section 605(e)(3) provides that "[a]ny person aggrieved by any violation of subsection (a) [of § 605] or paragraph (4) of this subsection may bring a civil action in a United States district court or in any other court of competent jurisdiction."  "Any person aggrieved," per the statute:

> shall include any person with proprietary rights in the intercepted communication by wire or radio, including wholesale or retail distributors of satellite cable programming, and, in the case of a violation of paragraph (4) of subsection (e) of this section, shall also include any person engaged in the lawful manufacture,

> distribution, or sale of equipment necessary to authorize or receive
> satellite cable programming.

47 U.S.C. § 605(d)(6).

Sky Cable argues that it qualifies as "any person aggrieved" with standing to bring suit under § 605 because it was denied commissions on all of the units receiving DIRECTV programming in excess of the initial 168 subscriber units, to which commissions it otherwise would have been entitled pursuant to its SMATV Affiliate Agreement with DIRECTV.  As they did at the motion to dismiss stage, the Coleys argue Sky Cable lacks standing to enforce DIRECTV's statutory rights under 47 U.S.C. § 605(a).  The court agrees.

Assuming Sky Cable has met the minimum constitutional standing requirement, prudential limitations on the exercise of federal jurisdiction prevent the court from deciding the merits of Sky Cable's claim.  The Supreme Court has held that in order to have standing to assert a claim in federal court, "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Warth v. Seldin, 422 U.S. 490, 499 (1975).  Standing "often turns on the nature and source of the claim asserted." Id. at 500.

> Moreover, the source of the plaintiff's claim to relief assumes
> critical importance with respect to the prudential rules of standing
> that, apart from Art. III's minimum requirements, serve to limit the
> role of the courts in resolving public disputes.  Essentially, the
> standing question in such cases is whether the constitutional or
> statutory provision on which the claim rests properly can be
> understood as granting persons in the plaintiff's position a right to
> judicial relief.

Id.  Here, any claim Sky Cable has against the Coleys is entirely derivative of DIRECTV's claim against them for failure to pay DIRECTV the subscription fees it was owed.  No relationship exists between Sky Cable and the Coleys except by way of Sky Cable's contractual relationship

with DIRECTV.  The rights to be enforced under § 605 are those of DIRECTV, not Sky Cable. Cf. Danos v. Jones, 652 F.3d 577, 582-83 (5th Cir. 2011) (judicial secretary lacked prudential standing to pursue constitutional claim against Judicial Council for suspending the authority of her former supervisor, a federal judge, to employ staff for a period of time as a result of his judicial misconduct, which led to her termination, as rights at issue were those of the judge, not his secretary); Jewell v. United States, 548 F.3d 1168, 1172 (8th Cir. 2008) (shareholder did not have prudential standing to sue for recovery of pro-rata share of tax sanction imposed on former law firm in connection with closing agreement between the firm and the IRS).

For these same reasons, Sky Cable lacks statutory standing to bring this claim.  "Any person aggrieved" by a violation of § 605(a) can bring suit in federal court.  47 U.S.C. § 605(e)(3)(A).  Focusing on the words "shall include," Sky Cable argues the definition of "any person aggrieved" in § 605(d)(6) was not intended by Congress to be an exclusive list of parties who might be aggrieved by violations of § 605(a).  In support of that contention, Sky Cable cites to DIRECTV v. Hoverson, 319 F. Supp. 2d 735 (N.D. Texas 2004) and DIRECTV v. Budden, 420 F.3d 521 (5th Cir. 2005).

In Hoverson, defendant moved to dismiss a claim brought by plaintiff DIRECTV under § 605(e)(4), in which DIRECTV asserted it was damaged by defendant's surreptitious possession and use of illegal devices and equipment designed to intercept and decrypt DIRECTV's protected satellite communications.  In considering whether plaintiff could bring suit pursuant to § 605(e)(3)(A), the district court held that neither category of "any person aggrieved" set forth in § 605(d)(6) applied to the plaintiff, DIRECTV.  The offense did not involve interception of a communication, rendering the first part of the definition inapplicable, and there was no allegation that the plaintiff was engaged in the lawful manufacture, distribution, or sale of equipment

19

necessary to authorize or receive satellite cable programming, as that term is defined in the statute.  319 F. Supp. 2d at 738-39.  The <u>Hoverson</u> court concluded, however, "that § 605(d)(6) is not a true definition but, instead, merely is a description of two categories of persons who come within the broad term 'any person aggrieved.'"  <u>Id.</u> at 739.  In so holding, the court referenced the language used in each of the six definitions contained in § 605(d):  the term "means" precedes the definitional language in three definitions, the word "includes" in one definition, and the words "shall not include" in another.  <u>Id.</u>  The definition at issue, § 605(d)(6), uses the words "shall include" and "shall also include."  The <u>Hoverson</u> court explained: "Congress's choice of words supports the court's conclusion that Congress did not intend to restrict the term 'any person aggrieved' to the categories of persons that follow the words 'shall include.' . . . The words 'shall include' normally 'convey the conclusion that there are other items includable, though not specifically enumerated by the statute.'"  <u>Id.</u> (citations omitted). The court declined to hold that the allegations raised by plaintiff DIRECTV in the complaint, which asserted a violation of § 605(e)(4) adversely affecting plaintiff, were insufficient to bring DIRECTV within the scope of § 605(e)(3)(A).

Approximately one year later, the Fifth Circuit in <u>Budden</u> affirmed a district court's grant of summary judgment against defendant who purchased and distributed over 100 devices primarily used to illegally gain access to satellite services, in violation of 47 U.S.C. § 605(e)(4). 420 F.3d 521.  Defendant argued on appeal that DIRECTV lacked standing to bring the claim because it was not a "person aggrieved" as defined by the statute.  <u>Id.</u> at 526.  As in <u>Hoverson</u>, the defendant in <u>Budden</u> argued that § 605(d)(6) is an exhaustive list of those who have standing to bring a claim for a violation of § 605(e)(4).  420 F.3d at 527.  He argued that neither category of "any person aggrieved" set forth in § 605(d)(6) applied to DIRECTV, as the case did not

involve an "intercepted communication" and because "satellite cable programming" does not include the "direct-to-home satellite services" DIRECTV provides.  Id.  The Fifth Circuit held that the definitional phrase "shall include" did not limit the broad scope of § 605(e)(3)(A).  In so holding, the court looked to its prior interpretation of the word "includes," finding it "is usually a term of enlargement, and not of limitation," as well as the common dictionary definition of the term.  Id. at 527.  The court further relied on the Sixth Circuit's decision in National Satellite Sports, Inc. v. Eliadis, Inc., 253 F.3d 900 (2001), which held that "'the plain language of the word "include" in § 605(d)(6) does not render the definition of a "person aggrieved" an exclusive one.'"  Budden, 420 F.3d at 528 (quoting Eliadis, 253 F.3d at 914).  Finally, the Fifth Circuit in Budden noted that a number of district courts, including Hoverson, agree that § 605(d)(6) is not an exclusive list and determined that DIRECTV had standing to bring the § 605(e)(4) claim as a "person aggrieved."  420 F.3d at 528.

The Fifth Circuit in Budden and the Sixth Circuit in Eliadis both reference the fact that Congress amended § 605 in 1988 with the express purpose of expanding standing to sue.  The Eliadis court quotes the House Report accompanying the 1988 amendment as follows:

> Section 5 of [the Satellite Home Viewer Act of 1988] amends [§ 605] of the Communications Act pertaining to the piracy of satellite cable programming.  The Committee's amendment is intended to deter piracy practices by (1) stiffening applicable civil and criminal penalties, (2) *expanding standing to sue*, and (3) making the manufacture, sale, modification . . . of devices or equipment with knowledge that its primary purpose is to assist in unauthorized decryption of satellite cable programming expressly actionable as a criminal act.

253 F.3d at 912 (quoting H.R. Rep. No. 100-877(II), at 28, reprinted in 1988 U.S.C.C.A.N. 5638, 5657 (emphasis added by Sixth Circuit)); see also Budden, 420 F.3d at 528 n.32.  But this does not mean that anyone has standing to bring a claim under § 605.  To be sure, Hoverson, Budden

and Eliadis —as well as the statutory language itself —support the argument that § 605(d)(6)'s description of "persons aggrieved" is not exhaustive.  These cases in no way suggest, however, that Congress intended that Sky Cable be "'a member of the class given authority by [the] statute to bring suit. . . .'"  CGM, LLC, 664 F.3d at 52.

The plaintiffs in Hoverson, Budden and Eliadis all had proprietary rights which gave rise to their standing to sue.  DIRECTV was the plaintiff in both Hoverson and Budden and, not surprisingly, those courts held that DIRECTV had standing to bring a claim under § 605 against a defendant who allegedly possessed and used (in the case of Hoverson), or purchased and distributed (in the case of Budden), devices designed to illegally gain access to DIRECTV's satellite programming services.  In Eliadis, the plaintiff had "the exclusive right to broadcast [a boxing] event to commercial establishments in Ohio," 253 F.3d at 904, which gave it "a propriety interest in the transmission of the event."  Id. at 915.  In contrast, Sky Cable can point to no rights which give rise to its standing to sue under this statute.

Moreover, Sky Cable offers no case law to support its assertion that it has standing to sue under § 605(e)(3)(A) as a party without proprietary rights in the satellite signal at issue.  Nor is the court aware of any such case law.  Indeed, Sky Cable is "asking this court to be the first to establish that a non-proprietary Plaintiff has standing to sue under 47 U.S.C. § 605 when they have been aggrieved by the theft of the satellite signal which formed the basis of their income stream."  Pl.'s Br. in Opp. to Defs.' Mot. for Summ. J., Dkt. # 179, at 6.  That the court will not do.  The class of potential plaintiffs with standing to bring suit pursuant to § 605(e)(3)(A) is not limitless.

