**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**Harrisonburg Division**

| | | |
|---|---|---|
| **Sky Cable, LLC, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.:  5:11-cv-00048-MFU** |
| | ) | |
| **Randy Coley, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DIRECTV'S MOTION FOR SUPPLEMENTAL PROCEEDING TO DETERMINE WHETHER ASSETS CONTROLLED BY JUDGMENT DEBTOR RANDY COLEY ARE SUBJECT TO THE JUDGMENT

Under Federal Rule of Civil Procedure 69(a), judgment creditor DIRECTV LLC moves for this supplementary proceeding in aid of the judgment, seeking a determination of what property Randy Coley, as the judgment debtor, has that could be subjected to execution. Specifically, DIRECTV moves for an order declaring that Mr. Coley is the alter ego of his single-member LLCs and that because he has abused the corporate form to evade the judgment, the property he holds in his LLCs are subject to the judgment.

Since the judgment was entered in January 2014, Mr. Coley has not paid a penny to DIRECTV but has maintained his affluent lifestyle by living off his various income streams—all of which he routes through his sham LLCs.  During post-judgment discovery, he has shown he is willing to commit perjury and proffer fraudulent documents to further his goal of evading this judgment.  His brazen misconduct should come as no surprise, since the underlying case concerned his systematic theft of DIRECTV satellite programming, which he sold for hundreds of thousands of dollars in annual profits.  Throughout this proceeding, Mr. Coley has been recalcitrant, dishonest, and evasive, compounding the burden on DIRECTV and draining judicial resources.

The facts support the requested remedy.  Mr. Coley and his LLCs are merely two sides of the same financial coin:  he commingles the funds of his alter-ego entities, treats their assets as *his* personal assets, maintains no records concerning the inter-dealings of these entities, keeps no accounting of their expenses and income, and avoids paying taxes through underreporting income.  There could not be a clearer set of facts to justify veil-piercing than those here.  An overview of Mr. Coley's abuse of the corporate form is set forth below.

## I.  BACKGROUND

### A.    Entry of Judgment against Coley Defendants

The Court is familiar with the background of this case.  In January 2014, the Court granted judgment in favor of DIRECTV against Randy Coley, Resort Cable LLC and East Coast Cablevision LLC ("Coley defendants") in the amount of $2,393,000, plus interest, for violations of the Federal Communications Act, 47 U.S.C. § 605(a).  (ECF No. 219, 220.)  In September 2014, this Court affirmed a magistrate judge's award of an additional $236,013.85 in attorney's fees and costs to DIRECTV.  (ECF No. 236.)

### B.    Post-Judgment Discovery Issues

In December 2014, DIRECTV served discovery requests on the Coley defendants under Federal Rule of Civil Procedure 69(a)(2) to aid the judgment execution.  Mr. Coley did not respond to these discovery requests for nearly six months—and only then after he was under threat of sanctions from the Court.  On May 15, 2015, the Court held a show-cause hearing at which Mr. Coley appeared *pro se* and was directed to attend an in-court deposition, which occurred on June 16, 2015.  (ECF No. 254.)  He eventually retained counsel and produced some financial records on June 1, 2015.

Mr. Coley recently sought credit for bringing a "full trailer load of documents pertaining to [his] financial affairs" to his deposition.  (ECF No. 264 at 5.)  But while he may have brought numerous papers for effect, he could not answer basic questions about the flow of money

between his entities and to himself.  *See* Exhibit 1[1] (6/16/15 Dep Tr. at 122:23-24) ("Q:  What was the source of the $37,000 deposit?  A: I couldn't tell you."); *Id*. at 123:9-16 ("In the middle of the page on December 9th you'll see a deposit of $118,890.99.  Do you see that?  A: Uh-huh.  Q:  What can you tell me about that deposit and its source?  A:  Without looking at the records, I couldn't tell you, sir.").  After the deposition, he declined to provide more details of his financial practices.  (Ex. 2.)

On August 12, 2015, the Court awarded DIRECTV $5,285 in attorney's fees and expenses as a sanction for Mr. Coley's handling of post-judgment discovery.  (ECF No. 269.)

**C.      Randy Coley's Limited Liability Companies**

As the Court is now aware, the challenge of collecting the judgment from Mr. Coley does not stem from his lack of assets.  The problem is that Mr. Coley is willing to take any steps— legal or otherwise—to evade his obligations.  Indeed, he has seemingly been preparing for this moment for some time.  In 2008, Mr. Coley put his assets, including his personal residence and vacation home, among many other properties, into Its Thundertime LLC, his single-member limited liability company, which he has described as a "real estate holding company."  *See* Ex. 3 (9/18/12 Dep. Tr. at 50:20-51:9; 73:5-6; 75:10-19; 98:17-99:8).  During his depositions in this case, Mr. Coley would not explain why he put his personal residence and vacation home in North Carolina into Its Thundertime LLC.  (*Id*. at 75:19-76:6; Ex. 1 at 85:13.)  But his testimony is not needed to recognize that he took this step to shield his personal assets from judgment creditors.

Thus, because Mr. Coley holds no assets in his own name, the focus of post-judgment discovery has been on his single-member LLCs.  Its Thundertime LLC has been discussed in this case, but little has been known about the other LLCs through which Mr. Coley operates:  East Coast Sales LLC and South Raleigh Air LLC.[2]  An overview of these entities is below.

---

[1] All exhibits referenced here are attached to the supporting Declaration of John H. Jamnback.

[2] East Coast Cablevision appears no longer to be functioning.  (Ex. 1 at 9:25-10:9.)