While factually distinguishable, the Fourth Circuit's decision in CGM, LLC v. BellSouth Telecommunications, Inc., 664 F.3d 46 (2011), is nevertheless instructive here.  CGM, a billing

22

agent for competitive local exchange carriers (LECs), brought a declaratory judgment action against BellSouth, an incumbent LEC, claiming BellSouth offered long term promotional discounts to its own customers but failed to pass along the full value of those discounts to CGM's competitive LEC clients, in violation of the Telecommunications Act of 1996.[17]  CGM was paid by its competitive LEC clients based in part on the money CGM obtained for them from credits, rebates, cashbacks, winbacks, and offsets that BellSouth provided to its customers and was obligated under the 1996 Act to pass along to the competitive LECs.

CGM was the only named plaintiff in the suit.  CGM itself provided no telecommunications services; it was neither an incumbent LEC nor a competitive LEC.  Nor was CGM a party to any interconnection agreement, which is a private contract between an incumbent LEC and a competitive LEC that governs an incumbent LEC's 1996 Act resale duties.  And CGM did not contend that BellSouth owed it money directly.  Rather, CGM was merely the billing agent for certain competitive LECs.  Its theory of recovery was that BellSouth owed CGM's competitive LEC clients over $14 million as a consequence of the overcharging dispute, and these competitive LECs in turn owed CGM over $360,000 in fees.  Id. at 50-51.

The district court held that CGM lacked standing to bring its claims for alleged violations of duties arising under the 1996 Act, because (1) it was not a party with rights under the 1996 Act; (2) that a "seemingly broadly worded" general redress provision in the Federal Telecommunications Act of 1934[18] "provided no lifeline to CGM's failed claims;" and (3) that

---

[17]  "The 1996 Act imposes new duties on incumbent local telecommunications carriers, which had previously enjoyed monopolies in local telecommunications markets; those duties include the duty to sell telecommunications services at wholesale rates to would-be competitors for resale to consumers."  664 F.3d at 48.  Regulations promulgated to implement the 1996 Act prevent incumbent LECs from devising retail promotional schemes enabling them to offer discounts to their retail customers without extending the value of those discounts to competitive LECs.  Id.

[18] The provision at issue stated:  "If any person fails or neglects to obey any order of the [FCC] other than for the payment of money, while the same is in effect, the [FCC] or any party injured thereby . . . may apply to the

the Declaratory Judgments Act, 28 U.S.C. § 2201, did not provide an independent basis for

CGM's suit.  Id. at 49, 51.  On appeal, the Fourth Circuit affirmed, holding:

> At the end of the day, CGM seeks to shoehorn claims against its own competitive LEC clients into a claim against BellSouth.  In reality, CGM appears to complain that its own client competitive LECs have failed to enforce their rights under the 1996 Act against BellSouth.  Yet neither the 1996 Act nor a seemingly broadly worded but nonetheless inapplicable statute from the Federal Telecommunications Act of 1934 provides statutory standing for CGM to bring this action against BellSouth.  Accordingly, we hold that the district court properly dismissed this case.

Id. at 56.

Like in CGM, LLC, Sky Cable seeks to shoehorn its contractual claims against

DIRECTV into a claim against the Coleys.  Any injury Sky Cable has suffered stems from its

contractual agreement with DIRECTV.  Sky Cable has not been directly injured by the Coleys,

has no contractual relationship with the Coleys, and has no rights which give rise to standing

under § 605(e)(3)(A).  Sky Cable cannot sue to enforce DIRECTV's rights.

"The party invoking federal jurisdiction bears the burden of establishing [standing]."

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Sky Cable has simply not met its

burden here.  It has not cited any case law supporting its standing argument in this case.  While

the court held that it had alleged enough to get past a Rule 12(b)(6) motion, the court cannot as a

matter of law find that Sky Cable has standing to pursue its claim against the Coleys under

§ 605.  Any injury Sky Cable has sustained as a result of the Coleys' actions is properly asserted

against DIRECTV in a breach of contract action, and that action has been dismissed from this

case in favor of arbitration.  See Dkt. # 108.

---

appropriate district court of the United States for the enforcement of such order."  664 F.3d at 53 (quoting 47 U.S.C. § 401(b)).

For these same reasons, Sky Cable lacks standing to pursue Count 4, a violation of Virginia's anti-piracy statute, Virginia Code § 18.2-187.1.  Sky Cable asserts it is an "aggrieved party" within the meaning of Virginia Code § 18.2-187.1(E).  Section 18.2-187.1(E) specifically identifies who can bring a claim under this section:

> Any party providing oil, electric, gas, water, telephone, telegraph, cable television or electronic communication service who is aggrieved by a violation of this section may, in a civil proceeding in any court of competent jurisdiction, seek both injunctive and equitable relief, and an award of damages, including attorney's fees and costs. In addition to any other remedy provided by law, the party aggrieved may recover an award of actual damages or $500 whichever is greater for each action.

Sky Cable is not a party "providing . . . cable television or electronic communication service" who is aggrieved by a violation of Virginia Code § 18.2-187.1; DIRECTV is.  It was not Sky Cable's cable television or electronic communication service that was pirated, it was DIRECTV's.  Because it attempts to stand on the rights of DIRECTV, Sky Cable lacks prudential standing to bring Count 4.  See Warth v. Seldin, 422 U.S. 490, 500 (1975) (question is whether the statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief).

As such, the Coleys' motion for summary judgment (Dkt. # 163) is **GRANTED** as to Counts 1 and 4 of the amended complaint.  Because it lacks standing to bring Count 1, Sky Cable's motion for partial summary judgment (Dkt. # 170) as to the Coleys' liability under § 605 is **DENIED**.

## B.

In Count 7, Sky Cable alleges a violation of RICO, 18 U.S.C. § 1962.[19]  Specifically, Sky Cable alleges that the Coleys have engaged in a pattern of racketeering activity involving the

---

[19]  The amended complaint does not specify what subsection of § 1962 was allegedly violated.

predicate acts of fraud in connection with access devices (18 U.S.C. § 1029), money laundering (18 U.S.C. § 1956), and engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957).  Am. Compl., Dkt. # 59, at ¶¶ 119-121.

Section 1964(c) of Title 18 provides that "[a]ny person injured in his business or property by reason of a violation of section 1962" can file suit in a United States district court.  Once again, Sky Cable argues it is "any person injured" and relies on the Supreme Court's opinion in Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479 (1985), in support of its argument.  Sky Cable cites Sedima for the proposition that a criminal conviction for a predicate act is not required prior to bringing a private civil RICO action.  While Sedima does indeed stand for this proposition, Sky Cable's argument misses the mark.  The Coleys do not argue that a criminal conviction is a prerequisite for standing.  Rather, they argue Sky Cable lacks standing to pursue its RICO claim for the same reason it lacks standing under § 605—because Sky Cable has no proprietary rights in DIRECTV's signals and programming and has no contractual or other relationship with the Coleys.

The Supreme Court in Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), recognized that while the language of 18 U.S.C. § 1964(c) concerning who can bring a civil action under RICO can be read to be expansive, it should not be:  "[T]he very unlikelihood that Congress meant to allow all factually injured plaintiffs to recover persuades us that RICO should not get such an expansive reading."  Id. at 265-66.  The Holmes case stemmed from a complaint filed by the Securities Investor Protection Corporation (SIPC), a private corporation with a duty to reimburse the customers of registered broker-dealers who become unable to meet their financial obligations.  SIPC alleged that Holmes conspired with others in a scheme to manipulate stock prices, causing share prices to plummet and certain broker-dealers to liquidate,

resulting in "SIPC's advance of nearly $13 million to cover [the broker-dealers'] customers' claims."  Id. at 262-63.  The Court held that SIPC did not have the right to sue Holmes under RICO for his alleged role in the scheme, reasoning:

> [T]he link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers.  That is, the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims.

Id. at 272.  The Court held that a plaintiff's right to sue under the RICO statute "required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well."  Id. at 268.  The Court explained:

> Here we use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts.  At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'  Accordingly, among the many shapes this concept took at common law, was a demand for some direct relation between the injury asserted and the injurious conduct alleged.

Id. (internal citations omitted).

The Court was not persuaded by SIPC's reliance on the "congressional admonition that RICO be 'liberally construed to effectuate its remedial purpose,'" stating:

> There is, for that matter, nothing illiberal in our construction:  We hold not that RICO cannot serve to right the conspirators' wrongs, but merely that the nonpurchasing customers, or SIPC in their stead, are not proper plaintiffs.  Indeed, we fear that RICO's remedial purposes would more probably be hobbled than helped by SIPC's version of liberal construction:  Allowing suits by those injured only indirectly would open the door to "massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits."

Id. at 274 (quoting Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 545 (1983)) (alterations in original).

In the instant case, there is no direct relation between the injury asserted and the injurious conduct alleged.  See id. at 268.  The direct victim of the Coleys' conduct was DIRECTV, not Sky Cable.  "The attenuated connection between [Sky Cable's] injury and the [Coleys'] injurious conduct thus implicates fundamental concerns expressed in Holmes."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 459 (2006).  The Supreme Court in Anza stated:  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  Id. at 461.  As in Anza and Holmes, the answer in the instant case is no.  Thus, Sky Cable lacks standing to bring a claim under § 1964(c).  As such, the Coleys' motion for summary judgment (Dkt. # 163) is **GRANTED** as to Count 7 of the amended complaint, and Sky Cable's motion for partial summary judgment (Dkt. # 170) as to the Coley's liability under RICO is **DENIED**

## C.

Sky Cable also lacks prudential standing to maintain the remaining counts alleged in the amended complaint—common law fraud (Count 8), unjust enrichment (Count 9), and statutory business conspiracy (Count 10).  As previously stated, any claim Sky Cable has against the Coleys is entirely derivative of DIRECTV's claim against the Coleys for their failure to pay DIRECTV the subscription fees owed.  No relationship exists between Sky Cable and the Coleys except by way of Sky Cable's contractual relationship with DIRECTV.  Moreover, these three state law claims are meritless and fail as a matter of law.