### 1. Its Thundertime LLC

Its Thundertime is a single-member LLC through which Mr. Coley owns at least eighteen properties. (Ex. 4.) Most of these properties were originally acquired by Mr. Coley in the late 1990s/early 2000s and then transferred into Its Thundertime when it was formed in 2008. (*Id*.) Public records show that these properties have significant net value. (*Id*.) More information about Its Thundertime and how Mr. Coley actually operates this LLC is set out later in this brief.

### 2. East Coast Sales LLC

While much of the attention has been focused on Its Thundertime, discovery has shown that the main entity through which Mr. Coley operates is East Coast Sales, which is his trailer-sales business based out of Raleigh, NC. (Ex. 1 at 10:16-18.) The evidence in this case establishes that this entity is also a single-member LLC. (Ex. 3 at 90:16-18.)

In his earlier deposition, Mr. Coley stated that the purpose of East Coast Sales was to sell trailers. (Ex. 3 at 89:10-13.) He also listed "trailer sales and service" as the purpose of this business in his June 2015 interrogatory answer. (Ex. 5 at 127.) In his recent deposition, however, Mr. Coley tried to explain why so much money was being routed through that entity's bank account, by claiming that, in addition to selling trailers, it also is a "property management company that oversees . . . all these properties for us." (Ex. 1. at 11:24-12:1.) This explanation does not make sense, but he insisted that "East Coast Sales will oversee certain properties with Its Thundertime"—whatever that means. (*Id*. at 12:3-6.)

### 3. South Raleigh Air LLC

According to Mr. Coley, South Raleigh Air LLC exists to "manage[] and collect[] rent money from the [Its Thundertime] properties that East Coast Sales does not," which are four properties located at the Fuquay Varina, NC airport. (Ex. 1 at 29-30.) The reality is that Mr. Coley simply deposits rent payments into this LLC's account and then pays a variety of his own expenses from it, including cars and the mortgage on his airport properties, as discussed more below. He also uses this account to receive the rental income from his single-family property in Wilson, NC, which is held within Its Thundertime. (Ex. 1 at 114:9-115:17.)

According to the records of the North Carolina Secretary of State, South Raleigh Air LLC was administratively dissolved on February 5, 2015. (Ex. 6.)

**D.      Mr. Coley Falsely Testifies about Its Thundertime's Membership**

Before reviewing these entities in more detail, one part of this post-judgment discovery process merits discussion. For the first time, Mr. Coley now claims that his wife, Kimberli Coley, is—and has always been—his co-member in Its Thundertime and his other entities. The Court may recall that Ms. Coley was named as a defendant in the underlying action, and, in seeking her dismissal from the case, she and Mr. Coley swore repeatedly that she had no involvement in any of Mr. Coley's entities. This Court's March 23, 2012 Order noted that Kim Coley claimed "she is a stay-at-home mother and has no involvement whatsoever in her husband's business dealings." (ECF No. 107 at 13.)

Now at risk of losing his assets, Mr. Coley's testimony has changed. He now claims that his wife owns one-half of his entities' assets, so that (presumably) only his half of the assets is at risk for judgment collection.[3] Since he has no compunction about lying whenever it suits his interests, he pressed this falsehood repeatedly during his recent deposition. The following discussion underscores that fraud and deceit are at the core of how Mr. Coley operates. His misconduct is one of many reasons the relief sought in this motion is warranted.

**1.      The Coleys' Earlier Testimony about Kim Coley's Membership in Its Thundertime**

In the underlying case, the Coleys testified that Kim Coley had no involvement of any kind in her husband's business entities. In her January 11, 2012 declaration supporting her motion to dismiss (ECF No. 75), Ms. Coley swore she was "not and [has] never been involved as an owner, member, stockholder, director, officer, partner, agent, or employee of any entities associated with [Randy Coley's] work." (ECF No. 77.) In a sworn Interrogatory answer given

---

[3] Among other things, the Coleys would be collaterally estopped from even taking this position, since they vigorously contended Kim Coley was a non-member and non-participant in all of Mr. Coley's business entities in the underlying litigation, which led to her eventual dismissal from the lawsuit. Moreover, even if Mr. Coley *had* since taken steps to transfer interests to Ms. Coley since the judgment was entered, those efforts would constitute a fraudulent conveyance.

in August 2012, Ms. Coley responded "none" when asked to state her interest in "any and all joint ventures, partnerships, or other business enterprises" in which she was "engaged or had any interest in either solely or jointly with others since June 1, 1999." (Ex. 7 at 150.) Similarly, Ms. Coley was asked specifically to "identify [her] interests in 'Its Thundertime, LLC,'" and she gave this sworn answer in November 2012: "None." (Ex. 8 at 157.) Indeed, she swore she had *no* interest in *any* "business, corporation, partnership, LLC or another entity" since 1999, including East Coast Sales LLC. (*Id*. at 3.)

At a hearing before this Court on December 20, 2012, Ms. Coley was asked in open court whether she had any "ownership interest" in Its Thundertime LLC, and Ms. Coley testified: "No, sir." (Ex. 9 at 16:3-6.) The Court itself asked Ms. Coley: "What does Its Thundertime do?" Ms. Coley responded: "I don't know." (*Id*. at 16:7-10.) She also responded "I don't know" when the Court asked her whether she was "aware of any business that It's Thundertime has done." (*Id*.)