To illustrate, Sky Cable claims in Count 8 of the amended complaint that Randy Coley made "numerous false statements, representations and material omissions . . . with knowledge

that said statements were false, involved material facts, and were done with the intention to be

acted upon by the Plaintiff Sky Cable to its detriment."  Am. Compl., Dkt. # 59, at ¶ 130.  Yet

Robert Saylor testified in his deposition that he had never met Randy Coley before the litigation

and perhaps had spoken to Randy Coley "a couple of times over several years."  Saylor Dep.

Sept. 19, 2012, Dkt. # 164-3, at 72.  He later testified that he was not even sure he ever talked to

Randy Coley:

> Q.  And you told us about your conversations with Randy Coley
> and they were brief and they were about whether he was . . .
>
> A.  I'm not even sure when and if I had conversations with Randy.
> I know I had conversations with people that called me from North
> Carolina a few times.  And I had no way of knowing who it really
> was.
>
> Q.  But you've already told us about those, haven't you?
>
> A.  I think I've mentioned them, yeah.  I'm pretty sure I have.

Id. at 198.  Saylor clarified, however, that he never spoke to Randy Coley concerning the number

of units he was servicing at Massanutten:

> Q.  Neither Randy Coley nor anyone else with East Coast Cable
> told you they were just servicing 168 or 170 units out there.  You
> didn't have that kind of conversation, right?
>
> A.  No.

Id. at 198-99.  There is no evidence of a relationship between Sky Cable and the Coleys, let

alone any misrepresentations made, that could give rise to a fraud claim under Virginia law.  See

Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999).

Likewise, Sky Cable's unjust enrichment claim fails as a matter of law.  In Virginia, a

plaintiff asserting unjust enrichment must demonstrate:  1) he conferred a benefit on the

defendant; 2) the defendant knew of the benefit and should reasonably have expected to repay

the plaintiff; and 3) the defendant accepted or retained the benefit without paying for its value. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 165-66 (4th Cir. 2012) (citing Schmidt v. Household Fin. Corp., 276 Va. 108, 116, 661 S.E.2d 834, 838 (2008)).  Again, there is no evidence of any relationship between Sky Cable and the Coleys, nor is there evidence that Sky Cable conferred any type of benefit upon the Coleys[20] that could support a claim for unjust enrichment.

Finally, Sky Cable asserts a statutory business conspiracy claim in Count 10, in violation of Virginia Code § 18.2-499.  "To recover in an action for statutory conspiracy to harm a business, a plaintiff must prove a combination of two or more persons for the purpose of 'willfully and maliciously injuring another in his reputation, trade, business, or profession,' Va. Code Ann. § 18.2-499(a), and resulting damage to the plaintiff."  Waytec Elec. Corp. v. Rohm & Haas Elec. Materials, LLC, 459 F. Supp. 2d 480, 492 (W.D. Va. 2006) (citing Va. Code § 18.2-500 and Allen Realty Corp. v. Holbert, 227 Va. 441, 449, 318 S.E.2d 592, 596 (1984)), aff'd, 255 F. App'x 754 (4th Cir. 2007), cert. denied, 129 S. Ct. 37 (2008).  There is simply no evidence to support a statutory business conspiracy claim in this case.

As such, the Coleys' motion for summary judgment (Dkt. # 163) is **GRANTED** as to Counts 8, 9 and 10 of the amended complaint.[21]  Having no surviving claims against any party, Sky Cable will be **DISMISSED** from this action.

## IV.

One paragraph of the Coleys' summary judgment brief is dedicated to the argument that Kimberli Coley is entitled to summary judgment because the court lacks personal jurisdiction

---

[20] Indeed, in its amended complaint, Sky Cable asserts only that Randy Coley conferred benefits "upon himself." See Am. Compl., Dkt. # 59, at ¶¶ 136, 138.

[21] Because the court grants the Coleys' motion for summary judgment on standing grounds, it will not address the Coleys' argument on brief that Sky Cable's claims are partially time-barred.

over her or, alternatively, that she lacks liability.  The court declines to accept either of these arguments.

## A.

Kimberli Coley has twice before unsuccessfully raised a personal jurisdiction argument in this proceeding.  Her argument on summary judgment fairs no better.

A federal court may exercise personal jurisdiction over a defendant in the manner provided by state law.  Fed. R. Civ. P. 4(k)(1)(A); see ESAB Group, Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997).  Before exercising personal jurisdiction over a non-resident defendant, a court must find that two conditions are satisfied:  first, that the state's long-arm statute "authorizes the exercise of jurisdiction in the circumstances presented;" second, that "the exercise of jurisdiction comports with Fourteenth Amendment due process standards." Ellicott Mach. Corp., Inc. v. John Holland Party Ltd., 995 F.2d 474, 477 (4th Cir. 1993).  Because Virginia's long-arm statute, Virginia Code § 8.01-328.1, extends personal jurisdiction to the extent permitted by the Due Process Clause, see English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990), "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one."  Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 135-36 (4th Cir. 1996).  The question, then, is whether the defendant has sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).

The "minimum contacts" test requires that defendants purposefully avail themselves of the forum state.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985).  This test aims to ensure defendants are not "hauled into a jurisdiction solely as a result of random, fortuitous, or

attenuated contacts," id. at 475, and affords defendants protection "from having to defend

[themselves] in a forum where [they] should not have anticipated being sued." Consulting

Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009) (citing World-Wide

Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).  Determining the reach of judicial

power over persons outside of a state's borders under the International Shoe standard is

undertaken through two different approaches—by finding specific jurisdiction based on conduct

connected to the suit, or by finding general jurisdiction.  Helicopteros Nacionales de Colombia,

S.A. v. Hall, 466 U.S. 408, 414 (1984).  General jurisdiction exists where a defendant's overall

contacts with the forum state are continuous and systematic.  See Goodyear Dunlap Tires

Operations, S.A. v Brown, 131 S. Ct. 2846, 2851 (2011).  Specific jurisdiction, on the other

hand, focuses on the conduct giving rise to the suit.  Id.

　　"[T]here is no hard-and-fast rule for determining when a defendant's contacts with the

forum state reach the level necessary to justify a finding of general personal jurisdiction."

 Wright v. Suntrust Bank, No. 1:11-cv-00041, 2011 WL 1984468, at *3 (S.D. W. Va. May 20,

2011).  However, "there are certain indicia which courts look to in making their decision," which

include:

> (a)  whether the defendant has any physical presence in the forum
> state, see Centricut, Inc., 126 F.3d at 624; (b) the proportion of
> defendant's total business activities that is conducted in the forum
> state, see id.; (c) the extent to which advertising or solicitation of
> business is directed specifically at particular individuals, or
> whether it is of a more general nature, see Boone v. Sulphur Creek
> Resort, Inc., 749 F. Supp. 195, 199 (S.D. Ind. 1990); and (d) the
> extent to which the non-resident defendant created long-term
> business relationships with resident customers of the forum state,
> see Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 335 (3d
> Cir. 2009); see also Roberts v. Synergistic Int'l, LLC, 676 F. Supp.
> 2d 934, 942 (E.D. Cal. 2009) ("Longevity, continuity, volume,
> economic impact, physical presence, and integration into the

state's regulatory or economic markets are among the indicia of
such a presence.").

Id.  With regard to specific jurisdiction, a court is required to evaluate "(1) the extent to which
the defendant has purposefully availed [herself] of the privilege of conducting activities in the
state; (2) whether the plaintiff['s]claims arise out of those activities directed at the state; and
(3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"
Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs. Inc., 334 F.3d 390, 397 (4th Cir. 2003) (citing
ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 711–12 (4th Cir. 2002) &
Helicopteros, 466 U.S. at 414 & n.8)).

Kimberli Coley offers no new argument or evidence to support her claim that the court
lacks personal jurisdiction over her.  Rather, she relies once again on the fact that she is a
homemaker who has never been to Massanutten Resort.  Defs.' Summ. J. Br., Dkt. # 164, at 5,
Ex. 2 at ¶¶ 2, 4.  At the December 20, 2012 hearing, in response to a Show Cause Order,
Kimberli Coley testified that she lives in North Carolina, has been married to her husband Randy
for 19 years, and has not held a job outside of the home since she has been married.  In two
separate declarations, Kimberli Coley asserts that she has no affiliation with her husband's cable
business.  K. Coley Decl., Dkt. # 77, at ¶ 4; K. Coley Decl., Dkt. # 164-2, at ¶ 3.  She further
claims that she does not own property in Virginia, that she has not conducted business in
Virginia, and that it has been more than twenty years since she spent any time in Virginia.
K. Coley Decl., Dkt. # 77, at ¶¶ 5-7.

Despite her claims to the contrary, evidence produced in discovery sufficiently links
Kimberli Coley to her husband's business such that the court can exercise specific personal
jurisdiction over her.  In an application for a Citibank Platinum credit card, Kimberli Coley is
listed as the primary applicant whose income source for the past eight years was "East Coast

Cablevision," providing an annual salary of $480,000 per year.  Jamnback Decl., Dkt. # 139-1, at

Ex. 1A.  This is corroborated by a Fidelity Bank credit report from 2005 and an Equifax report

from 2009, both of which list "VP, East Coast Cable" as Kimberli Coley's employment.  Id. at

Ex. 4, 5.