Mr. Coley himself has repeatedly testified in the same manner. In a December 15, 2011 deposition, Mr. Coley was twice asked: "Are you the sole owner of all interest in [Its Thundertime LLC]?" He responded both times: "Yes." (Ex. 10 at 163:18-21, 167:1-6.) In his deposition in this case on September 18, 2012, he was asked: "You're a member and a manager of [Its Thundertime LLC.] Who else is a member-manager of that company?" His answer: "That's it . . . I am the only one." (Ex. 3 at 50:20-24.) He was asked whether Its Thundertime has any employees, officers, or members besides himself. His answer: "No." (*Id*. at 86:7.) He was asked specifically: "Does your wife play any role in Its Thundertime LLC?" (*Id*. at 86:13-15.) His answer: "No." (*Id*.)

## 2.    Its Thundertime Operating Agreement.

During the same period as this testimony, Mr. Coley produced the operating agreement for Its Thundertime, which showed he was its sole member and manager. On November 1, 2012, in response to a discovery request, Mr. Coley, through counsel, produced the document attached

as Ex. 13 to the Jamnback Declaration.  The document is entitled "First Amendment to and Restatement of the Operating Agreement of Its Thundertime LLC" and states that the LLC "was established on April 10, 2008" and that Randy Coley is "its sole Member."  (Ex. 13 at 248.)  This agreement, dated October 31, 2012, "amends" the original operating agreement, which is appended to this document (*Id.* at 602) and which also reflects that Mr. Coley is the sole member of Its Thundertime.  (*Id.*)  Mr. Coley produced only these documents in response to discovery requests for the operating agreement for Its Thundertime.

### 3. Mr. Coley's June 2015 Deposition Testimony

Mr. Coley evidently did not review or remember giving his earlier testimony and discovery responses before attending his recent deposition, which occurred on June 16, 2015. Indeed, his testimony showed his contempt for the oath that he had taken before Magistrate Judge Ballou at the start of his deposition.  He came to the deposition to testify that Kimberli Coley was a co-member of his LLCs, including Its Thundertime, and had been since "day one." (Ex. 1 at 44:18-20.)  Not only was she his co-member, but, according to Mr. Coley, "she's more of [an] active participant in this company than [he was]" and "always has been."  (*Id.* at 45:8-13, 17.)  He then identified all the activities—"filings" and "paperwork"—that Ms. Coley performed for "several hours per week" at the office.[4]  (*Id.* at 45:19-46:1-22.)

When confronted with his earlier testimony, Mr. Coley had a variety of shifting explanations.  First, he tried to retreat from the testimony he gave minutes earlier:  "[M]y wife has been – my wife has been – I don't consider her a member; I consider as a wife – as my wife. She's been a – if you want to consider her a member – But I'm the only one that actually does any work-work outside . . ."  (*Id.* at 53:9-12.)  But ultimately he decided to dig in and persist with his perjury.  He blamed counsel for trying to "trick" him because his "wife has been a member since day one" and, despite saying moments earlier that he was the "only one that

---

[4] Mr. Coley also testified Kim has a "key" to his office.  (Ex. 1 at 46:15-22.)  In his September 2012 deposition, Mr. Coley testified that "As long as I've known her for nineteen years . . . [s]he's never worked.  She doesn't even have a key to my office."  (Ex. 3 at 80:16-81:2.)

actually does any work," claimed she has been a "huge part of these companies . . . More than I have." (*Id*. at 54-21:56:22.) For the remainder of the deposition, Mr. Coley insisted that he must have misunderstood the questions in his earlier depositions and thought Kim must have been confused too. (*Id*. at 57-64.) Indeed, despite all of his earlier testimony, he swore he never would "have made a statement anywhere to anybody at any time that my wife is [not] a member" of Its Thundertime. (*Id*. at 70:11-13.) He also claimed Kim had always been his co-member of East Coast Sales. (*Id*. at 19:1-5.)

**4.    Coley Produces a Fake Version of the Its Thundertime Operating Agreement**

In addition to lying throughout his deposition, Mr. Coley went a step further: he created and produced the fraudulent documents attached as Exhibit 11 to the Jamnback Declaration. These documents, which were produced in early June 2015 for the first time, included a fake operating agreement for Its Thundertime LLC—one in which Ms. Coley is listed as his co-member in the LLC. Both Randy and Kim Coley signed the fake operating agreement and backdated it to April 11, 2008. (*Id*. at 524.) In producing this document, Mr. Coley evidently forgot he had already produced the actual operating agreement nearly three years earlier.

There is little mystery as to how this fraudulent document was created. A Google search for "Delaware LLC operating agreement" returns this link as its first result: http://www.bizfilings.com/toolkit/Libraries/Tools_and_Forms_for_Download/LLCOpAgreeDel. sflb.ashx. (Ex. 12 is the document downloaded directly from this site.) This link offers a Word version of the *identical* document Mr. Coley produced—identical in font, format, and content. Mr. Coley filled in a few spaces and then tried to pawn it off as legitimate. The document is plainly false. At his deposition, when presented with the actual operating agreement for Its Thundertime that *he* had himself produced earlier in the case—but forgot about—Mr. Coley claimed ignorance: "I don't know what you're talking about. We don't have copies of this." (Ex. 1 at 66:5-6.) Eventually he arrived at this explanation: "I don't know where [this operating agreement] came from, but this was not adopted." (*Id*. at 67:19-21.)

In addition, Mr. Coley produced purported "meeting minutes" for Its Thundertime signed by him and his wife.  (Ex. 11 at 198-209.)  Note that these meeting minutes cover a period—2009 through 2015—when the Coleys were regularly testifying about her non-involvement in Its Thundertime.[5]  Kim Coley is as culpable as Mr. Coley for signing and backdating these fake documents intended to mislead DIRECTV and the Court.