      Moreover, Kimberli Coley opened a BB&T account (xx4399) on February 13, 2009 in

the name of Kimberli M. Coley DBA Resort.  Id. at Ex. 1B.  She signed the paperwork on behalf

of herself individually and on behalf of Resort.  She claims that she did so as a "favor to [her]

husband" because he was "travelling quite a bit."  K. Coley Decl., Dkt. # 77, at ¶ 9.  Yet Randy

Coley, a signatory to the account, signed the requisite form the same day the account was

opened, February 13, 2009.  Jamnback Decl., Dkt. # 139-1, at Ex. 1B.

      Randy Coley testified at East Coast's Chapter 11 bankruptcy hearing that checks

submitted to DIRECTV for payment of service for DIRECTV programming provided to

Massanutten Resort were written from this BB&T account.  Jamnback Decl., Dkt. # 139-1, at Ex.

3.  Indeed, in a deposition taken in connection with East Coast's Chapter 11 proceeding, Randy

Coley testified as a Rule 30(b)(6) representative for East Coast that this was the primary account

for East Coast's business; all checks East Coast wrote to pay operations, payroll and debts came

from the Resort checking account.  Id. at Ex. 2.  In his responses to requests for admission,

Randy Coley admitted that he deposited payments he received from the Massanutten entities into

this account, and that he used this account to pay the monthly bills he received from DIRECTV.

Jamnback Decl., Dkt. # 166-8, at Ex. 7 at ¶¶ 33-35.  This account was also used to make monthly

mortgage payments on loans at Fidelity Bank in Kimberli Coley or Randy Coley's name, and to

pay balances on credit cards issued in Kimberli Coley's name by CitiBank.  Jamnback Decl.,

Dkt. # 139-1, at Ex. 1.  While Kimberli Coley swore in a declaration that she never withdrew

funds from this Resort account, she admitted in her responses to requests for admission that she withdrew $100 from the BB&T account (xx4399) on July 12, 2010.  Id.

Further linking Kimberli Coley to East Coast's operations at Massanutten is the fact that a cell phone listed in Kimberli Coley's name was used on at least two occasions to contact DIRECTV's customer service department concerning the Massanutten SMATV account.  Keith Waite Decl., Dkt. # 139-9, at Ex. A, B.  This evidence establishes that Kimberli Coley is sufficiently tied to East Coast's operations at Massanutten Resort such that she has "purposefully availed [herself] of the privilege of conducting activities" in the Commonwealth.  Carefirst of Md., 334 F.3d at 397.  The exercise of personal jurisdiction is constitutionally reasonable in this case.  Accordingly, Kimberli Coley's motion for summary judgment (Dkt. # 163) is **DENIED** on personal jurisdiction grounds.

## B.

While the court might have personal jurisdiction over Kimberli Coley, the issue of her liability is another question entirely—one that cannot be determined as a matter of law at this stage of the proceedings.

In one paragraph of the Coleys' brief in support of their motion for summary judgment, Kimberli Coley argues that she is entitled to summary judgment because she lacks liability to either Sky Cable[22] or DIRECTV.  She provides no analysis as to the merits of the claims raised against her.[23]  Rather, she argues yet again that she "is a homemaker who has never been to Massanutten," and contends that "[h]er status as Randy's spouse does not subject her to personal liability."   Defs.' Summ. J. Br., Dkt. # 164, at 5-6.

---

[22]  Because Sky Cable does not have standing to pursue its claims against Kimberli Coley, as discussed supra, the question of Kimberli Coley's liability to Sky Cable is moot.

[23]  DIRECTV names Kimberli Coley in two counts of its amended cross-claim—Count 1 (47 U.S.C. § 605(a)) and Count 5 (unjust enrichment).

For the reasons stated <u>supra</u>, there is a genuine issue of material fact concerning the extent of Kimberli Coley's involvement in the East Coast business and, as such, her liability in this case.  While Kimberli Coley testified that she has no affiliation with her husband's cable business, she is the primary account holder on East Coast's operating account.  Kimberli Coley withdrew funds from this account on at least one occasion, and the account was used to make monthly payments on loans in Kimberli Coley's name as well as pay personal credit card bills.  Moreover, two credit reports and a credit card application list East Coast Cable as Kimberli Coley's employer—indeed, the credit reports indicate she was the company's Vice President— and her cell phone was used to make calls to DIRECTV concerning the Massanutten SMATV account.  Given these facts, the court cannot find as a matter of law at this stage of the proceedings that Kimberli Coley is not liable in this case.  As such, Kimberli Coley's motion for summary judgment (Dkt. # 163) as to her lack of liability is **DENIED**.

## V.

DIRECTV argues it is entitled to summary judgment against defendants Randy Coley and East Coast[24] on Count 1 of its amended cross-claim and third-party complaint, alleging a violation of the Communications Act, 47 U.S.C. § 605(a).  The court agrees.

### A.

Section 605(a) reads in full:[25]

---

[24] The court will refer to these two defendants collectively as "the Coley defendants" for purposes of this section. DIRECTV does not move for summary judgment on its § 605 claim against Kimberli Coley.

[25]  Although the statute itself refers to wire or radio communications, Congress amended the Communications Act in 1984 to address "the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations."  See <u>Nat'l Satellite Sports, Inc. v. Eliadis</u>, 253 F.3d 900, 911 (6th Cir. 2001) (citing 1984 U.S.C.C.A.N. 4655, at 4745).  While the original prohibitions in § 605 were retained without amendment, the 1984 amendments and supplementations to the statute plainly brought satellite communications within the ambit of § 605(a).

> Except as authorized by chapter 119, Title 18, no person receiving,
> assisting in receiving, transmitting, or assisting in transmitting, any
> interstate or foreign communication by wire or radio shall divulge
> or publish the existence, contents, substance, purport, effect, or
> meaning thereof, except through authorized channels of
> transmission or reception, (1) to any person other than the
> addressee, his agent, or attorney, (2) to a person employed or
> authorized to forward such communication to its destination, (3) to
> proper accounting or distributing officers of the various
> communicating centers over which the communication may be
> passed, (4) to the master of a ship under whom he is serving, (5) in
> response to a subpena issued by a court of competent jurisdiction,
> or (6) on demand of other lawful authority. No person not being
> authorized by the sender shall intercept any radio communication
> and divulge or publish the existence, contents, substance, purport,
> effect, or meaning of such intercepted communication to any
> person. No person not being entitled thereto shall receive or assist
> in receiving any interstate or foreign communication by radio and
> use such communication (or any information therein contained) for
> his own benefit or for the benefit of another not entitled thereto.
> No person having received any intercepted radio communication or
> having become acquainted with the contents, substance, purport,
> effect, or meaning of such communication (or any part thereof)
> knowing that such communication was intercepted, shall divulge
> or publish the existence, contents, substance, purport, effect, or
> meaning of such communication (or any part thereof) or use such
> communication (or any information therein contained) for his own
> benefit or for the benefit of another not entitled thereto. This
> section shall not apply to the receiving, divulging, publishing, or
> utilizing the contents of any radio communication which is
> transmitted by any station for the use of the general public, which
> relates to ships, aircraft, vehicles, or persons in distress, or which is
> transmitted by an amateur radio station operator or by a citizens
> band radio operator.

Section 605(e)(3)(A) permits any person aggrieved by a violation of § 605(a) to bring a civil action in federal court. "Any person aggrieved" is defined to include any person with proprietary rights in the intercepted communication by wire or radio. There is no dispute that DIRECTV has proprietary rights in the communications at issue, and there has been no issue raised as to DIRECTV's standing to bring this claim.

The evidence makes clear that from at least 2004 through June 2011, the Coley defendants received DIRECTV programming signals authorized for 168 units at Mountainside Villas and distributed those signals to more than 2,500 properties the Coley defendants serviced at Massanutten Resort without proper authority from, or payment to, DIRECTV.  Indeed, in a Rule 30(b)(6) deposition taken in connection with the Chapter 11 bankruptcy proceedings of East Coast, Randy Coley testified as follows:

> Q.  Since 2004, you have known that your billings from DIRECTV were understated, correct?
>
> A.  Correct.
>
> Q.  You've known since 2004 that you were being billed for 168 units—or 164 units?  How many units?
>
> A.  Correct.
>
> Q.  How many?
>
> A.  I believe it's 168.
>
> Q.  168 units.  And at the same time, you knew you were providing service to over 2,000 units?
>
> A.  Correct.

Jamnback Decl., Dkt. # 166-8, at Ex. 9 at 208.  Coley admits that he reported to DIRECTV that 168 subscriber units at Massanutten would have access to DIRECTV programming, that he never paid DIRECTV for more than the 168 subscriber units originally reported, and that as of May 2011 he was providing DIRECTV programming to 2,353 subscriber units managed by GERM, among other areas of Massanutten, using programming obtained from the Massanutten DIRECTV SMATV account.  Id. at Ex. 6 at ¶¶ 14, 17, 28, 30.  The subscriber unit count on the Massanutten SMATV account remained at 168 units from 1999 through June 2011.  Decl. of Keith Waite, Dkt. # 166-1, at ¶¶ 32, 35.  While Coley asserts that he tried to notify DIRECTV

that subscriber unit counts at Massanutten had changed, he provided the DIRECTV signal to far more than the initial 168 units without first notifying and receiving authorization from DIRECTV.