### 5.    Mr. Coley's Accountant Confirms the Nature of these Entities.

The falsity of Mr. Coley's recent actions is obvious and needs no additional proof. Nevertheless, counsel for DIRECTV contacted the accounting office of Scott Dewey CPA, in Cary, North Carolina, which prepared Mr. Coley's recently filed tax returns.  Tax preparer Scott Simpson prepared the returns and worked with Mr. Coley on them.  Mr. Simpson signed the declaration attached as Exhibit 14.  As stated in the declaration, Mr. Coley contacted Mr. Dewey's accounting office after the IRS "had contacted [Coley] about his failure to file returns for several years."[6]  (*Id.*, ¶ 2.)  Mr. Coley produced these tax returns (for years 2009-2014) in recent discovery.[7]

The profit and loss from Mr. Coley's three LLCs (Its Thundertime, East Coast Sales, and South Raleigh Air) are reported on Schedules C and E to his individual return.  Mr. Simpson explained that Mr. Coley "told [him] that he was the only member of these three LLCs," so the accountants "prepared and filed the returns accordingly."  (*Id.*, ¶ 7.)  "As single-member LLCs, they are 'disregarded' for federal income tax purposes" and thus are included directly on Mr.

---

[5] The amateurish nature of these meeting minutes is striking—and likely intentional.  Coley also produced meeting minutes dated October 31, 2012 (Ex. 12 at 532-535) that appear real.  These minutes, which look nothing like the others, memorialize his consultation with an attorney, Robert Seidel, who assisted in preparing the October 31, 2012 amended operating agreement for Thundertime, which Coley produced earlier.  These meeting minutes tell the truth: Randy Coley is the sole member.  But, before his recent production, Mr. Coley wrote "Void" across this document and interlineated other handwritten "corrections" to "explain" why he is listed as the sole member.  (*Id.*)

[6] In earlier testimony, Mr. Coley stated he had filed tax returns since 2009.  *See* Ex. 3 at 52:24-25 (Q: "And I assume you and your wife file tax returns?  A: I file tax returns.").  At the December 2012 hearing, he asserted his Fifth Amendment rights in response to questions about having filed tax returns.  *See* Ex. 9 at 32:15-17 (Q: "Have you filed personal tax returns?  A: "Your honor, in respect to you and your court, and advice from my counsel, I exercise my right to the Fifth Amendment.")

[7] These returns do not include Kim Coley, who evidently filed no return nor was included on her husband's return.

Coley's return.  (*Id.*, ¶ 6.)  Mr. Simpson explained that, if there were other members of these LLCs, "the profit and loss information would instead have been reported on a K-1 schedule (Form 1065) to each member."  *Id.*  In short, no income, nor K-1, was issued to Kim Coley because she is not a member of any of Mr. Coley's entities.

This discussion of Mr. Coley's fraudulent testimony and document production is only part of this story.  The way he operates his entities and conducts his financial affairs is similarly deceitful and disdainful of basic standards.

**E.    Mr. Coley's Abuse of His LLCs.**

There are multitudes of ways in which Mr. Coley abuses the corporate form:

**1.    Mr. Coley's Uses the Assets of his Entities to Fund His Lifestyle.**

Mr. Coley has set up a comfortable lifestyle for himself through having his entities pay for his personal expenses and by taking money out of his entities whenever he wants.

**Mr. Coley's Personal Bank Account.**  Mr. Coley regularly deposits and withdraws sizable amounts of cash and transfers money to himself directly from his LLC's accounts.  In 2014 alone, Mr. Coley transferred over $120,000 in cash into his personal account, much of which came directly from East Coast Sales' account.  (Ex. 15.)  The regular cash deposits—there are several per month—foreclose tracing their source.  He also takes checks made out to East Coast Sales and deposits them directly into his personal account.  (Ex. 16.)  But despite transferring this sizable income to himself, he reported $0 as his personal income on his 2014 tax return filed in May 2015.  (Ex. 17.)  In his recent interrogatory response, he similarly contended he "takes no salary," nor "income," from his LLCs and that he had $0 in cash.  (Ex. 6.)

Mr. Coley also routes his LLCs' money through his wife, Kim, even though he told his accountants she draws no income, and she pays no taxes.  (Ex. 14, ¶ 3.)  He also testified at his recent deposition that she has no income other than what he puts into her account.  (Ex. 1. at 16:11-15).  Nevertheless, in December 2013, one month after the Court granted summary judgment against him (ECF No. 214), Mr. Coley withdrew $90,000 from the bank account of Its

Thundertime and issued a cashier's check to Kim Coley.  (Ex. 18.)  How the Coleys used these funds is unknown.