Section 605 imposes strict liability for violations. J&J Sports Prods., Inc. v. Jorkay, LLC, No. 5:10-CV-542-D, 2013 WL 2629461, at *2 (E.D.N.C. June 11, 2013). The statute "clearly proscribes the unauthorized divulgence or use of communications which have been received legally for certain purposes." J&J Sports Prods., Inc. v. J.R. Mills, Inc., No. 5:06-CV-155-D, 2007 WL 1959246, at *3 (E.D.N.C. July 3, 2007). A showing of willfulness is not required to establish liability, see 47 U.S.C. § 605(e)(3)(C)(iii) (imposing liability on violators who were not aware that their actions constituted violations of the statute), and only bears on the issue of damages.

Randy Coley raises no argument concerning his personal liability, and the court finds DIRECTV has established that Randy Coley is individually liable for the § 605 violation. Randy Coley is the sole member/manager of East Coast Cablevision, LLC and played a direct role in the unauthorized transmission of DIRECTV programming at Massanutten Resort. See McFarland v. Va. Ret. Servs. of Chesterfield, LLC, 477 F. Supp. 2d 727, 739-40 (E.D. Va. 2007) (while an LLC is an entity that, like a corporation, is designed to shield its members from personal liability based on actions of the entity, an LLC member should still be held individually liable if he or she personally participates in a tort committed by the LLC or directs it to be done); see also Van Buren v. Va. Highlands Orthopaedic Spine Ctr., LLC, 728 F. Supp. 2d 791 (W.D. Va. 2010) (finding Virginia Supreme Court would reject McFarland's reasoning and declining to conclude that supervisor could be held individually liable for tort of wrongful discharge), rev'd, 2013 WL 1150486 (4th Cir. Mar. 21, 2013) (unpublished table decision) (district court erred in

dismissing plaintiff's claim based on its determination that the Virginia Supreme Court would find wrongful discharge claims by an employee cognizable only against the employer and not against supervisors or co-employees in their individual capacity).  Additionally, Randy Coley is vicariously liable for the actions of East Coast Cablevision, LLC.  To hold Randy Coley liable in his individual capacity under § 605, DIRECTV must show that he "had 'a right and ability to supervise the violations, and that[]he had a strong financial interest in such activities.'"  J&J Sports Prods., Inc. v. Ribeiro, 562 F. Supp. 2d 498, 501 (S.D.N.Y. 2008) (quoting J&J Sports Prods., Inc. v. Meyers, No. 06 Civ. 5431 (BSJ) (JCF), 2007 WL 2030288 (S.D.N.Y. July 16, 2007)).  Randy Coley had supervisory control over the activities of East Coast and received a financial benefit therefrom.  See id.  DIRECTV can hold Randy Coley jointly and severally liable for damages in both an individual and corporate capacity.  Id.

### B.

The Coley defendants argue that DIRECTV is not entitled to summary judgment because it sued under the wrong statute.  Relying on Joe Hand Promotions v. Dock Street Enterprises, No. WMN-11-1973, 2011 WL 6141058 (D. Md. Dec. 8, 2011) (Nickerson, J.), reconsideration denied, 2012 WL 401080 (D. Md. Feb. 7, 2012), the Coley defendants claim that DIRECTV should have filed suit under 47 U.S.C. § 553, which prohibits the unauthorized interception or reception of cable communications,[26] instead of § 605, which applies to satellite communications, because the alleged piracy occurred when DIRECTV's programming was being transmitted by cable, rather than by satellite.

---

[26] Section 553(a)(1) provides:  "No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."

**1.**

In Dock Street, the defendant bar maintained a commercial account with Comcast, a cable provider, to provide the programming shown on the television sets in its establishment. Dock Street contacted Comcast to inquire about the pricing and availability of purchasing the "Ultimate Fighting Championship 100: Making History," to which program plaintiff Joe Hand Promotions owned the exclusive television distribution rights.  Without entering into a separate sublicensing agreement with Joe Hand, Dock Street ordered the program from Comcast at a cost of $54.99 and broadcast the program in its establishment to about 70 patrons the night it was televised, July 11, 2009.  2011 WL 6141058, at *1.  Joe Hand subsequently filed suit, alleging violations of both § 605 and § 553, as well as conversion.  Dock Street moved for summary judgment on the § 605 claim, arguing the statute only applies to intercepted satellite signals, not to cable transmissions.  Id.

Recognizing that these two statutes "have generated numerous cases which grapple with how to apply potentially overlapping provisions to various fact situations," id. at *3 (citing Kingvision Pay Per View, Ltd. v. Duermeier, 24 F. Supp. 2d 1179, 1182 (D. Kan. 1998)), Judge Nickerson stated:

> An overlap occurs when both sections are applied to the same program, rather than tracing the violation to either satellite or cable.  The difficulty arises because the life cycle of a television program quite often begins as satellite signals and ends as cable transmissions.  Ambiguity arises when determining whether each statute should apply to unauthorized interception of satellite, cable, or both.

Id.

The circuits appear to be split as to how to resolve this ambiguity.  The Seventh Circuit held in United States v. Norris, 88 F.3d 462, 469 (7th Cir. 1996), that defendant could only be

prosecuted for selling cable television descrambler equipment under § 553, not § 605.  The Seventh Circuit found no overlap between the two statutes, stating:  "Congress intended for § 605 to apply to the unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming while it is actually being transmitted over a cable system."  Id.  On the other hand, the Second Circuit in International Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996), held that both § 605 and § 553 apply to the distribution of cable television descramblers, relying on the statute's legislative history.  The Second Circuit recognized that while this holding results in some, but not complete, overlap between § 605 and § 553, "it is for Congress, not the courts, to address any perceived resulting disorder."  Id. at 133.

Faced with alleged violations of both § 605 and § 553 in Dock Street, Judge Nickerson adopted the view of the Seventh Circuit,[27] finding:

> § 605 applies to the interception of cable signals "before they begin to travel through the cable," while Section 553 applies to transmissions "at the point in the system that the transmission is carried by coaxial cable or wires."  Kingvision Pay Per View, Ltd., 24 F. Supp. 2d at 1183.  In other words, the statutes do not overlap. Liability does not run throughout the entire lifecycle of a signal. Rather, it is the point at which the unauthorized use occurs that determines which statute applies in a given case.

2011 WL 6141058, at *4.  Judge Nickerson held that the program at issue was intercepted by Dock Street as a cable transmission, and thus it was subject to liability under § 553 only.  The court relied on an affidavit filed by Dock Street, establishing that it received the program through the cable service provided by Comcast.  "Where Dock Street acknowledges that it showed the Program through its cable connection, there is no logical basis to posit or imagine some secondary satellite violation."  Id. at *4 n.3.

---

[27]  As Judge Nickerson noted, "[t]he Fourth Circuit has not squarely addressed the issue."  Dock Street, 2011 WL 6141058, at *3.

**2.**

Kingvision Pay Per View, Ltd. v. Duermeier, a district court case out of Kansas cited by

Judge Nickerson in Dock Street, also involved the unauthorized broadcast of a live telecast.

Plaintiff in that case owned exclusive rights to distribute a prize fight between Mike Tyson and

Evander Holyfield to closed-circuit locations such as arenas, clubs, restaurants and bars.

Defendant Duermeier contracted with his local cable provider TCI to receive and view the

program at his residence, which adjoined the bar that he owned and operated.  TCI, which had

the right to provide the event to residential cable customers but not to commercial

establishments, received the telecast via satellite radio waves and forwarded it to Duermeier's

apartment through a cable wire.  Duermeier recorded the event on his VCR when it aired at

8:00pm, and then shortly after midnight when the fight was over, he took his videotape to the bar

and played it for bar employees and patrons.  24 F. Supp. 2d at 1181.  Plaintiff sued, alleging

violations of both § 605 and § 553.  Adopting the Seventh Circuit's reasoning in Norris, the

Kansas district court reasoned:

> [A]lthough [the] first sentence of § 605 suggests that it applies to
> both wire and radio communications, even the Second Circuit in
> Sykes acknowledges that the first sentence of § 605 is probably
> "intended to regulate the conduct of communications personnel—
> ie., those legitimately involved in transmitting or receiving radio or
> wire communications—rather than to address the problem of
> unauthorized interception or reception of communications."  75
> F.3d at 131.  Thus, defendants can not be liable under the first
> sentence of § 605.  The remaining provisions of § 605, under
> Norris, apply only to radio and not cable communications.  Thus,
> because the broadcast at issue here was received over cable wire,
> defendants are not liable under § 605.

Kingvision, 24 F. Supp. 2d at 1183.

The Kingvision court went on to find no liability as to § 553, holding Duermeier did not

"intercept" the cable transmission because he contracted to have the communication arrive at his

43

apartment and it arrived there.  Id. The court stated "[t]he word 'intercept' indicates 'the taking or seizure by the way or before arrival at the destined place.'"  Id. (citing Goldman v. United States, 316 U.S. 129, 134 (1942), overruled on other grounds, Katz v. United States, 389 U.S. 347 (1967)).  While Duermeier did "receive" the program, meeting this portion of § 553, the receipt was not unauthorized, because Duermeier ordered the event and TCI delivered it to his residence.  Id.  Duermeier's subsequent broadcast of the event was not authorized, but § 553 "does not on its face prohibit videotaping and later publication of programs provided over a cable service."  Id. at 1185.

### 3.

The Coley defendants' reliance on Dock Street is misplaced.  For one thing, in Dock Street, Joe Hand alleged violations of both § 605 and § 553, and the court had to determine which statute applied to the conduct.  That same question is not currently before the court.  Here, DIRECTV alleges only a violation of § 605.  The question before the court is whether the Coley defendants' conduct violated § 605.  There can be no dispute that the conduct at issue in this case falls squarely within the ambit of § 605(a).