**Personal Residence**.  While Mr. Coley routinely deposits money from his entities directly into his personal account, he also uses the accounts of his entities to pay for most of his personal expenses.  His personal residence in Cary, North Carolina, of which Its Thundertime LLC is the named owner, is nearly 7,100 square feet according to public records and has a market value of around $1,000,000.  (Ex. 19.)  The Coleys (not Its Thundertime) obtained the mortgage from Fidelity Bank for this residence, and the Coleys owe monthly payments to the bank.  (Ex. 20.)  But Mr. Coley pays the monthly mortgage with a check drawn from the account of East Coast Sales, his trailer business.  (Ex. 21.)  He pays the annual property taxes from the account of Its Thundertime.[8]  (Ex. 1 at 118:25-119:14.)  Of course, he falsely told the IRS that *he* paid the interest on these loans, and that *he* paid the property tax bills, to benefit from the corresponding tax deduction.  *See* Ex. 1 at 78:3-10 ("Q:  So . . . you're the borrower, Its Thundertime is the owner, and this mortgage payment is paid by East Coast Sales every month, isn't it?  A:  Correct.  Yes.  Q:  And you claimed the interest on this loan as a personal deduction on your 1040, didn't you?  A:  Through 2014, correct.")  This sequence perfectly captures the lack of distinction between Mr. Coley and his entities:  Its Thundertime "owns" the property; Mr. Coley obtained the mortgage for the property and lives in it; East Coast Sales pays the monthly obligation; and Mr. Coley takes the tax deductions.  His "explanation" for why monies flow so freely between his entities and him is that "it's how it's been done."  (Ex. 1 at 78:17.)

**Personal Vacation Home.**  There is a similar arrangement for Mr. Coley's million-dollar lakefront weekend home in Macon, North Carolina.  (Ex. 22.)  This property, too, is held within Its Thundertime.  Mr. Coley personally borrowed the money to acquire the property, and the monthly mortgage payment is $5,292.21.  (Ex. 4.)  He again uses the bank account of his trailer business, East Coast Sales, to pay this personal obligation.  (Ex. 23.)  While this vacation home

---

[8] Mr. Coley has never paid rent to Its Thundertime for living in its property.  (Ex. 1 at 87:2-4.)  Moreover, he does not claim as income the funds he uses from East Coast Sales to pay his personal obligations.  (*Id*. at 89:16-24.)

is "owned" by Its Thundertime LLC and paid for by East Coast Sales, Mr. Coley takes

deductions related to this property from his *personal* tax return.  (Ex. 15.)  He thinks it is

appropriate to do so because:  "The loan's to me."  (Ex. 1 at 80:3.)  When he is asked:  "But you

didn't pay any of the interest; did you?"  He answers:  "Whatever – however you twist it up, sir."

(*Id*. at 80:3-8.)  Mr. Coley did not tell the accountant preparing his returns that he did not pay any

of the loan interest.  (*Id*. at 88:6.)

      **Car Payments.**  Mr. Coley owns a 2012 Toyota Camry and 2014 Toyota Tundra, for

which he applied for financing through Toyota.  (Ex. 24.)  Mr. and Mrs. Coley applied for the

financing, and, on their November 26, 2013 application, Mr. Coley states his salary as $176,000

through "East Coast Cable."  (Ex. 25.)  Each month, Mr. Coley draws money from the South

Raleigh Air account to pay the car loans (totaling $911 monthly).  (Ex. 1 at 73:20-23; Ex. 26.)

      **Other Expenses.**  At his deposition, Mr. Coley admitted he uses his businesses to pay for

his personal mortgages, his personal vehicles, and numerous other expenses.  (Ex. 1 at 154-155.)

He was asked whether he personally paid any of his bills and could cite only a light bill as an

expense he "personally" pays.  (Ex. 1 at 155:9.)

      **2.**      **Mr. Coley Commingles the Assets of his Entities and Observes No
Distinctions between Them.**

      Not only does Mr. Coley use the money of his entities as personal piggy bank, but he also

commingles the assets of each of his entities, which are indistinguishable—they are names on

bank accounts that he uses however he wants.  The money generated from these entities goes

wherever Mr. Coley needs it at a given moment.

      For instance, Mr. Coley deposits all of the rental income generated by Its Thundertime's

properties into the accounts of South Raleigh Air and East Coast Sales.  *See* Ex. 1 at 80:15-24

("East Coast Sales gets money and has gotten money from many years from Its Thundertime

rental income. . . . Same thing with South Raleigh Air.  It receives money in from Its

Thundertime rental properties.")  Its Thundertime is listed on paper as the owner of these

properties, but this whole structure is a farce.  Its Thundertime never borrowed money to acquire

the properties.  (*Id*. at 77.)  It receives none of the rents.  (*Id*. at 120.)  It does not "manage" the properties.  (*Id*. at 11.)  It does not make payments on the loans for the properties.  (*Id*. at 87.)  It does not pay most of the expenses on the properties.  (*Id*. at 115.)  When property taxes are due at year-end, Mr. Coley transfers money from East Coast Sales to Its Thundertime's account to cover the checks.  (*Id*. at 118-119.)

In reality, Mr. Coley presides over a series of income streams and distributes and uses this cash however he wants.  Consider further how he manages his real estate income:

**Top Sail Beach Property.**  Through Its Thundertime, Mr. Coley owns a beachfront vacation home in Top Sail Beach, NC.  Since April 2014, this property has grossed $133,495 in rental income, and Mr. Coley himself has received $86,700 of that amount.  (Ex. 27.)  While Its Thundertime is the "owner," the property manager's statements are directed, and the payments made, to "East Coast Sales LLC"—the "trailer" business.  (*Id*.)  Mr. Coley reported the income and expenses for this property on the tax schedule for Its Thundertime, despite that it received none of the income.  (Ex. 17.)  Even worse, on his 2014 tax return he reported receiving less than $20,000 in income for this property and operating at a net loss of -$1,634—figures that grossly understate the amount of taxable income from this property.  (*Id*.; Ex. 27.)