The first sentence of the statute reads:  "[N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception . . . ."  47 U.S.C. § 605(a).  Section 605 liability is not limited to intercepting a satellite signal from the sky, as the Coley defendants would have this court believe.  Arguably, no "interception" even occurred in this case.  As the Kingvision court recognized, the first sentence of § 605(a) suggests that it applies to both wire and radio communications and "is probably 'intended to regulate the

conduct of communications personnel—ie., those legitimately involved in transmitting or receiving radio or wire communications—rather than to address the problem of unauthorized interception or reception of communications.'"  24 F. Supp. 2d at 1183 (quoting Int'l Cablevision, Inc. v. Sykes, 75 F.3d 123 (2d Cir. 1996)).  The Coley defendants were authorized to receive the satellite signal from DIRECTV and use it to provide cable television programming to 168 units at Mountainside Villas.  What was not authorized was the transmission of that signal to more than 2,500 units throughout Massanutten Resort.  This conduct is plainly prohibited by the first sentence of § 605(a).  As such, the court cannot accept the Coley defendants' argument that DIRECTV is not entitled to summary judgment on its § 605(a) claim.

## C.

The Coley defendants further argue in opposition to DIRECTV's motion for summary judgment that there is a material issue of fact as to whether DIRECTV impliedly authorized the Coley defendants' use of DIRECTV's programming or, alternatively, waived the right to complain about a § 605(a) violation.  The Coley defendants assert that both Randy Coley and Robert Saylor notified DIRECTV that the subscriber unit counts on the Massanutten SMATV account were markedly understated, yet DIRECTV continued to send monthly invoices for 168 units.  Additionally, the Coley defendants argue that since DIRECTV does not have a complete copy of the SMATV Viewing Agreement for Massanutten Resort, upon which DIRECTV relies to show the Coley defendants' transmission of DIRECTV programming was unauthorized, there is a question of fact as to whether such an agreement was even executed and, by extension, whether the transmission was unauthorized.

The Coley defendants offer no case law to support their implied authorization theory. Nor is the court aware of any cases that recognize implied authorization with respect to § 605(a).

45

The statute makes clear that Section 605 imposes strict liability.  47 U.S.C. § 605(e)(3)(C)(iii);
see also J&J Sports Prods., Inc. v. Jorkay, LLC, No. 5:10-CV-542-D, 2013 WL 2629461, at *2
(E.D.N.C. June 11, 2013).  The Coley defendants certified to DIRECTV when setting up the
Massanutten SMATV account in 1999 that 168 subscriber units would receive DIRECTV
programming.  Decl. of Keith Waite, Dkt. # 166-1, at Ex. C.  Notwithstanding any attempts that
Randy Coley or Robert Saylor might have made to notify DIRECTV that the subscriber unit
count had changed, the subscriber unit count on the Massanutten DIRECTV SMATV account
remained at 168.  Id. at ¶¶ 32, 35.  The Coley defendants never paid DIRECTV for more than
168 units, yet as of 2011, they were providing programming to over 2,353 units at Massanutten.
Jamnback Decl., Dkt. # 166-8, at Ex. 9 at 208; see also id. at Ex. 6 at ¶¶ 14, 17, 28, 30.  It cannot
be said that DIRECTV impliedly authorized the Coley defendants to distribute DIRECTV
programming to over 2,353 units at Massanutten while only getting paid for 168.  Such an
argument is illogical.

        Moreover, the fact that DIRECTV does not have a complete copy of the SMATV
Viewing Agreement is of no moment.  DIRECTV has not asserted a breach of contract claim,
and it does not have to prove the Coley defendants knew of DIRECTV's policies concerning
SMATV programming transmission in order to establish liability under § 605(a).  Indeed, the
statute imposes liability even for conduct that is not willful.  47 U.S.C. § 605(e)(3)(C)(iii).

        The Coley defendants' waiver theory is likewise unsupported.  The cases they cite
address waiver in the context of fraud and breach of contract, not the federal statute at issue.
These cases establish that waiver "'is the voluntary, intentional abandonment of a known legal
right.  It has two essential elements:  (1) knowledge of the facts basic to the exercise of the right,
and (2) the intent to relinquish that right.'"  Bernsen v. Innovative Legal Marketing, LLC, 885 F.

Supp. 2d 830, 832-833 (E.D. Va. 2012) (quoting Bergmueller v. Minnick, 238 Va. 332, 383
S.E.2d 722, 725 (1989)).  "Since knowing intent to waive is an essential element of true waiver,
it can never arise constructively or by implication."  Employers Commercial Union Ins. Co. of
Am. v. Great Am. Ins. Co., 214 Va. 410, 413, 200 S.E.2d 560, 562 (1973).  The Coley
defendants point to no evidence that suggests DIRECTV knowingly intended to relinquish its
right to recovery under § 605.

The Coley defendants' implied authorization and waiver arguments are simply
unavailing.

### D.

The Coley defendants[28] move for summary judgment on statute of limitations grounds,
arguing DIRECTV's § 605 claim is partially time-barred.  They argue the court should apply a
two-year statute of limitations, borrowing from Virginia's anti-piracy statute, Virginia Code §
18.2-187.1, through the catch-all statute of limitations provision contained in Virginia Code §
8.01-248.  Alternatively, the Coley defendants argue the court should apply to Count 1 the two-
year statute of limitations that applies to Count 2, DIRECTV's claim under 18 U.S.C. § 2511.
Section 2520(e) provides that such a claim shall not be commenced later than two years after the
date upon which claimant first has a reasonable opportunity to discover the violation.  That
opportunity, according to the Coley defendants, occurred when Robert Saylor notified
DIRECTV in 2001 and 2003 that the Massanutten SMATV account subscriber unit count was
understated.  And even if no such reports were made, the Coley defendants argue that Saylor and
Sky Cable's knowledge of the underreporting is attributable to DIRECTV as a result of their
agency relationship.

---

[28] Kimberli Coley joins in this motion for summary judgment.

**1.**

Congress did not explicitly provide a statute of limitations for § 605.  "Generally, where a federal statute fails to provide a statute of limitations, federal courts look to the statute of limitations for the 'state statute "most closely analogous" to the federal Act in need.'"  J&J Sports Prods., Inc. v. West Side Stories, No. 5:10-CV-179-F, 2011 WL 2899139, at *3 (E.D.N.C. July 18, 2011) (quoting North Star Steel Co. v. Thomas, 515 U.S. 29, 34 (1995) (quoting Reed v. Transp. Union, 488 U.S. 319, 323 (1989) and DelCostello v. Teamsters, 462 U.S. 151, 158 (1983))).  Because of this longstanding practice, courts can assume that "'in enacting remedial legislation, Congress ordinarily "intends by its silence that we borrow state law."'"  Id. (quoting Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 355 (1991) (quoting Agency Holding Corp. v. Malley-Duff Assocs., Inc., 483 U.S. 143, 147 (1987))).  This leaves no doubt that state law is the "'the lender of first resort'" for providing statutes of limitations where federal law contains no provision.  Id. (quoting North Star, 515 U.S. at 33-34).  Courts should borrow the limitations period from a parallel state statute "'unless the state limitations period impedes implementation of national policies, is at odds with the purpose or operation of federal substantive law, or is demanded by the practicalities of litigation,'" id at *3 (quoting Kingvision Pay-Per-View Corp., Ltd. v. 898 Belmont, Inc., 366 F.3d 217, 221 (3d Cir. 2004)), in which case, courts may borrow a limitation period from an analogous federal statute.  However, courts should only borrow an analogous federal statute over a state statute of limitations when the federal statute provides a closer analogy than the available state statute, and "'when the federal policies at stake and the practicalities of litigation make the rule a significantly more appropriate vehicle for interstitial lawmaking.'"  Innovative Sports Mgmt., Inc. v. 3508 Eastern LLC, No.

48

MJG-11-3268, 2012 WL 6563378, at *2 (D. Md. Dec. 13, 2012) (quoting Reed, 488 U.S. at 326 (quoting DelCostello, 462 U.S. at 172)).

Here, the court finds it appropriate to borrow the statute of limitations from Virginia Code § 18.2-187.1. This Virginia statute prohibits any person from knowingly, with intent to defraud, obtaining or attempting to obtain, inter alia, telephone, telegraph, cable television or electronic communication service by use of false information and "by the use of any scheme, device, means or method, or by a false application for service with intent to avoid payment of lawful charges therefor." Va. Code Ann. § 18.2-187.1. The conduct prohibited by this Virginia statute is the very conduct in which the Coley defendants are alleged to have engaged. Indeed, DIRECTV raises a separate claim under § 18.2-187.1 in its amended cross-claim and third-party complaint (Count 3). Both § 605 and the Virginia statute provide for criminal sanctions as well as a civil right of action, through which aggrieved parties can recover damages, attorney's fees and costs, and seek injunctive relief. These two statutes prohibit similar behavior and provide for similar relief. The court finds Virginia Code § 18.2-187.1 to be parallel in form and substance to 47 U.S.C. § 605. Thus, the court borrows the two year limitations period applicable to § 18.2-187.1,[29] which is found in Virginia Code § 8.01-248. See West Side Stories, 2011 WL 2899139, at *4-5 (borrowing catch-all statute of limitations period applicable to N.C. Gen. Stat. § 14-113.5 for § 605 claim, finding the two statutes parallel in form and substance); see also Innovative Sports Mgmt., 2012 WL 6563378, at *3 (borrowing limitations period from Maryland's Piracy Statute, Md. Crim. Law § 7-303). But cf. Time Warner Cable Nat'l Div. v. Bubacz, 198 F. Supp. 2d 800 (N.D. W.Va. 2001) (applying three year limitations period borrowed from federal Copyright Act instead of state limitations period for conversion claim).