**Other Rental Properties.**  Twelve of the properties Mr. Coley holds in Its Thundertime are rental properties managed by Buyers Resource Realty ("BR Realty").  (Ex. 28.)  BR Realty prepared a rental income summary showing that these twelve properties generated $85,536 in rental income in 2014.  (*Id*.)  Even though the properties are "owned" by Its Thundertime, the rental payments are made each month to East Coast Sales.  Exhibit 29 is a copy of checks BR Realty issued to "East Coast Sales USA" reflecting the August 2014 rent payments, which Mr. Coley then deposited into that entity's account.  BR Realty issued the 1099 form to "It's Thundertime LLC d/b/a East Coast Sales USA LLC."  (Ex. 28.)

Of course, Mr. Coley did not accurately report the payments on his tax return.  The 1099 from BR Realty shows the rental income he has received far exceeds what he reported on the schedule for Its Thundertime—a fact he could not explain at his deposition.  (Ex. 1 at 148-152.)

**Other Properties**.  Not surprisingly, this pattern is consistent across the properties Mr. Coley owns and manages.  Mr. Coley personally borrowed the funds to acquire four properties near the Fuquay Varina, NC airport.  (Ex. 1 at 81:14-20.)  The properties are held within Its Thundertime.  (*Id*. at 81:21-22.)  Mr. Coley uses the bank account of South Raleigh Air LLC to pay the monthly mortgage.  (*Id*. at 81:25-82:2.)  Of course, for tax purposes, Its Thundertime takes the business expense associated with these mortgage payments, even though no money from its accounts is used to pay these obligations.  (Ex. 17.)

In sum, money flows freely between all of these interchangeable entities and to Mr. Coley.  The structure is a paper-thin charade.

## II.  ARGUMENT

### A.    Factors for Reverse Veil Piercing

This motion seeks an order from the Court reverse-veil piercing Mr. Coley's LLCs, thus subjecting the assets he holds within them to the judgment in this case.  While the remedy of "reverse-veil piercing" is considered an extraordinary one, Mr. Coley's use of his three single-member LLCs amounts to nothing more than a fraudulent scheme set up to cheat judgment creditors and the government.  The remedy is warranted.

Reverse veil-piercing is "appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted."  *LFC Mktg. Group, Inc., v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).  As one court explained:  "Although one purpose of corporation law is to limit shareholders' liability for corporate debts . . . corporations are not intended to be used to shelter the assets of shareholders from lawful claims of judgment creditors."  *Winey v. Cutler*, 678 A.2d 1261 (Vt. 1996).

In Virginia, reverse-veil piercing is available when "the litigant who seeks to disregard a [corporate] entity must show that the [entity] sought to be pierced has been controlled or used by the debtor to evade a personal obligation, to perpetrate a fraud or a crime, to commit an injustice,

or to gain an unfair advantage."[9]  *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 12 (2003);

*Medici888, Inc. v. Rileys Ltd.,* No. 2:12cv317, 2013 WL 5533235, at *4 (E.D. Va. Oct. 3, 2013)

("The alter ego doctrine may be used to hold shareholders liable for the debts of their corporation

(traditional veil piercing), [or] to hold a corporation liable for the debts of a sole shareholder

(reverse veil piercing.").

The Fourth Circuit has articulated several factors that "guide the determination of

whether one entity constitutes the alter ego of another," including:

> gross undercapitalization, insolvency, siphoning of funds, failure to observe
> corporate formalities and maintain proper corporate records, non-functioning of
> officers, control by a dominant stockholder, and injustice or fundamental
> unfairness[,] ... intermingling of funds; overlap in ownership, officers, directors,
> and other personnel; common office space; the degrees of discretion shown by
> the allegedly dominated corporation; and whether the dealings of the entities are
> at arm's length.

*Vitol, S.A. v. Primerose Shipping Co*., 708 F.3d 527, 541 (4th Cir. 2003) (citations and internal

quotation marks omitted).  "The conclusion to disregard the corporate entity may not, however,

rest on a single factor, whether undercapitalization, disregard of corporation's formalities, or

what-not, but must involve a number of such factors; in addition, it must present an element of

injustice or fundamental unfairness."  *De Witt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*,

540 F.2d 681, 687 (4th Cir. 1976).

Reverse veil-piercing has been applied in circumstances similar to this one.  In *Litchfield*

*Asset Mgmt. Corp. v. Howell*, 799 A.2d 298 (Conn. App. 2002), the debtor, a 97% owner of an

LLC, contributed assets to the LLC after the plaintiff sued.  Other owners, including the debtor's

daughters, contributed $10 each.  Relying on traditional corporate veil-piercing rules, the court

---

[9] To the extent Delaware law guides the analysis on "veil piercing," similar factors are used, and the analysis ultimately turns on "injustice and unfairness."  *See Trevino v. Merscorp, Inc.*, 583 F.Supp.2d 521, 528 (D. Del. 2008) ("While no single factor justifies a decision to disregard the corporate entity, some combination of [listed factors] is required, and an overall element of injustice or unfairness must always be present as well."). The veil-piercing factors courts are consider in Delaware are: (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; or (5) whether, in general, the company simply functioned as a façade for the controlling shareholder. Delaware courts also must find an element of fraud to pierce the corporate veil.  *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063 at *3 (Del. Ch. 2008).

reverse-pierced the LLC veil, allowing the creditor to reach LLC assets.  The court emphasized the control exercised by the debtor, the debtor's unauthorized use of LLC funds to pay personal expenses, and the owner's commingling of business and personal affairs and funds.