---

[29]  There is no suggestion that this state statute "impedes implementation of national policies, is at odds with the purpose or operation of federal substantive law, or is demanded by the practicalities of litigation." West Side Stories, 2011 WL 2899139, at *3 (quoting Kingvision Pay-Per-View Corp., 366 F.3d at 221).

**2.**

Having determined that a two-year statute of limitations applies to DIRECTV's § 605 claim, the court now turns to the issue of when the cause of action accrued.  "Case law and the relevant statutes provide little direct guidance" on the subject; however, "[t]he accrual of federal rights generally remains a matter of federal law even when a limitations period is borrowed from a statue source."  <u>DIRECTV v. Webb</u>, 545 F.3d 837, 852 (9th Cir. 2008).  "Under federal law, 'a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action.'"  <u>Id.</u> (quoting <u>Stanley v. Trustees of Cal. State Univ.</u>, 433 F.3d 1129, 1136 (9th Cir. 2006)).

DIRECTV asserts it did not discover the underreporting scheme at issue until at least December 2010 when Robert Saylor met with DIRECTV investigators, prompting DIRECTV to conduct testing at Massanutten in June 2011 to confirm that its signal was being transmitted to far more than the 168 subscriber units reported.  But both Randy Coley and Robert Saylor insist they notified DIRECTV prior to 2010 that the subscriber unit counts for the Massanutten SMATV account were not accurate and needed to be increased.  <u>See, e.g.</u>, Saylor Dep. Sept. 19, 2012, Dkt. # 164-3, at 81, 82; Coley Dep. Oct. 17, 2012, Dkt. # 180-4, at 33, 36.  DIRECTV claims it has no record of any such communications from either Coley or Saylor.  Decl. of Keith Waite, Dkt. # 166-1, at ¶¶ 36, 37.  Plainly, there is a factual dispute over when DIRECTV gained knowledge of the facts giving rise to its claim.  <u>See</u> DIRECTV's Mem. in Opp. to Coley Defs.' Mot. for Summ. J., Dkt. # 182, at 8 ("[T]here is an evidentiary dispute over when DIRECTV gained actual knowledge of the Coley Defendants' fraud . . . .").

The Coley defendants further argue that Sky Cable's knowledge of the underreporting is imputable to DIRECTV, because an agency relationship exists between Sky Cable and

DIRECTV.  "[A]gency is the fiduciary relationship that arises when one person (a 'principal')

manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf

and subject to the principal's control, and the agent manifests assent or otherwise consents to

act."  United States v. Kolon Industries, Inc., No. 3:12cr137-01, 2013 WL 682896, at *12 (E.D.

Va. Feb. 22, 2013) (citing Restatement (Third) of Agency § 1.01 (2006)).  Two factors are

necessary to prove that an agency relationship has been established.  First, the agent must be

subject to the principal's control with regard to the work to be done and the manner of

performing it.  United States v. Rapoca Energy Co., 613 F. Supp. 1161, 1163 (W.D. Va. 1985)

(citing Whitfield v. Whittaker Mem. Hosp., 210 Va. 176, 181, 169 S.E.2d 563, 567 (1969)).

"Virginia courts have looked at the extent to which the purported principal controls the methods

and details of the agent's work."  Butterworth v. Integrated Resources Equity Corp., 680 F.

Supp. 784, 789 (E.D. Va. 1988) (citing Wells v. Whitaker, 207 Va. 616, 624, 151 S.E.2d 422,

429 (1966); Griffith v. Electrolux Corp., 176 Va. 378, 388, 11 S.E.2d 644, 648 (1940)).  It is the

right to control—not actual control—that is determinative.  Rapoca Energy, 613 F. Supp. at

1163; see also Prototype Prod., Inc. v. Reset, Inc., 844 F. Supp. 2d 691, 695 (E.D. Va. 2012)

(critical test is nature and extent of control exercised by purported principal over agent);

Butterworth, 680 F. Supp. at 789 (question is not whether party exercises control over agent, but

whether he has it); Murphy v. Holiday Inns, Inc., 216 Va. 490, 493, 219 S.E.2d 874, 876 (1975)

(critical test is nature and extent of control agreed upon in contract).  "Second, 'the work has to

be done on the business of the principal or for his benefit.'"  Rapoca Energy Co., 613 F. Supp. at

1163 (quoting Whitfield, 210 Va. at 181, 169 S.E.2d at 567).  It matters not what the parties call

themselves; what matters is the actual relationship between the parties.  Id. (citing 1A Michie,

Michie's Jurisprudence § 12, p. 543 (1980)).  "The mark of an agent is the ability, whether actual

or apparent, to contract in the name of the principal and thereby bind him." Kolon Industries, Inc., 2013 WL 682896, at *13 (citing Taylor v. Mayo, 110 U.S. 330, 334-35 (1884); Chien v. Commonwealth Biotechnologies, Inc., 484 B.R. 659, 666 (E.D. Va. 2012)).  "[T]he intention of the parties is the significant element in determining whether the relationship exists. . . . [T]he intention of the parties is to be found in all the facts and circumstances of the particular case, not solely in their selfserving descriptions of their status." Eitel v. Schmidlapp, 459 F.2d 609, 614 (4th Cir. 1972) (citations omitted).

"The party who asserts the existence of [an] agency relationship has the burden of proving it." Kolon Industries, Inc., 2013 WL 682896, at *16 (alteration in original) (quoting Karl Rove & Co. v. Thornburgh, 39 F.3d 1273, 1296 (5th Cir. 1994)); accord McLean Contracting Co. v. Waterman Steamship Corp., 277 F.3d 477, 479 (4th Cir. 2002) ("[A]s a matter of settled agency law, the burden to prove agency falls upon [the party asserting it] once the issue is in dispute." (citing 3 Am. Jur. 2d Agency § 359, at 869 (2d ed. 1986))).  "Generally, the existence and scope of agency relationships are factual matters." Metco Products, Inc., Division of Case Mfg. Co. v. Nat'l Labor Relations Bd., 884 F.2d 156 (4th Cir. 1989); see also Whitfield, 210 Va. at 182, 169 S.E.2d at 568 (issue of whether nurse was agent of doctor was question of fact that should have been sent to a jury).

DIRECTV recognizes there is a factual issue as to the existence of an agency relationship between DIRECTV and Sky Cable.  DIRECTV's Mem. in Opp. to Coley Defs.' Mot. for Summ. J., Dkt. # 182, at 10.  The nature of the parties' relationship is governed by the DIRECTV SMATV Affiliate Agreement.  While the agreement expressly disclaims any agency relationship, see Suppl. Decl. of Keith N. Waite, Dkt. # 181-4, at Ex. at ¶ 5.10, that fact alone is not determinative.  See Rapoca Energy, 613 F. Supp. at 1163 ("'What the parties call themselves is

immaterial . . . .'" (quoting 1A Michie, Michie's Jurisprudence of Virginia & West Virginia, § 12, p. 543 (1980))).  The actual relationship between the parties is an issue of fact that must be resolved by a jury.

Because there are disputed issues of fact as to (a) when DIRECTV gained knowledge of the Coley defendants' unauthorized use of the DIRECTV signal at Massanutten and (b) whether Sky Cable was an agent of DIRECTV such that its knowledge of the unauthorized use is imputable to DIRECTV, the court cannot determine at this time when DIRECTV's § 605 claim accrued and apply the appropriate statute of limitations.  Thus, the court declines to find as a matter of law that DIRECTV'S § 605 claim is partially time-barred.  As such, the Coley defendants' motion for summary judgment (Dkt. # 163) on statute of limitations grounds as it relates to the § 605 claim is **DENIED** at this time.

### E.

Notwithstanding these unresolved factual issues, DIRECTV's motion for partial summary judgment as to Randy Coley and East Coast's § 605 liability is well-taken.  Application of the limitations period may be uncertain, but it is clear the statute of limitations does not shield Randy Coley and East Coast's § 605 liability entirely.  Indeed, given the nature of Randy Coley and East Coast's conduct in this case, the court finds the continuing violation doctrine tolls the limitations period.  Therefore, each act that violates the statute and injures the plaintiff "'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'"  Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997); see DIRECTV, Inc. v. Bunnapradist, No. CV-03-3399-SVW, 2004 WL 5642008, at *10 (C.D. Cal. Apr. 6, 2004) (noting use of continuing violation theory was especially appropriate in § 605 context because no single purchase of pirate access device could be identified as the cause of the continuing injury—

the receipt and use by defendant and others of DIRECTV's signal); see also DIRECTV, Inc. v. Webb, 545 F.3d 837, 853 (9th Cir. 2008) (noting as to § 605 violation, "[t]his wrongful conduct is no different from the kind of continuing tort for which the limitations period does not start running until the conduct ends."). While a plaintiff may not be able to rely on violations occurring within the limitations period as a bootstrap for injuries caused by violations that occurred outside the limitations period, see Klehr, 521 U.S. at 190; Lyons P'ship, L.P. v. Morris Costumes, Inc., 243 F.3d 789, 797 (4th Cir. 2001), at the same time, a defendant cannot use "'its earlier illegal conduct to avoid liability for later illegal conduct of the same sort.'" Bunnapradist, 2004 WL 5642008, at *10.