In *C.F. Trust, Inc. v First Flight Ltd. P'ship*, 140 F. Supp. 2d 628, 645 (E.D. Va. 2001), the judgment debtor (Peterson) had "treated his corporate and personal affairs as if they were indistinguishable."  Peterson initially owned and controlled 100% of the partnership interest in his entity.  *Id*. at 633.  Six weeks after a judgment was obtained against him, he transferred half of his interest to his son and purportedly surrendered control as part of a scheme to insulate himself from payment of the judgment.  *Id*.  He used his entity "as a device to pay his personal expenses," *id*. at 633, including his primary home, his vacation home, his car payments, and his legal fees.  Like Mr. Coley, Peterson claimed that he derived no salary from his entities because the payments toward his personal expenses constituted repayments of prior loans to those entities.[10]  He maintained control and retained decision-making authority over the entity, *id*. at 634, "commingled his personal funds with the funds of entities that he controlled and owned," *id*. at 644, and "siphoned business assets for his personal use."  *Id*.  Accordingly, the court held the plaintiffs were "entitled to an order declaring that [Peterson's limited partnership] . . . [was his] alter ego[] . . . and that its assets are subject to" the judgment.  *Id*. at 645.

**B.**     **Reverse Veil Piercing Is the Appropriate Remedy.**

The facts of this case are at least as egregious as those in *C.F. Trust*.  The very *purpose* of Mr. Coley's LLCs is to "evade a personal obligation," "perpetuate a fraud," "commit an injustice," and "gain an unfair advantage."  Mr. Coley's operation of his LLCs violates the most basic tenets of corporate law:

**Failure to maintain records**.  Mr. Coley does not document the actions of each of his entities, nor account for the regular commingling of funds between these entities.  No documents

---

[10] In his September 2012 deposition, Mr. Coley claimed he had no earned income because the payments to him were for loans he had given East Coast Cable.  Ex. 3 at 96:14-97:17 (explaining that the money he received from East Coast Cable reflected loan repayments).

exist that would show arms-length dealings between these entities to justify the free flow of money between them.  Mr. Coley cannot account for why he takes from one to give to another. *E.g.*, Ex. 1 at 121:22-122:2 (responding "I don't know" when asked why Its Thundertime was transferring money to East Coast Sales); *id.* at 141 (responding "I don't know" when asked how he accounts for the monies received by East Coast Sales for Its Thundertime properties).  Mr. Coley could not explain how he accounts for the roughly $150,000 that East Coast Sales receives each year that is generated by Its Thundertime's properties.  (*Id.* at 141:12-25.)  His version of "accounting" is to keep separate bank accounts for each entity.  (Ex. 1 at 94:1-5.) ("I mean, I give you the bank statement's.  That's all I've got.  That's pretty simple.")  But as shown by his tax returns, his accounting is a farce, if it exists at all.

**Commingling the assets of separate entities**.  East Coast Sales, South Raleigh Air, and Its Thundertime are the same entity.  They are just different names Mr. Coley uses for various bank accounts.  He regularly, and with no explanation, transfers tens of thousands of dollars between these entities—when this occurs, and how much, turns only on whatever entity happens to have the funds when needed.  *See* Ex. 1 at 118:15-24 ("Q:  How do you decide when to transfer money between these two LLCs?  A:  "[I]t was December, so there must have been some tax due . . . [W]e must have had a major expense or something that needed to be paid.")  For no reason, East Coast Sales and South Raleigh Air pay the expenses associated with the properties in Its Thundertime.  Similarly, and inexplicably, there is no reason for why Its Thundertime "owns" the properties but *all* of the rental income is deposited into the accounts of the other two entities.  Mr. Coley testified that he never saw a "need" to keep the assets of these entities separate.[11]  Ex. 1 at 120:13-24 (explaining that East Coast Sales receives rental payments because: "I just didn't—I really didn't see a need, nor was it brought up with me and my wife,

---

[11] After his June 16, 2015 deposition, during which he gave contentious testimony concerning his financial practices, Mr. Coley apparently decided to change his way of operating.  Days after the deposition, he received rental payments made out to "East Coast Sales."  When he deposited them on June 18, 2015, he endorsed them on the back "East Coast Sales for deposit to Its Thundertime LLC BB&T account."  (Ex. 36.)

neither one of us brought it up that we need to contact [the property managers] and let's just pay all this money to Its Thundertime.")

**Treating business assets as personal assets**.  Mr. Coley lives rent-free in his personal residence that he owns through Its Thundertime and enjoys his expensive vacation home on weekends, which is also rent-free to him.  He and his wife drive cars that he pays for through South Raleigh Air.  There are numerous examples of his plundering the assets of his entities to pay for his personal expenses—consider that he could cite only his "light bill" as one he personally pays.  (Ex. 1 at 154-155.)  Even now, despite that this judgment is his personal obligation, he has paid his current lawyers with checks drawn from Its Thundertime's account.  (Ex. 30.)  At his whim, he transfers thousands of dollars out of his entities' bank accounts and takes it for himself (yet claims none of the cash as taxable income).  He also regularly deposits cash and checks—drawn from his LLCs—into his wife's account.  (Exs. 18, 31.)  He does not hesitate to take whatever he wants, whenever he wants it.  It is all the same pot of assets to him.

**Overlapping and dominating ownership and control**.  Mr. Coley alone controls these three entities.  There are no other members or managers.  He is accountable to no one and directs the flow of money between these entities and to himself.