The fact that a jury might find DIRECTV had knowledge of the § 605 violations as far back as 2001 does not shield Randy Coley and East Coast from liability for violations committed during the limitations period. See Lyons P'ship, 243 F.3d at 797. At the very least, Randy Coley and East Coast are subject to injunctive relief and are liable for damages stemming from § 605 violations that occurred two years prior to the date DIRECTV filed suit. See Coley Defs.' Summ. J. Br., Dkt. # 164, at 21 (arguing "DIRECTV may not recover for any underpayments in violation of [§ 605] that occurred more than two years prior to the dates it filed suit against the various Coley Defendants.").

As such, DIRECTV's motion for partial summary judgment (Dkt. # 165) as to Randy Coley and East Coast's § 605 liability is **GRANTED**.

### F.

Finally, DIRECTV argues that its damages are not restricted to only those § 605 violations occurring within the two-year statute of limitations period because the doctrine of fraudulent concealment applies in this case. The doctrine of fraudulent concealment provides

that when a fraud has been concealed or is self-concealing, the limitations period begins to run only after the plaintiff discovers the fraud.  Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995) (analyzing fraudulent concealment doctrine in case filed in 1993 alleging price-fixing conspiracy from 1984 to 1987).  "It does not stop the clock; it moves the clock, starting it from when the wrong was discovered rather than when it was committed."  GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 178 (4th Cir. 2007) (citing Bailey v. Glover, 88 U.S. 342, 349-50 (1874)) (analyzing fraudulent concealment doctrine in case filed in 2005 for antitrust injuries that allegedly drove plaintiff out of business in 1994).  "The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it concealed itself until' the defendant 'could plead the statute of limitations to protect it.'"  Supermarket of Marlinton, 71 F.3d at 122 (quoting Bailey, 88 U.S. at 349).  The doctrine is to be read into every federal statute of limitations, id., including those state statutes of limitations adopted by federal law, see In re State Police Litig., 888 F. Supp. 1235, 1250 (D. Conn. 1995) (citing Riddell v. Riddell Wash. Corp., 866 F.2d 1480, 1491 (D.C. Cir. 1989)), appeal dismissed, 88 F.3d 111 (2d Cir. 1996).

To invoke the doctrine of fraudulent concealment, a plaintiff must demonstrate that: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence."  Supermarket of Marlinton, 71 F.3d at 122 (citing Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir. 1974)).  With respect to the first element, the Fourth Circuit in Supermarket of Marlinton held that the "plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself."  Id. (citing Texas v.

Allan Constr. Co., 851 F.2d 1526, 1532 (5th Cir. 1988)).  However, the Fourth Circuit suggested that if the violation itself is self-concealing, the plaintiff may satisfy the first element simply by proving that a self-concealing violation has occurred.  Id. at 122-123, 123 n.1; see also id. at 128 ("In summary, we here hold: (1) because this case does not involve an inherently self-concealing antitrust violation, the intermediate, affirmative acts standard should be used . . . .").

In DIRECTV, Inc. v. Bunnapradist, CV-03-3399-SVW(SHSx), 2004 WL 5642008 (C.D. Cal. Apr. 6, 2004), the court found § 605 claims to be self-concealing by nature:

> [T]he doctrine of fraudulent concealment would apply to claims under 47 U.S.C. § 605 even if Defendant did not take affirmative steps to prevent Plaintiff's discovery of the claims at issue in this case because the unauthorized receipt of a radio communication for one's own benefit does not deprive the rightful recipient of that communication of such receipt—the act is by its very nature self-concealing, and the statute of limitation may be equitably tolled.

Id. at *9 (citing In re State Police Litig., 888 F. Supp. at 1250; New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988); Brown v. Am. Broadcasting Co., 704 F.2d 1296, 1304 (4th Cir. 1983)).

Even assuming that DIRECTV can establish the first element of fraudulent concealment, factual issues surrounding elements two and three prevent the court from determining its application to this case.  The second element of the Supermarket of Marlinton test requires DIRECTV to demonstrate that it failed to discover facts that form the basis of its claims within the statutory period.  As noted supra, there is a factual dispute as to when DIRECTV gained knowledge of the unauthorized use of its signal.  This factual dispute also impacts the third element of the fraudulent concealment test, which requires the plaintiff to establish it exercised due diligence.  "Inquiry notice, which charges a person to investigate when the information at hand would have prompted a reasonable person to do so, touches on the diligence requirement of

part three." GO Computer, Inc., 508 F.3d at 178 (citing Brumbaugh v. Princeton Partners, 985 F.2d 157, 162 (4th Cir 1993)).  While "a diligent plaintiff need not engage in ceaseless inquiry when reasonable inquiry does not expose grounds for suit," a negligent plaintiff is not excused from the diligence requirement, even if the fraud is well-disguised.  Id. at 179; see also Supermarket of Marlinton, 71 F.3d at 128.  Here, the parties dispute when DIRECTV received actual and/or inquiry notice of the § 605 violations.

Therefore, the court cannot determine whether application of the fraudulent concealment doctrine is appropriate in this case.[30]  DIRECTV's motion for partial summary judgment (Dkt. # 165) as to damages under § 605 is **DENIED** at this time.  The measure of damages to be awarded DIRECTV on Count 1 will be calculated after these outstanding factual issues are resolved.

## VI.

To summarize, Sky Cable lacks standing to bring its claims in this case.  While the court has personal jurisdiction over Kimberli Coley, her liability to DIRECTV must be determined by the trier of fact.  DIRECTV has established as a matter of law Randy Coley and East Coast's liability under 47 U.S.C. § 605.  However, there are disputed issues of fact that impact application of the statute of limitations and, thus, the measure of damages to be awarded DIRECTV under § 605.  These issues must be resolved by a jury.

---

[30]  Randy Coley, Kimberli Coley, and East Coast argue in their summary judgment motion that the remaining four claims brought by DIRECTV are subject to two-year statutes of limitations and are therefore partially time-barred. Case law suggests that the doctrine of fraudulent concealment applies to state law claims, as well as federal claims. In re State Police Litig., 888 F. Supp. 1235, 1250 (D. Conn. 1995) (citing Connell v. Connell, 214 Conn. 242, 250, 571 A.2d 116, 120 (1990) and Bound Brook Assoc. v. Norwalk, 198 Conn. 660, 665, 504 A.2d 1047 (1986)); see Newman v. Walker, 270 Va. 291, 297-98, 618 S.E.2d 336, 339-40 (2005); Patterson v. Bob Wade Lincoln-Mercury, Inc., 48 Va. Cir. 471 (1999); see also Va. Code Ann. § 8.01-229(D).  Because there are factual issues concerning when the claims alleged by DIRECTV accrued, as well as whether the doctrine of fraudulent concealment applies in this case, the court declines to hold at this time that any of these four claims are partially-time barred.  As such, the Coley defendants' motion for summary judgment (Dkt. # 163) on statute of limitations grounds, as it applies to Counts 2, 3, 4, and 5 of DIRECTV's amended cross-claim and third-party complaint, is **DENIED**.

Therefore, for the reasons set forth herein, Kimberli Coley, Randy Coley and East Coast Cablevision, LLC's motion for summary judgment (Dkt. # 163) is **GRANTED in part** and **DENIED in part**; DIRECTV LLC's motion for partial summary judgment (Dkt. # 165) is **GRANTED in part** and **DENIED in part**; plaintiffs' motion for partial summary judgment (Dkt. # 170) is **DENIED**; plaintiffs are **DISMISSED** from this action; and this matter will be set down for further proceedings as follows.

Following the summary judgment hearing, by Order entered December 20, 2012, the court took the Show Cause Order (Dkt. # 177) under advisement as to Randy Coley, granted Sky Cable's motions to compel (Dkt. # 141 & 143) and DIRECTV's motions to compel (Dkt. # 148 & 161), and took under advisement both Sky Cable and DIRECTV's motions for attorney's fees and costs in having to file these discovery motions. The parties are **DIRECTED** to contact chambers (540/857-5124) within fourteen (14) days to schedule a hearing to resolve these outstanding issues. The parties are further **DIRECTED** to contact chambers to schedule a trial date on the remaining claims.[31]

Under 47 U.S.C. § 605(e)(3)(B)(i), a court is empowered to grant final injunctions it deems reasonable to prevent or restrain violations of § 605(a). It is appropriate to do so here. Defendants Randy Coley and East Coast Cablevision, LLC, along with their agents, employees, representatives, successors and assigns, and any persons or entities controlled directly or indirectly by Randy Coley and East Coast Cablevision, LLC, are permanently enjoined and

---

[31] The claims left to be tried are DIRECTV's § 605 claim against Kimberli Coley (Count 1), as well as the four remaining counts alleged in DIRECTV's amended cross-claim and third-party complaint—Count 2 against Randy Coley and East Coast (violation of 18 U.S.C. § 2511(1)(a)), Count 3 against Randy Coley and East Coast (violation of Virginia Code § 18.2-187.1), Count 4 against Randy Coley (fraud), and Count 5 against Randy Coley, Kimberli Coley, and East Coast (unjust enrichment). The issues of notice and agency, which impact application of the statute of limitations as to DIRECTV's § 605 claim, as well as its other four claims, will also be submitted to a jury.

restrained from engaging in any of the following acts or practices at Massanutten Resort and any of its related entities:

      1.   Reselling, retransmitting, or re-broadcasting DIRECTV's encrypted satellite transmissions of television programming through television systems owned or controlled by Randy Coley and East Coast Cablevision, LLC, or by other means not authorized by DIRECTV; and

      2.   Installing or operating DIRECTV satellite receiving equipment, including satellite dishes, integrated receivers/decoders, access cards and other equipment intended for DIRECTV's satellite television services, for use in connection to cable television systems owned or controlled by defendants Randy Coley and East Coast Cablevision, LLC, or other facility not authorized by DIRECTV.

      An appropriate Order will be entered.

Entered:  July 11, 2013

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge

59