**Multiple entities with the same office/address.**  Randy Coley, Kim Coley, South Raleigh Air, and Its Thundertime all use the same address for banking and other purposes:  3008 Air Park Road, Fuquay Varina, NC.  (Ex. 32.)  East Coast Sales, which sometimes operates as a d/b/a for "Its Thundertime," is located at 501 Tryon Road, Raleigh, NC, which is the address both Its Thundertime and East Coast Sales use with the North Carolina Secretary of State.  (Ex. 33.)  Moreover, East Coast Sales' bank account statements are sent to P.O. Box 69, Willow Spring, NC (Ex. 34), which is the same address to which Its Thundertime's property tax notices are sent.  (Ex. 35.)  Again, because Mr. Coley alone is at the center of these entities, he uses these three addresses interchangeably for his entities.

**Misrepresentation of the identity of members**.  Mr. Coley committed perjury when he testified that his wife has always shared ownership and control of his entities.  He gave false

testimony, and cooked up a fake operating agreement, in hopes of ensuring the continued flow of money to him through his wife.  It is all a fraud and underscores that his primary goal is to evade obligations while enriching himself.

       **No "Innocent" Parties Affected.**  Courts must also consider the impact of piercing on "innocent" partners and creditors and "the availability of other remedies the creditor may pursue."  *C.F. Trust,* 580 S.E.2d at 811.  Neither of these factors is in play here.  Because there are no other members of these LLCs, no one else would be unfairly affected by the seizure of Mr. Coley's LLC assets.  *See Floyd v. IRS*, 151 F.3d 1295 (10th Cir. 1998) (recognizing that the harm element "may be viewed as less serious in cases where a corporation is controlled by a single shareholder . . . [and thus there are] no third-part[ies] . . . to be unfairly prejudice by disregarding the corporate form").  Moreover, without the ability to reach the assets of these LLCs directly, DIRECTV has few effective remedies in this situation.  Under Delaware statute § 18-703, a creditor of a Delaware LLC member may go through a special proceeding to obtain a "charging order," which means the "judgment creditor has only the right to receive any distribution . . . to which the judgment debtor would otherwise have been entitled . . . ."  But a charging order would be a toothless remedy in this situation because there is *no doubt* that Mr. Coley would take all steps (legal or not) to avoid distributing money to himself in a way that might be captured by a charging order.  A charging order would only allow Mr. Coley to continue his evasive tactics with impunity.  The only remedy available to DIRECTV is to find that his LLCs are his alter ego and subject his assets to the judgment.

## C.    The Issue Should Be Resolved Now.

       Mr. Coley has suggested that his LLCs should not be a part of this post-judgment process and that a separate proceeding is needed for the Court to consider the remedy sought here.  (ECF No. 264 at 2-3.)  This argument is nothing more than a delay tactic.

       There may be instances when a separate proceeding is necessary, such as when other members of a corporate entity would be affected by veil piercing or when, as in *C.F. Trust*, there are multiple creditors and debtors involved and fraudulent conveyance claims are at issue (that

may involve third parties).  Here, however, Mr. Coley is only party needed to determine which of his assets should be subject to this judgment.  There is such singularity of interest and ownership between Mr. Coley and his entities that he is the only person who is needed to resolve this issue. If he can offer evidence that his assets are properly shielded within his LLCs, he will have an ample and fair opportunity to do so.  If an evidentiary hearing is needed on this motion, the parties can appear and present additional evidence.  The very question before this Court is whether Mr. Coley and his assets are alter egos, and Mr. Coley is properly before this Court in this supplemental proceeding to address this issue.

Moreover, it cannot be ignored that Mr. Coley has shirked his obligations for a long time, and it is past time for him to account for them.  It would be a charade to pretend that these fraudulent LLCs are proper legal entities entitled to a standalone proceeding, and to suggest that additional discovery and motion practice is needed.  Indeed, it would require ignoring the overwhelming evidence presented in this motion.

### III.  CONCLUSION

Mr. Coley owes DIRECTV a large judgment because he cheated and sold satellite programming to thousands of subscribers without authority to do so.  Since January 2014, Mr. Coley has been cheating DIRECTV by hiding behind his sham LLCs and paying nothing towards the judgment.  For years, he has cheated the Internal Revenue Service.  Mr. Coley has only one mode:  to cheat.  He needs to be accountable.  His considerable assets should go towards paying the judgment rather than continuing to prop up his lifestyle.

//

//

//

//

//

//

Accordingly, DIRECTV requests an order declaring that Mr. Coley's LLCs are his alter egos and that the assets within these LLCs are subject to the judgment in this case.

Dated:  September 11, 2015.

s/John H. Jamnback
John H. Jamnback (VSB No. 27818)
Email:  jjamnback@yarmuth.com
Lyle A. Tenpenny (*pro hac vice*)
Email:  ltenpenny@yarmuth.com
Yarmuth Wilsdon PLLC
818 Stewart Street, Suite 1400
Seattle, Washington  98101
Tel: (206) 516-3800
Fax: (206) 516-3888

Robert E. Travers, IV (VSB No. 66021)
Email:  rtravers@williamsmullen.com
Williams Mullen, P.C.
222 Central Park Avenue, Suite 1700
Virginia Beach, Virginia  23462
Tel: (757) 499-8800
Fax: (757) 473-0395

*Attorneys for Defendant and Cross-Claimant*
*DIRECTV, LLC*

**CERTIFICATE OF SERVICE**

I certify that on this date the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants of record in this case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated this 11th day of September, 2015 at Seattle, Washington.

s/John H. Jamnback
John H. Jamnback (VSB #27818)
Email:  jjamnback@yarmuth.com
Yarmuth Wilsdon PLLC
818 Stewart Street, Suite 1400
Seattle, WA 98101
Tel: (206) 516-3800
Fax: (206) 516-3888

900.03 ph176601