# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

SKY CABLE, LLC, <u>et al.</u>,                )
                                             )
    Plaintiffs,           )    Civil Action No. 5:11cv00048
                                             )
v.                                           )
                                             )
RANDY COLEY, <u>et al.</u>,                  )
                                             )    By:    **Michael F. Urbanski**
    Defendants.           )            **United States District Judge**
                                             )

## MEMORANDUM OPINION

This case is proceeding in the post-judgment phase of litigation. On January 23, 2014, the court entered judgment in favor of DIRECTV, LLC against defendants Randy Coley and East Coast Cablevision, LLC (collectively, the "Coley defendants"), jointly and severally, in the amount of $2,393,000, representing 2,393 violations of 47 U.S.C. § 605(a) at the statutory minimum rate of $1,000 per violation, with interest. 47 U.S.C. § 605(e)(3)(C)(i)(II). The court subsequently ordered awards of attorney's fees and costs and monetary sanctions against the Coley defendants. They have paid nothing to date.

DIRECTV asks the court to reverse-pierce the corporate veil and declare that Randy Coley is the alter ego of his three limited liability companies, such that the assets held by those LLCs are subject to the judgment in this case. In furtherance of that effort, DIRECTV has filed a Motion for Supplemental Proceeding to Determine Whether Assets Controlled by Judgment Debtor Randy Coley are Subject to the Judgment (ECF No. 271). DIRECTV also asks the court to appoint a receiver to prevent fraud during the judgment execution process (ECF No. 292).

The facts of this case are egregious and warrant the extraordinary relief sought by DIRECTV. Justice requires a finding that Randy Coley is the alter ego of his sham corporate entities. Additionally, given Coley's history of deception and efforts to evade judgment, a

receivership is appropriate in this case. Thus, the court will reverse-pierce the corporate veil and set this matter down for further proceedings concerning appointment of a receiver.

## I.     PROCEDURAL HISTORY

This case concerns the Coley defendants' receipt and unauthorized distribution of DIRECTV satellite programming at Massanutten Resort in violation of 47 U.S.C. § 605. The underlying facts have been detailed in numerous opinions issued by the court over the course of this five year litigation and need not be repeated here. Suffice it to say that for over a decade, the Coley defendants collected programming revenue from more than 2,000 subscriber units at Massanutten Resort while reporting to DIRECTV the provision of service to only 168 units, pocketing approximately $38,000 in unauthorized subscriber fees on a monthly basis. The court entered summary judgment in DIRECTV's favor against the Coley defendants on the § 605 claim. ECF Nos. 203, 204. DIRECTV elected statutory rather than actual damages at the minimum amount of $1,000 per violation for the two years prior to the filing of DIRECTV's crossclaim. See ECF Nos. 213, 214, 219, 220. DIRECTV thereafter agreed to voluntarily dismiss all remaining claims against the Coley defendants and against Randy Coley's wife, Kimberli Coley, leaving no factual issues to be resolved by a jury. ECF Nos. 225, 226. Accordingly, the court entered judgment against the Coley defendants, jointly and severally, in the amount of $2,393,000, and dismissed the case. ECF Nos. 219, 220, 224. The clerk taxed costs against the Coley defendants in the amount of $3,052.99 at DIRECTV's request, ECF No. 234, and the court awarded DIRECTV $236,013.85 in attorney's fees and costs, adopting the recommendation of the United States Magistrate Judge without objection, ECF Nos. 235, 236.

### A. Related interpleader action·

The filing of the instant case gave rise to two related interpleader cases, which were later consolidated into Case No. 5:11cv00123. In this action, Great Eastern Resort Management, Inc.

2

(GERM)[1] and various Massanutten homeowners associations sought a determination of rights to monies owed for DIRECTV programming provided for a period of time beginning in 2011, after the instant case was filed and the Coley defendants' underreporting scheme was exposed.

Following entry of judgment in the underlying case, plaintiffs in the interpleader action moved for partial judgment on the pleadings against the Coley defendants and to compel arbitration. Case No. 5:11cv123, ECF No. 69. The motion concerned the Coley defendants' refusal to perform under a January 3, 2012 settlement agreement entered into between the parties in connection with the Chapter 11 bankruptcy proceedings of defendant East Coast Cablevision, LLC. The Coley defendants had agreed to convey to GERM whatever interests they had in certain cable television infrastructure at Massanutten Resort and to arbitrate the amount to be paid for that infrastructure. In exchange, East Coast Cablevision obtained a dismissal of its bankruptcy and resumed use of the company's remaining assets. This agreement was negotiated and drafted by counsel and recited at a January 3, 2012 hearing before the bankruptcy court, at which Randy Coley was present. Based on the representations by the parties as to the terms of the settlement, the bankruptcy court approved the joint settlement agreement, granted the plaintiffs' motion for relief from the automatic stay, and ultimately dismissed East Coast Cablevision's bankruptcy.

Thereafter, the Coley defendants refused to comply with their obligations under the agreement, alleging one of the signatories to that agreement, Kimberli Coley, never assented to its terms—notwithstanding the fact the bankruptcy court had expressly found that: "On January 3, 2012, the Massanutten Parties, the Debtor, by and through its Debtor Designee, Randy P. Coley, Resort Cable, LLC, **and Kimberli Coley** reached an agreement resolving numerous issues related to certain Cable Service Infrastructure at the Massanutten Resort." See Case No. 5:11cv123, ECF No. 58-3, at 2-3 (emphasis added).

---

[1] GERM is a repository of payments for television cable services received by various recreational facilities, business operations and timeshares at Massanutten Resort.

3

The Coley defendants' actions forced the Massanutten plaintiffs to turn to the court for relief. Plaintiffs accused the Coley defendants of "playing fast and loose with the federal judiciary." Case No. 5:11cv123, ECF No. 70, at 3. That appears to be accurate.

The Coley defendants elected not to file a written response to plaintiffs' motion for partial judgment on the pleadings and to compel arbitration. The court entered a show cause order directing Randy Coley to appear on behalf of himself and the Coley defendants at a hearing on July 25, 2014. Case No. 5:11cv123, ECF No. 79. At that hearing, Coley (and his counsel) agreed to and endorsed, on behalf of himself and the Coley defendants, a Consent Judgment Order that gave effect to the terms of the parties' January 3, 2012 settlement agreement and required the Coley defendants to execute and deliver within sixty days the instruments necessary to convey their interest in the cable infrastructure to GERM. The Coley defendants further agreed to and endorsed a separate Consent Order granting plaintiffs' motion to compel arbitration. Case No. 5:11cv123, ECF Nos. 82, 84.

Coley's signature did nothing to secure his compliance with his obligations under those orders, however. Coley inexplicably refused, numerous times, to properly execute and deliver to counsel for GERM the necessary conveyance documents, notwithstanding the fact that those documents had been approved by the Coley defendants' counsel. Additionally, Coley resisted efforts to commence arbitration by refusing to execute the arbitration engagement agreement and pay the Coley defendants' share of the retainer. GERM was again forced to turn to the court for assistance.

Following a hearing on December 10, 2014, the court held Randy Coley in contempt and awarded $8,571.95 in sanctions against the Coley defendants. Pursuant to Rule 70 of the Federal Rules of Civil Procedure, the court divested the Coley defendants' interest in the cable infrastructure and vested title in GERM. Case No. 5:11cv123, ECF No. 103.

4

Coley's recalcitrance continued following the withdrawal of his counsel from both the interpleader action and the underlying case. Acting on a written directive from Coley to cease representation, counsel for the Coley defendants moved to withdraw from the related actions on December 23, 2014. A hearing was held on January 9, 2015 and, the same day, the court entered an order granting the motion to withdraw and directing the defendant limited liability companies to secure counsel on or before January 16, 2015. Case No. 5:11cv123, ECF No. 110. No counsel ever entered an appearance for any of the Coley defendants in the interpleader action.

In a memorandum opinion and order entered February 25, 2015, the court vacated the Consent Order compelling arbitration and entered summary judgment in favor of DIRECTV, dismissing with prejudice any claim by the Coley defendants to the interpleaded funds. Case No. 5:11cv123, ECF Nos. 115, 116.

## B. Post-judgment proceedings

Unfortunately, Coley's obstructionist tactics did not end with the dismissal of the interpleader action. The underlying case was by then pending in the post-judgment phase of proceedings when Coley failed to secure counsel for his LLCs by the court's deadline of January 16, 2015. See ECF No. 241.

Coley also failed to timely respond to discovery requests issued to the Coley defendants in December 2014 in aid of judgment execution pursuant to Federal Rule of Civil Procedure 69(a)(2). Attempts by DIRECTV to confer with Randy Coley on this discovery issue were futile, and on January 28, 2015, DIRECTV filed a motion to compel. ECF No. 243. The court granted the motion and, by order entered February 26, 2015, required the Coley defendants to respond by March 26th to the discovery requests and to DIRECTV's fee request filed pursuant to Rule 37(a)(5). ECF No. 244. The Coley defendants filed no response whatsoever.

DIRECTV then filed a motion for sanctions and finding of contempt on April 6, 2015. ECF No. 245. The court issued a show cause order, directing Randy Coley to appear at a hearing on May 15, 2015 and show cause why he should not be held in contempt of court. ECF No. 249. Coley appeared pro se at the May 15th hearing, insisting he had not received the discovery requests, the motion to compel, or the court's February 26, 2015 order. The court took DIRECTV's motion for sanctions under advisement and ordered Coley: 1) to respond to DIRECTV's discovery requests on or before June 1, 2015; 2) to notify the court whom he retained as counsel on or before June 1, 2015; and 3) to appear before the magistrate judge for a sworn deposition on June 16, 2015 and bring with him all books or financial records related to Its Thundertime, LLC and any properties owned or held by Its Thundertime, LLC, as well as all information concerning assets held by Randy Coley personally and by East Coast Cablevision, LLC and related entities. ECF No. 254.

Coley did retain counsel, respond to the discovery requests, and appear at the June 16, 2015 deposition, to which he claims to have brought "a full trailer load of documents." ECF No. 264, at 5. Coley thereafter took the position that DIRECTV's motion for sanctions was moot, as he had fulfilled all of his obligations to DIRECTV and the court. ECF No. 264. DIRECTV saw things differently. It argued Coley's June 16, 2015 deposition testimony contradicted his previous sworn testimony and discovery responses, that Coley could not answer basic questions about the flow of money between his entities and himself, and that certain documents he produced related to Its Thundertime, LLC were fraudulent and back-dated. DIRECTV stated that in a forthcoming motion, it would ask the court to reverse-pierce the corporate veil given Coley's abuse of the corporate form. DIRECTV indicated it no longer sought assistance from the court in securing the Coley defendants' participation in the post-trial discovery process but renewed its motion for monetary sanctions against the Coley defendants for their previous failures to comply with court

orders. ECF No. 265. The court granted DIRECTV's motion and awarded sanctions against the Coley defendants in the amount of $5,285. ECF Nos. 268, 269.

As promised, DIRECTV filed a motion for a supplemental proceeding to determine whether assets controlled by Randy Coley are subject to the judgment in this case. DIRECTV seeks a declaration that Coley is the alter ego of his single-member LLCs, namely Its Thundertime, LLC, East Coast Sales, LLC, and South Raleigh Air, LLC. A hearing was held on November 19, 2015, at which Randy Coley appeared in person and by counsel. DIRECTV filed a supplemental request to appoint a receiver. Both motions are currently pending before the court.

The Coley defendants owe DIRECTV more than $2.6 million. As Randy Coley allegedly holds no assets[2] in his own name, the focus of these post-judgment proceedings is on his limited liability companies.

## II.     THE CORPORATE ENTITIES

### A.  Coley's limited liability companies

#### 1.  *Its Thundertime, LLC*

According to an operating agreement (and amendment thereto) produced by Coley in discovery in 2012, Its Thundertime, LLC, a Delaware limited liability company, was formed on April 10, 2008. Randy Coley is its sole member. Jamnback Decl., ECF No. 272-2, at Ex. 13.

According to an operating agreement produced by Coley in response to post-judgment discovery requests in 2015, Its Thundertime, LLC has two members—Randy Coley and Kimberli Coley. Jamnback Decl., ECF No. 272-2, at Ex. 11. This discrepancy is discussed infra in greater detail.

In any event, Coley described this corporate entity in his September 2012 deposition as "a real estate holding company." Jamnback Decl., ECF No. 272-1, at Ex. 3, p. 51. Evidence presented

---

[2] In his recent discovery responses, Coley stated he owned no assets aside from some automobiles and $200 in jewelry. See Jamnback Decl., ECF No. 272-1, at Ex. 5, p. 7.

7

by DIRECTV indicates Its Thundertime owns a total of 19 properties, including Coley's primary residence and vacation home, with a total combined assessed value of $5,232,151. Id. at Ex. 4; see also id. at Ex. 3, pp. 73, 75, 98. The profit from the rents collected from these properties goes to Its Thundertime, according to Coley's June 16, 2015 testimony. Id. at Ex. 1, pp. 31-32.

### 2. *East Coast Sales, LLC*[3]

In his 2012 deposition, Randy Coley described East Coast Sales as "a trailer company." Jamnback Decl., ECF No. 272-1, at Ex. 3, p. 89. Coley recently testified that East Coast Sales was formed around 2005, id. at Ex. 1, p. 11, is a separate entity from Its Thundertime, id. at Ex. 1, p. 13, and "was originally set up as a property management many years ago. It was just a way that we did property management. And later on we started selling trailers and it became a trailer business," id. at Ex. 1, p. 10. Corporate documents produced by Coley indicate East Coast Sales is a Delaware limited liability company formed in 2008. Coley Decl., ECF No. 277-1, at Ex. 7. These documents suggest both Randy and Kimberli Coley are members of East Coast Sales, contradicting Coley's prior testimony about Kimberli's involvement in the business. Id.; see discussion infra.

In his 2015 testimony, Coley described this LLC's primary business as selling trailers and its secondary business as "[m]anagement for rental properties." Jamnback Decl., ECF No. 272-1, at Ex. 1, p. 11; see Coley Decl., ECF No. 277-1, at Ex. 9 (business records for East Coast Sales). Coley explained that East Coast Sales acts as "a primary management company" that "oversee[s] certain properties with Its Thundertime"—specifically, rental properties owned by Its Thundertime, for which East Coast collects rental income. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 12, 80, 118. When asked why East Coast Sales needed to oversee properties held by Its Thundertime, Coley responded, nonsensically:

---

[3] East Coast Cablevision, LLC, a cable company that was the focus of much of the prior proceedings in this case, is "not in operation," according to Randy Coley's June 16, 2015 deposition testimony. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 9-10.

8

Its Thundertime was located in Delaware. We didn't have an office, per se, in Delaware. We do have a registered agent there. And we wanted—it was beneficial to us—prior to creating Its Thundertime, that's where the rental income came to. It always came to us in that fashion prior to it being a business, prior to Its Thundertime being a business.

The original thought was—of East Coast Sales was selling real estate; buy, sell rental real estate. That was the original plan. It's not—actually still not called East Coast Trailer Sales, it's just called East Coast Sales.

Id. at Ex. 1, pp. 12-13.

        3. *South Raleigh Air, LLC*

According to Coley, South Raleigh Air "manages and collects rent money from the properties that East Coast Sales does not." Id. at Ex. 1, p. 29; see Coley Decl., ECF No. 277-1, at ¶ 32. Randy Coley testified that this is the oldest of his LLCs, created after Coley and his wife bought 4 airport hangers in Raleigh. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 29-30. These properties—as well as the single family home in Wilson, North Carolina where Coley grew up—are owned by Its Thundertime but managed by South Raleigh Air. Id. at Ex. 1, pp. 31-32, 115. South Raleigh Air collects rent on these properties, pays the operating expenses, and then the profit is paid to Its Thundertime. Id.

### B. Kimberli Coley's membership interest

In a rather surprising turn of events, Kimberli Coley's membership interest in the above-referenced LLCs has become a point of contention in these post-judgment proceedings. Throughout the underlying litigation, Randy and Kimberli Coley adamantly maintained that Kimberli Coley had no involvement whatsoever in her husband's cable business or in his business ventures generally. For example, in a brief in support of her motion to dismiss for lack of personal jurisdiction, Kimberli Coley represented that she "is not and has never been involved as an owner, member, stockholder, director, officer, partner, agent, or employee of any entities associated with

9

her husband's work. (K. Coley Dec. ¶ 4) (R. Coley Dec. ¶ 15))." ECF No. 76, at 3; see also K. Coley

Aff., ECF No. 77, at ¶ 4. In his 2012 deposition, Randy Coley testified that Kimberli Coley "hadn't

worked a day in her life as far as [he has] known her . . . She's a homemaker. She takes care of two

boys." Jamnback Decl., ECF No. 272-1, at Ex. 3, p. 139. He explained:

> I don't think my wife has ever seen a bill. As long as I've known her
> for nineteen years, and we've been married for nineteen years, my
> wife has never paid the first bill. Not a light bill. Not a phone bill.
> She ain't paid a mortgage payment. She ain't paid a water bill. She
> doesn't work. She never worked. Mr. Jamnback, my wife's beyond
> reproach. Do you understand what I'm saying? And going to tell
> you why. She donates every day, every hour of her time to the
> community. She ain't worked since I've known her.

Id. at Ex. 3, p. 80.

While much of the focus in the underlying case was on Coley's cable business and the extent

of Kimberli Coley's involvement with East Coast Cablevision, LLC, Randy Coley was asked

specifically in his 2012 deposition whether his wife had any involvement in Its Thundertime, LLC

and East Coast Sales, LLC. He testified that he was the sole member/manager of Its Thundertime,

id. at Ex. 3, p. 50, and that his wife had no involvement with East Coast Sales, id. at Ex. 3, p. 90.

Testifying on behalf of East Coast Cablevision, LLC in a Rule 30(b)(6) deposition,[4] Coley stated he

was the sole member of both Its Thundertime and South Raleigh Air. Jamnback Decl., ECF No.

272-2, at Ex. 10, p. 167. Coley's deposition testimony was supported by Kimberli Coley's sworn

interrogatory responses, in which she stated she had no interest in Its Thundertime, LLC, East Coast

Sales, or any "joint ventures, partnerships, or other business enterprises." Jamnback Decl., ECF No.

272-1, at Ex. 5, ¶¶ 6, 8; Ex. 7, ¶ 20. In fact, while testifying under oath at a December 20, 2012

hearing before this court, Kimberli Coley was asked whether she has any ownership interest in Its

Thundertime and she responded, "No, sir." Id. at Ex. 9, p. 16.

---

[4] This deposition was taken in December 2011 as part of East Coast Cablevision, LLC's Chapter 11 Bankruptcy
proceeding.

The Coleys' assertions concerning Kimberli Coley's lack of involvement in her husband's business dealings ultimately served them well in the underlying litigation—DIRECTV voluntarily dismissed its claims against Kimberli Coley electing instead to pursue judgment against her husband and East Coast Cablevision on the § 605 claim. See ECF Nos. 220, 224, 225. Now in the post-judgment phase of proceedings, when his assets are at stake, Randy Coley's position on his wife's membership interest has changed drastically.

Flatly contradicting his prior testimony, Coley testified at his June 16, 2015 deposition that his wife has been a co-member of Its Thundertime, LLC since "day one," Jamnback Decl., ECF No. 272-1, at Ex. 1, p. 44; that he and his wife are both members of East Coast Sales, id. at Ex. 1, p. 19; and that he is "not sure" whether his wife is a member of South Raleigh Air, id. at Ex. 1, pp. 33-34. Not only is his wife a member of these LLCs, according to Coley's 2015 testimony, but she is an active participant in these companies, managing financial records of East Coast Sales, id. at Ex. 1, p. 20, and taking meeting minutes and doing the filing and billing records for Its Thundertime, id. at Ex. 1, pp. 45, 48-51. Coley, in fact, stated: "She's more of a – she is more of a active participant in [Its Thundertime] than I am." Id. at Ex. 1, p. 45. He then qualified this testimony as follows:

> Oh, she doesn't go to work; she helps manage and maintain the paperwork for Its Thundertime. She comes to my office where Its Thundertime records are held at, and she does filings, she does reconciliation, she's got this book she has that outlines money that comes in and all that stuff. But she doesn't go out and work. She doesn't go out and do anything. And she only spends several hours maybe a week. She'll come in there once a week.

Id. at Ex. 1, p. 46.

When confronted with his prior 2012 deposition testimony, in which he stated he was the sole member of Its Thundertime, Coley explained:

> I don't recall it. I don't recall it, but it looks accurate. But my wife has been—my wife has been—I don't consider her a member; I consider her as a wife—as my wife. She's been a—if you want to consider her a member—.

11

. . .

> But I am the only one that actually does any work-work outside.
> She's – the only thing that she does is file paperwork. That's the only
> thing she does.

Id. at Ex. 1, p. 53. Pressed further on his prior testimony that Kimberli Coley played no role

whatsoever in Its Thundertime, Coley testified on June 16, 2015:

> I'm telling you my wife has always been a member since day one.
> And she doesn't have a full role in Its Thundertime. She doesn't
> work. She doesn't do any work. All she does is go to my office and
> file paperwork. She's not an employee.

Id. at Ex. 1, pp. 53-54. Coley insisted any discrepancy in his testimony must have been the result of

confusion and continued to maintain that his wife "has a major role in Its Thundertime and East

Coast Sales," id. at Ex. 1, p. 59, and that "she has been a huge, huge part of these companies that we

operate. Huge part. More than I have." Id. at Ex. 1, p. 56.

In addition to his inconsistent testimony, Coley has produced contradictory operating

agreements for Its Thundertime, LLC. The operating agreement and amendment he produced in

discovery in 2012 state Its Thundertime is a single-member limited liability company. Jamnback

Decl., ECF No. 272-2, at Ex. 13. The operating agreement he produced in 2015 post-judgment

discovery—which has a different format than the previously-produced document[5]—states Its

Thundertime has two members, Randy Coley and Kimberli Coley. Id. at Ex. 11. Coley testified at

his June 2015 deposition that this recently-produced version is the effective operating agreement of

Its Thundertime. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 47-48; see also Coley Decl., ECF

No. 277-1, at ¶ 22 (stating the 2012 version attached as Exhibit 13 to Jamnback's Declaration "is not

and was not the effective Operating Agreement").

---

[5] DIRECTV argues that the operating agreement produced by Coley in 2015 uses a standard format that can be located through a quick internet search. See Jamnback Decl., ECF No. 272-2, at Ex. 12.

12

DIRECTV argues these later-produced documents are fraudulent and back-dated, as are the minutes produced along with them in post-judgment discovery. See Jamnback Decl., ECF No. 272-2, at Ex. 11. In support of this argument, DIRECTV points to the declaration of Stewart Simpson, staff accountant at the accounting office of Scott Dewey, CPA, who was hired in the fall of 2014 to prepare Randy Coley's tax returns "after the Internal Revenue Service had contacted him about his failure to file returns for several years."[6] Id. at Ex. 14, ¶ 2. Simpson stated his office prepared returns for Mr. Coley based on information he provided, and that the profit and loss from East Coast Sales, LLC, South Raleigh Air, LLC, and Its Thundertime, LLC were reported as part of Mr. Coley's personal return "because Mr. Coley is the only member of the LLCs." Id. at Ex. 14, ¶¶ 5-6; see also id. at Ex. 17. Simpson further stated "Mr. Coley told me that he was the only member of these three LLCs, so our office prepared and filed the returns accordingly." Id. at Ex. 14, ¶ 7.

DIRECTV also points to subpoenaed records from North Carolina attorney Robert Seidel, who was referenced in Its Thundertime's meeting minutes as having had a role in preparing the

---

[6] This statement concerning Coley's tax returns brings to light even more conflicting testimony by Randy Coley. By order entered November 1, 2012, the court required the Coley defendants to produce tax returns for years 1999-2011 in discovery. ECF No. 156. After the Coley defendants failed to comply with that discovery order, the court issued an order directing both Randy and Kimberli Coley to appear on December 20, 2012 and show cause why they should not be held in contempt. The court further ordered the Coleys to request from the IRS copies of tax returns filed for tax years 1999 through 2011 for Randy or Kimberli Coley, individually, and for corporate entities including East Coast and Its Thundertime. ECF No. 177.

At the December 20th hearing, Randy Coley testified he went down to the IRS office himself, pursuant to the court's order, and requested the tax documents, but the person he spoke with, a "Mr. Evans," "couldn't pull up any records" based on the tax I.D. numbers given. Second Decl. of Jamnback, ECF No. 286, at Ex. 6, pp. 30, 61. In response to further questions as to whether he filed personal tax returns or returns for his LLCs, Coley invoked the Fifth Amendment. Id. at Ex. 6, pp. 30-31, 49-50.

However, after learning that Coley had testified three months prior that East Coast Cablevision had, in fact, filed tax returns, id. at Ex. 6, p. 53; see also id. at Ex. 6, pp. 50-52 (detailing other prior inconsistent testimony on this issue), the court deemed Coley's Fifth Amendment privilege waived and required he answer questions regarding his tax returns, holding he "can't use the Fifth Amendment as a sword and a shield," id. at Ex. 6, p. 54. Coley thereafter testified at the December 20th hearing that East Coast Cablevision had not filed tax returns, id. at Ex. 6, pp. 54, 57, but he equivocated about whether he filed personal tax returns, stating he "had a lady," whom he could not name, "do some tax returns," id. at Ex. 6, p. 58, and "think[s]" he requested online an extension of the filing of his 2008 through 2010 returns, id. at Ex. 6, p. 59. The court found Coley's December 20th testimony incredible. See generally id. at Ex. 6, pp. 66-75. Somewhat presciently, considering the current state of the post-judgment proceedings, the court stated at the December 2012 hearing: "The Court has the power, if someone is monkeying around with the discovery system and is not producing documents and is hiding things or is lying, the Court has the inherent power to simply grant judgment as a sanction." Id. at Ex. 6, p. 119.

corporate documents. See id. at Ex. 11 (minutes of October 31, 2012). The operating agreement from Seidel's files is the same one produced by Coley back in 2012, which lists Coley as the sole member of Its Thundertime, LLC, lending support to DIRECTV's assertion that the 2012 version is the accurate one. Compare Second Decl. of Jamnback, ECF No. 286, at Ex. 5 with Jamnback Decl., ECF No. 272-2, at Ex. 13.

Additionally, Seidel produced a version of Its Thundertime's October 31, 2012 meeting minutes that differs from the version produced by Coley in June 2015. Although the format of these two sets of meeting minutes is the same, Coley's version contains handwritten alterations that blatantly (and unconvincingly) attempt to disguise statements indicating that Its Thundertime is a single-member entity:

MINUTES

OF

SPECIAL MEETING OF THE MEMBERS

OF

ITS THUNDERTIME LLC

* * * * *

A Special Meeting of the Members of Its Thundertime LLC was held on October 31, 2012, at 9:00 am o'clock.

Randy Coley, being the only Member of the company, was present as was Robert Seidel, legal counsel for the company. No other persons were present or participated.

The Waiver of Notice of the meeting, signed by Randy Coley ~~as the only~~ Member, was presented and ordered filed with the minutes of the meeting.

The first item for discussion was the primary purpose for the meeting: Randy Coley reported that in 2008, the time of the formation of the company, he purchased canned corporate documents which he used to in the operations and management of the company; however, certain original organizational documents of the company have been lost or otherwise cannot be located so new organizational documents need to be drafted and approved, including an amendment to the canned Operating Agreement and restated minutes of the initial and annual meetings of the Members. Mr. Coley presented a copy of the Certificate of Formation of the company, filed with the office of the Secretary of the State of Delaware on April 10, 2008, which was ordered to be inserted in the minute book of the company. Robert Seidel then presented for the Member's review, the First Amendment to and Restatement of the Operating Agreement of the company in its

DECL JAMNBACK ISO MTN SUPP PROC
NO. 5:11-cv-00048-MFU - Page 202

Coley Responses June 10, 2015 000532

Seidel's version of this document contains no such alterations and refers to Coley as "the only Member of the company" and "the sole Member." Compare Second Decl. of Jamnback, ECF No. 286, at Ex. 5 (minutes of October 31, 2012) with Jamnback Decl., ECF No. 272-2, at Ex. 13

15

(minutes of October 31, 2012). Seidel also produced minutes from a January 15, 2013 meeting that refer to Coley as the sole member of Its Thundertime and state: "Randy Coley desired to transfer fifty percent (50%) of his Membership Interest in Its Thundertime, LLC to his spouse, Kimberli Meyers Coley (a non-Member)." Second Decl. of Jamnback, ECF No. 286, at Ex. 5 (minutes of January 15, 2013). Of note, these minutes are dated after summary judgment in the underlying case had been argued, after mediation between the parties had failed, and before the court had issued its summary judgment ruling.

In his declaration filed in support of his opposition to the currently pending motion, Coley attempts to explain the confusion concerning his wife's membership interest in Its Thundertime by asserting that he is a member of two limited liability companies called "Its Thundertime"—one incorporated in North Carolina, the other in Delaware. Coley Decl., ECF No. 277-1, at ¶ 2. Indeed, when asked in his June 2015 deposition to review the operating agreement and amendment produced in discovery in 2012, see Jamnback Decl., ECF No. 272-2, at Ex. 13 (documents displaying the Bates numbers 0583 and 0602 as referenced in the deposition), Coley responded: "Okay, I know what this is now. It wasn't a Delaware—this is the 2012—... This is the operating agreement for Its Thundertime North Carolina; it's not Its Thundertime for Delaware," Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 66-67. This response is puzzling for many reasons—not the least of which is the fact that the documents themselves refer to Its Thundertime as a Delaware limited liability company.

Nevertheless, Coley asserts in his declaration that both he and his wife are members of the Delaware LLC, but the separate North Carolina LLC is a single-member entity that was formed "to manage the properties in Its Thundertime LLC (DE). However, [Coley] later determined that Its Thundertime LLC (NC) was unnecessary and therefore dissolved Its Thundertime LLC (NC)." Coley Decl., ECF No. 277-1, at ¶¶ 5, 7, 9. Coley insists that he provided his accountant Scott

16

Dewey the North Carolina entity's corporate documents "based on [his] understanding that any income from the properties owned by Its Thundertime LLC (DE) should be reported through Its Thundertime LLC (NC), which was formed in North Carolina where [his] properties were located." Id. at ¶ 10. According to Coley, this would explain accountant Stewart Simpson's statement in his declaration that Coley's three LLCs are single-member entities.[7] See Second Decl. of Stewart Simpson, ECF No. 277-7 (stating he understood Its Thundertime to be a single-member North Carolina LLC).

As for his previous testimony concerning the membership of Its Thundertime, Coley insists: "I either misunderstood which 'Its Thundertime LLC' counsel was referring to in the foregoing transcript excerpts or did not understand the question being posed. To set the record straight, Its Thundertime LLC (NC) was a single member limited liability company through the date of its dissolution. Its Thundertime LLC (DE) is and has always been owned by two members: Kimberli Coley and myself." Coley Decl., ECF No. 277-1, at ¶ 15. In support of his argument, Coley provides a declaration and supporting documents from real estate attorney Jason Fearon, who attests that the operating agreement for Its Thundertime given to him by the Coleys was signed by both Randy and Kimberli Coley. Fearon Decl., ECF No. 277-2, at ¶ 5.

### C. Commingling of assets

The interrelationship between these three limited liability companies and the commingling of their assets is even more confounding than Coley's testimony regarding their membership interests.

Randy Coley testified in his June 2015 deposition that Its Thundertime owns a number of rental properties that East Coast Sales and South Raleigh Air manage. Coley explained that that, in managing these properties, East Coast Sales and South Raleigh Air collect rental income, pay the operating expenses, and the remaining profit is then deposited back into Its Thundertime's bank

---

[7] The court notes, however, that this does not purport to explain the discrepancy in Coley's testimony concerning the membership interests in East Coast Sales and South Raleigh Air.

account. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 12, 31-32, 80, 118. Coley cannot explain why rental income is funneled through East Coast Sales or South Raleigh Air instead of being paid directly to Its Thundertime. He states only that "it was done that way day one, before Its Thundertime was – even existed. I just didn't – I really didn't ever see a need, nor was it brought up with me and my wife, neither one of us brought it up that we need to contact Larry Day and let's just pay all this money to Its Thundertime." Jamnback Decl., ECF No. 272-1, at Ex. 1, p. 120.

Coley's Macon, North Carolina property (which he insists is not a vacation home but a rental property listed on Craigslist for $5,000 per week, even though his family had visited the property seven times in the first half of 2015) is owned by Its Thundertime. However, Coley and his wife are the borrowers on the loan, and East Coast Sales—the hybrid trailer business/property management company—pays the mortgage each month. Id. at Ex. 1, pp. 77-78. Yet Coley claimed the interest on this loan as a personal deduction on his tax returns. Id. at Ex. 1, pp. 78-80; see Jamnback Decl., ECF No. 272-2, at Ex. 17. When asked why East Coast Sales makes payments on a loan held in the Coleys' name, Coley responded: "Well, it's making a loan for Its Thundertime profits. It's making a payment on behalf [of] Its Thundertime." Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 78-80. He continued:

> I don't know if it's a – I'm just telling you, I'm not going to say this any more. East Coast Sales gets money and has gotten money for many years from Its Thundertime rental income. That rental money gets put in a ledger and it gets disbursed out to pay Its Thundertime's expenses. That's the way it's always been done.
>
> Same thing with South Raleigh Air. It receives money in from Its Thundertime rental properties like it's been prior to even being an LLC, and disburses money out to manage and operate Its Thundertime properties.

Id. at Ex. 1, p. 80.

Similar arrangements exist with Coley's other properties. With respect to the 3008 Airpark Road property, Coley and his wife are the borrowers on the loan, the property is held in Its Thundertime's name, and South Raleigh Air makes the mortgage payments. Id. at Ex. 1, pp. 81-82. Coley's primary residence on Brittany Place in Cary, North Carolina[8] (valued at approximately $1 million, see Jamnback Decl., ECF No. 272-2, at Ex. 19) is also owned by Its Thundertime; Coley and his wife are listed as borrowers on the note, and the mortgage payments are made by "[p]robably the South Raleigh Air account." Jamnback Decl., ECF No. 272-1, at Ex. 1, p. 84. Coley and his family live in this house rent-free, id. at Ex. 1, p. 87, yet Coley takes the mortgage interest deduction on his personal tax return, id. at Ex. 1, pp. 139-40; see also Jamnback Decl., ECF No. 272-2, at Ex. 17.

While Coley maintains separate bank accounts for each of his corporate entities and himself, he cannot provide an accounting of the flow of money between them. Asked about transfers between LLCs, Coley stated that money is transferred from East Coast Sales to Its Thundertime because: "Me and my wife decided a while back that major expenses had to be approved and go through Its Thundertime. Major expenses. . . . taxes, insurance, taxes, we make sure it's all paid out of Its Thundertime. Major expenses." Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 119-20. When asked why account statements show transfers from Its Thundertime to East Coast Sales, Coley had no explanation: "I don't know. I'd have to look at that record and see." Id. at Ex. 1, pp. 121-22. Coley could only speculate about checks written from the South Raleigh Air account, stating they were likely for "HOA fees:"

> Q. That are paid to whom?
>
> A. HOAs.

---

[8] Although this is the Coley family's primary residence and all of Coley's businesses operate out of North Carolina, Coley carries a Tennessee driver's license and claims to be a Tennessee resident, explaining: "I just like Tennessee." Id. at Ex. 1, pp. 82-84.

19

Q. There's an HOA at the airport?

A. No. I mean HOAs for Its Thundertime. It's just the way it was set up.

Id. at Ex. 1, pp. 106-07. Inexplicably, funds from the South Raleigh Air bank account are also used to pay loans on two of Coley's vehicles, for which Coley himself is the borrower. Id. at Ex. 1, pp. 73-74.

Coley was asked in his 2015 deposition about deposits reflected on his personal bank statements. For example, he testified:

Q. And I'm interested in hearing you explain the deposit activity in this account. You will see, for example, on Bates Page 000043 four deposits in November and December 2013; do you see those?

A. Uh-huh. Yes.

Q. How do you decide—well, let me ask that a different way.
    Where does the money come from to make these deposits?

A. I couldn't tell you. I'd have to look at each deposit.

Q. Well, let's speak generally for a moment.

A. East Coast Sales – I mean, this looks like –this 3,409.58, I couldn't tell you where it come from, but it looks like maybe that's a payroll check or reimbursement.

Q. A reimbursement for what?

A. Reimbursement for East Coast Sales, that East Coast Sales would write me a reimbursement check. It was done either—yeah, that's probably what it is here.

Q. And when something is marked "counter deposit, $500," as you see on Page 000043 --

A. Uh-huh.

Q. – what does that mean?

A. I go to the bank and deposit the—make the deposit. Some of it's transfer, some of it's counter deposits.

20

Q. And are counter deposits cash?

A. Not all the time. Uh-uh.

Q. Are they checks written to cash?

A. Maybe. I'll take a check and write it to cash and cash it and maybe put some—it would be a disbursement to me—I don't know. No. No. No. If—a lot of these checks—this $3,200, I'm not really sure what that was unless I saw it. The $400 and $500, that's probably a disbursement. And this 3,409.58, there's got to be a reason for that, that's probably payroll or a reimbursement.

Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 90-92.

The evidence reveals that Coley deposits checks made out to East Coast Sales into his personal account. Jamnback Decl., ECF No. 272-2, at Ex. 16; see also id. at Ex. 15. He describes transfers from East Coast Sales into his personal account vaguely as "reimbursements I did here that I got paid back for" from East Coast Sales. Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 101-03; see also id. at Ex. 3, pp. 96-98 (testifying in 2012 about a $1.5 million "loan" he made to East Coast Sales). But the numbers do not add up, and Coley has no explanation:

Q. Well, I'm trying to understand, Mr. Coley, what do you exactly buy with your own money. Because as far as I can tell, you've got at least $130,000 flowing into your and Kim's account, your tax return from 2014 reports business income of $66,000 and a bunch of losses. And so I'm trying to understand how that all fits together. Can you explain it to me?

A. No. I don't know how – I don't – I can't explain this here. I can't explain that. . . .

Id. at Ex. 1, pp. 156-57. Despite these deposits into his personal account, Coley claims in his 2015 discovery responses to have no cash or accounts receivable. Id. at Ex. 5, ¶ 4. Moreover, Kimberli Coley received a $90,000 cashier's check, paid for with Its Thundertime funds, labeled "investor pay," Jamnback Decl., ECF No. 272-2, at Ex. 18, yet she filed no tax returns and claims to have no income, id. at Ex. 14, ¶ 3 ("There are no returns for Kimberli Coley because, according to Mr.

21

Coley, Kimberli has no income. . . . no income in recent years, and therefore none has been reported to the IRS."); see also Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 143-44 ("Kim created no income. . . . My wife has made no income.").

These are but a few examples of Coley's commingling of assets established by the record evidence in this case.

## III.  LEGAL FRAMEWORK

Generally, corporations[9] are recognized as entities that are separate and distinct from their officers and stockholders. "But this concept of separate entity is merely a legal theory, 'introduced for purposes of convenience and to subserve the ends of justice,' and the courts 'decline to recognize [it] whenever recognition of the corporate form would extend the principle of incorporation "beyond its legitimate purposes and [would] produce injustices or inequitable consequences."'" DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681, 683 (4th Cir. 1976) (citations omitted). When appropriate, and "'in furtherance of the ends of justice,'" a court may pierce the corporate veil and treat the corporation and its shareholders as one, id. (quoting 18 Am. Jur. 2d at 559), if it finds a corporation and its shareholders have misused or disregarded the corporate form, United States v. Kolon Indus., Inc., 926 F. Supp. 2d 794, 815 (E.D. Va. 2013). This is often referred to as an "alter ego theory."

Corporate veil piercing is an equitable remedy and an extraordinary one, exercised only in exceptional circumstances "when 'necessary to promote justice.'" C.F. Trust, Inc. v. First Flight Ltd. P'ship, 306 F.3d 126, 134 (4th Cir. 2002) (quoting Cheatle v. Rudd's Swimming Pool Supply Co.,

---

[9] The legal concepts discussed herein apply equally to limited liability companies which, like corporations, have a legal existence separate and distinct from its members. See, e.g., NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir. 2008) ("[T]he members of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a difficult task.'" (quoting Harco Nat'l Ins. Co. v. Green Farms, Inc., No. CIV A. 1331, 1989 WL 11053, at *4 (Del. Ch. Sept. 19, 1989))); Westmeyer v. Flynn, 382 Ill. App. 3d 952, 960, 889 N.E.2d 671, 678 (2008) ("[U]nder Delaware law, the doctrine of piercing the corporate veil applies to a limited liability company. Just as with a corporation, the members of an LLC are not generally liable for the obligations of the LLC. However, under Delaware law, just as with a corporation, the corporate veil of an LLC may be pierced, where appropriate.").

22

234 Va. 207, 360 S.E.2d 828, 831 (1987)), certified question answered 266 Va. 3, 580 S.E.2d 806 (2003); see also DeWitt, 540 F.2d at 683 ("This power to pierce the corporate veil, though, is to be exercised 'reluctantly' and 'cautiously....'"). In a traditional veil-piercing case, a party asks a court to "disregard the existence of a corporate entity so that the litigant can reach the assets of a corporate insider, usually a majority shareholder." C.F. Trust, Inc. v. First Flight L.P., 266 Va. 3, 10, 580 S.E.2d 806, 810 (2003). In the instant case, however, DIRECTV seeks to reach the assets of Its Thundertime, LLC and related entities to satisfy the judgment against member Randy Coley. This concept is called "reverse veil piercing."

"'Many jurisdictions recognize that the same considerations that justify piercing the corporate veil may justify piercing the veil in "reverse."'" C.F. Trust, Inc. v. First Flight Ltd. P'ship, 306 F.3d at 135 (quoting 1 William Meade Fletcher, Cyclopedia of the Law of Private Corporations, § 41.70 at 685 ((rev.vol.1999) (citations omitted)), and collecting cases). There are two different types of reverse veil piercing. "'Outsider' reverse veil piercing involves a third party creditor piercing the corporate veil in the reverse to reach the assets of the corporation to satisfy the debt of a corporate insider. 'Insider' reverse veil piercing involves an insider of the corporation seeking to disregard the corporate form of his own corporation for his own benefit." In re Howland, 516 B.R. 163, 166 (Bankr. E.D. Ky. 2014) (internal citations omitted), aff'd, No. CV 5:14-426-KKC, 2016 WL 3176649 (E.D. Ky. June 7, 2016). Here, DIRECTV proceeds as an "outsider," seeking to reach the assets of Randy Coley's various corporate entities because he has abused the corporate form in order to evade the judgment in this case.

"As a general proposition, 'the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation.'" United States v. Kolon Indus., Inc., 926 F. Supp. 2d 794, 814-15 (E.D. Va. 2013) (quoting First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621, (1983) and citing Restatement (Second) of Conflict of Laws § 307 (1971)

23

("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability ... to its creditors for corporate debts.")); see also Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993) ("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders. . . ."); In re Moore, 379 B.R. 284, 289 n.3 (Bankr. N.D. Tex. 2007) ("As courts are required to apply the law of the state of incorporation to corporate veil issues, the court will analyze Texas law in the case at bar." (citing Jefferson Pilot Broad. Co. v. Hilary & Hogan, Inc., 617 F.2d 133, 135 (5th Cir. 1980)); Westmeyer v. Flynn, 382 Ill. App. 3d 952, 957, 889 N.E.2d 671, 676 (2008) ("'Efforts to pierce the corporate veil are governed by the law of the state of incorporation.'" (citation omitted)). Because the relevant entities are Delaware LLCs, the court will apply Delaware law to the veil-piercing analysis.[10]

---

[10] This case presents a rather thorny choice-of-law issue that need not be resolved by this court, as all roads lead to Delaware. A district court's choice of law inquiry involves a two step process: "First, the court must determine whether federal or state choice of law rules govern. Second, once the court has determined which choice of law rules apply, it must apply these rules to the facts of the case to determine the appropriate substantive laws." Terry v. June, 420 F. Supp. 2d 493, 499-500 (W.D. Va. 2006). This court has federal question jurisdiction over the underlying action, and the judgment at issue is based on violations of a federal statute. To the extent the court should apply federal choice of law rules, see, e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980), "the law of the state of incorporation controls a corporate governance claim," In re Canopy Fin., Inc., 477 B.R. 696, 702 (Bankr. N.D. Ill. 2012). However, the case is proceeding in the post-judgment phase and concerns DIRECTV's attempt to collect its judgment pursuant to Federal Rule of Civil Procedure 69(a), which "'borrows' the practice and procedure of the [state where the federal court is located] with respect to enforcement of money judgments." S.P. Richards Co. v. Riley, No. 2:10cv192, 2011 WL 3515853, at *1 n.1 (E.D. Va. July 7, 2011) (applying Virginia law); see also Ramsay v. Sanibel & Lancaster Ins., LLC, No. 2:11cv207, 2015 WL 3830891, at *4 (E.D. Va. June 19, 2015) (same). If these circumstances more appropriately invoke the choice-of-law rules of the forum state, the result is the same, as "Virginia's choice of law principles dictate that the law of the state of incorporation determines whether a corporate veil may be pierced." McCarthy v. Giron, No. 1:13-CV-01559-GBL-TCB, 2014 WL 2696660, at *11 (E.D. Va. June 6, 2014) (citing Guest Service Co. v. Delia Ratta, No. 101281, 1991 WL 835131, at *4 (Va. Cir. Aug. 14, 1991) (citing Morrow v. Vaughn–Bassell Furniture Co., 173 Va. 417, 422 (1939); Mountain Lake Co. v. Blair, 109 Va. 147, 154 (1909))). Another approach bypasses the choice-of-law analysis altogether, looking to the Restatement (Second) of Conflict of Laws § 307 (1971), "which has been interpreted to abrogate general choice-of-law principles in veil-piercing cases," and states that "'[t]he local law of the state of incorporation will be applied to determine' whether piercing the corporate veil is justified." TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc., 808 F. Supp. 2d 60, 64 (D.D.C. 2011). But see id. at 64-65 (noting such approach has been "harshly criticized in the academic literature"). Regardless of which route one takes, Delaware law governs. And even if Virginia veil-piercing law, which DIRECTV cites on brief, did apply to this analysis, the court's ultimate conclusion would be the same. See C.F. Trust, Inc. v. First Flight, L.P., 266 Va. 3, 11, 580 S.E.2d 806, 810 (2003) ("Virginia does recognize the concept of outsider reverse piercing and [ ] this concept can be applied to a Virginia limited partnership.").

24

"Delaware courts take the corporate form and corporate formalities very seriously...." <u>Case Fin., Inc. v. Alden</u>, No. CIV. A. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009). "'Persuading a court to disregard the corporate entity in Delaware is a difficult task.' . . . Piercing the corporate veil under the alter ego theory 'requires that the corporate structure cause fraud or similar injustice.' Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud." <u>Wallace ex rel. Cencom Cable Income Parters II, Inc., L.P v. Wood</u>, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (internal citations omitted); <u>see also</u> <u>In re Foxmeyer Corp.</u>, 290 B.R. 229, 236 (Bankr. D. Del. 2003) (noting "fraud or a sham, strictly speaking, need not be shown to justify the piercing of the corporate veil under Delaware law," but the requisite injustice must be "something that is similar in nature to fraud or a sham"). Indeed, "the party seeking to pierce the corporate veil must show that the officers or shareholders of the corporation exercised 'complete domination and control' over the corporation" such that it "'no longer has legal or independent significance of its own.'" <u>In re Canopy Fin., Inc.</u>, 477 B.R. 696 (Bankr. N.D. Ill. 2012) (quoting <u>Wallace</u>, 752 A.2d at 1183-84). The corporation and its shareholders must have operated as a single economic entity. <u>Trevino v. Merscorp, Inc.</u>, 583 F. Supp. 2d 521, 528 (D. Del. 2008). The following factors, outlined by the Third Circuit in <u>United States v. Pisani</u>, 646 F.2d 83, 88 (3d Cir. 1981), should be considered in a traditional veil-piercing analysis: "(1) undercapitalization; (2) failure to observe corporate formalities; (3) nonpayment of dividends; (4) the insolvency of the debtor corporation at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders." <u>Trevino</u>, 583 F. Supp. 2d at 528-29. "'While no single factor justifies a decision to disregard the corporate entity,' some combination of the above is required, and 'an overall element of injustice or unfairness must always be present, as well.'" <u>Id.</u> at 529 (quoting <u>United States v. Golden Acres, Inc.</u>, 702 F. Supp. 1097, 1104 (D. Del.

25

1988)). The underlying cause of action, by itself, does not supply the necessary fraud or injustice required for a court to pierce the corporate veil. In re Foxmeyer, 290 B.R. at 236. Nor does "[t]he mere fact that [the moving party] stand[s] to lose money." In re Canopy Fin., Inc., 477 B.R. at 704. Courts properly apply veil piercing in order to prevent "'some wrong beyond a creditor's inability to collect.'" Id. (quoting Sea-Land Servs., Inc. v. Pepper Source, 941 F.2d 519, 524 (7th Cir. 1991)). The fraud or injustice must relate to a misuse of the corporate structure. See In re Foxmeyer, 290 B.R. at 236. This is a high bar to overcome. GEBAM, Inc. v. Investment Realty Series I, LLC, 15 F. Supp. 3d 1311, 1326 (N.D. Ga. 2013) (applying Delaware law). Indeed, a party seeking to pierce the corporate veil under Delaware law must prove its case by "at least somewhat greater than merely a preponderance of the evidence standard," if not by clear and convincing evidence. In re Foxmeyer, 290 B.R. at 237.

Delaware law, however, has not expressly authorized reverse veil piercing. See In re Canopy Fin., Inc., 477 B.R. at 703 ("Under Delaware law, however, it is not clear if a party can reverse-pierce the corporate veil." (citing MicroStrategy Inc. v. Acacia Research Corp., No. 5735-VCP, 2010 WL 5550455, at *12 n.90 (Del. Ch. Dec. 30, 2010))). The Coley defendants argue Delaware law would not support reverse veil piercing, pointing to two cases on brief. In In re ALT Hotel, LLC, 479 B.R. 781, 802 (Bankr. N.D. Ill. 2012), an Illinois bankruptcy court declined to reverse-pierce the corporate veil, noting that while Delaware has never expressly adopted this equitable remedy, "general tenor of Delaware corporate law suggests its acceptance would be doubtful." However, three years later, the Court of Chancery of Delaware suggested in Cancan Development, LLC v. Manno, No. CV 6429-VCL, 2015 WL 3400789, at *22 (Del. Ch. Mar. 30, 2015), aff'd, 132 A.3d 750 (Del. 2016), that a reverse-pierce claim "might have prevailed" had the claim been properly presented and supported.

26

# IV. ANALYSIS

There could not be a more appropriate set of circumstances justifying application of the reverse veil-piercing theory than those presented in the instant case.

## A. Application of Delaware law

The court agrees with Coley that it must look to Delaware law, as the law of the state of incorporation, in determining whether to disregard the corporate form and find the assets held by Coley's limited liability companies are subject to execution of the judgment against Coley in this case. The court further agrees with Coley that Delaware appellate courts have never expressly recognized the remedy DIRECTV seeks here. Indeed, the court is not aware of any authority applying an outsider reverse veil-piercing theory under Delaware law. Without case law on point, the court is mindful that it "cannot 'simply substitute its judgment for that of the state court.'" EiA Prop., LLC v. Fenwick Equestrian, LLC, No. 5:14-CV-328-REW, 2015 WL 5698540, at *8 (E.D. Ky. Sept. 28, 2015) (quoting Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998)).

That said, no court has held that an outsider reverse veil-piercing theory would be prohibited under Delaware law. In re ALT Hotel, LLC, 479 B.R. 781 (Bankr. N.D. Ill. 2012), a case cited by Coley, casts doubt on whether reverse piercing would be authorized under Delaware law. However, In re ALT Hotel involved insider reverse veil piercing:

> The piercing claim of Hotel Allerton Mezz is unusual, defying easy classification. At first blush, it appears to involve outside reverse piercing: a former corporate outsider (Hotel Allerton Mezz) is asserting that a former corporate insider (Alt Hotel Mezz) was the alter ego of the insider's then-subsidiary (the debtor). When the current status of the parties is considered, however—the former outsider is now an insider, having become the parent of the subsidiary in question—the claim appears to involve something like inside reverse piercing: the current insider/parent is asserting that the former parent, now an outsider, was the alter ego of the subsidiary. The point of the alter ego claim, moreover, is to make the current insider/parent a creditor of its own subsidiary in order to bolster the

27

> joint effort of parent and subsidiary to subordinate a third party's
> claim. That sounds distinctly like an inside reverse piercing claim.

479 B.R. at 801. The Illinois bankruptcy court noted that courts are "'overwhelmingly hostile'" to

inside reverse piercing, reasoning "that insiders who benefit from incorporation should not be able

to deny corporate existence later on when the corporate form 'works to their detriment or

disadvantage.'" Id. at 802 (citations omitted). These are not the circumstances of the instant case.

Moreover, the Court of Chancery of Delaware has hinted that a reverse piercing claim may

be viable under Delaware law if properly presented. In Cancan Development, LLC v. Manno, a case

recently affirmed by the Delaware Supreme Court, the court noted:

> The veil-piercing claim is actually a reverse veil-piercing claim.
> Despite seeking to hold Manno Enterprises liable for Manno's
> conduct, CanCan's arguments rely entirely on instances when courts
> have done the opposite and held an individual liable for the debts of
> an entity. "Reverse pierce claims implicate different policies and
> require a different analytical framework from the more routine
> corporate creditor veil-piercing attempts." Gregory S. Crespi, The
> Reverse Pierce Doctrine: Applying Appropriate Standards, 16 J.
> Corp. L. 33, 37 (1990). No one grappled with the different
> implications. Had the claim been properly presented and supported,
> it might have prevailed. Under the circumstances, it fails for lack of
> support.

2015 WL 3400789, at *22, aff'd, 132 A.3d 750 (Del. 2016).

Other states—including North Carolina, where the companies at issue in this case operate

and their assets are located, and Virginia, where this federal district court sits—recognize the

concept of outsider reverse veil piercing. See Fischer Inv. Capital, Inc. v. Catawba Dev. Corp., 200

N.C. App. 644, 656, 689 S.E.2d 143, 151 (2009); C.F. Trust, Inc. v. First Flight Ltd. P'ship, 266 Va.

3, 11, 580 S.E.2d 806, 810 (2003); see also Stoebner v. Lingenfelter, 115 F.3d 576, 579 n.4 (8th Cir.

1997) ("Minnesota has recognized the 'reverse pierce' of the corporate veil under very limited

circumstances…."); Zahra Spiritual Trust v. United States, 910 F.2d 240 (5th Cir. 1990) (discussing

28

reverse veil piercing under Texas law); JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. &

Trade Servs., Inc., 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004) (recognizing reverse veil piercing under

New York law); In re Levitsky, 401 B.R. 695, 713 (Bankr. D. Md. 2008) (applying doctrine of reverse

veil piercing under Maryland law); In re Phillips, 139 P.3d 639, 641 (Colo. 2006) (recognizing outside

reverse piercing in Colorado); LFC Mktg. Grp., Inc. v. Loomis, 116 Nev. 896, 904, 8 P.3d 841, 846

(2000) (recognizing application of reverse veil piercing in Nevada in appropriate limited

circumstances). But see Postal Instant Press, Inc. v. Kaswa Corp., 162 Cal. App. 4th 1510, 1519-24,

77 Cal. Rptr. 3d 96, 102-06 (2008) (rejecting reverse veil-piercing theory); Acree v. McMahan, 276

Ga. 880, 882, 585 S.E.2d 873, 875 (2003) (same).

 To be sure, traditional veil piercing is itself an extraordinary remedy, and "'[p]ersuading a

Delaware court to disregard the corporate entity is a difficult task.'" Wallace ex rel. Cencom Cable

Income Partners II, Inc., L.P v. Wood, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (citation omitted).

However, this is an extraordinary case.

 The record is replete with evidence of Randy Coley's misdeeds. From the underlying

scheme to profit from unauthorized DIRECTV programming to his testimony at the December 20,

2012 show cause hearing[11] to his flatly inconsistent assertions, under oath, about the membership

interests of his LLCs, Coley has engaged in conduct designed to suit his purposes and thwart justice.

 A prime example is Coley's pervasive abuse of corporate formalities. The evidence

presented by DIRECTV leaves no doubt that Randy Coley is the alter ego of his limited liability

companies. Coley and his LLCs operate as a single economic entity in which money flows freely

between them at Coley's whim. Checks made out to "East Coast Sales" are deposited into Coley's

personal account. Jamnback Decl., ECF No. 272-2, at Ex. 16; see also id. at Ex. 15. While Coley

and his companies maintain separate bank accounts, Coley cannot provide an accounting for the

---

[11] See supra note 6; see also Second Decl. of Jamnback, ECF No. 286, at Ex. 6.

funds that are transferred in and out of the various accounts at any given time. In his June 2015 deposition, Coley speculates as to the reason for certain of these transfers—e.g., "they're probably taxes," Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 121-22—but more often admits he does not know. For example, when asked how he decides when to transfer himself money from the corporate accounts, Coley responded:

> A.    My wife and I decide if Its Thundertime or East Coast Sales can afford a disbursement, we'll allow the disbursement.
>
> Q.    Do you have records that would permit you to identify what these various deposits are?
>
> A.    Now say it one more time.
>
> Q.    Do you have records that would allow us to see the nature of these deposits, what they are?
> When it says "deposit," I have no idea what that means.
>
> A.    Well, I just get a deposit slip.
>
> Q.    But do you have records that would show—for example, looking at Page 000047 on 12/11 it says deposit of $900.
>
> A.    Right.
>
> Q.    And the next day, deposit $900.
>
> A.    Oh, there's a track record of it, yes, sir.
>
> Q.    Right. But what is the record that you would need to tell us what it is? You're just speculating on what it is?
>
> A.    Yeah.
>
> Q.    So what is the record that we could look at to see?
>
> A.    I'd have to go on my bank statement and pull up the deposit slips. I mean, I give you the bank statements. That's all I've got. That's pretty simple.

Jamnback Decl., ECF No. 272-1, at Ex. 1, pp. 93-94.

Moreover, Coley's personal expenses are paid by his companies. He and his family live rent-free in a million dollar home in Cary, North Carolina that is owned by Its Thundertime and paid for by South Raleigh Air. They drive vehicles paid for by South Raleigh Air.

Coley has no explanation for why all of his assets are owned by one company but "managed" by another. Rental properties are held in the name of Its Thundertime, rents are collected and deposited into the bank account of either South Raleigh Air or East Coast Sales (both a property management company and a trailer company), and the "profit" from that rental income is then transferred back to Its Thundertime. Coley simply states this is the way it has always been done. See, e.g., id. at Ex. 1, p. 120. The record is fraught with evidence of Coley's failure to observe corporate formalities, an utter lack of proper accounting records, and extensive commingling of assets.

Coley insists the court must consider the effect reverse veil piercing would have on innocent third parties. While that is typically a concern, see, e.g., Scholes v. Lehmann, 56 F.3d 750, 758 (7th Cir. 1995) ("Reverse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of the corporation's assets to pay a shareholder's debts would be a wrong to the other shareholders."), it is not a concern in the instant case. Either there is no innocent third party or Coley is equitably estopped from asserting there is one.

The membership interest of the subject LLCs has been placed in dispute by Randy Coley in these post-judgment proceedings. Given the conflicting evidence,[12] the court cannot make heads or tails of whether the Coley entities are single member LLCs or whether both Coley and his wife Kimberli have membership interests. But that factual issue need not be resolved for purposes of this analysis. To the extent that Kimberli Coley is a shareholder of any of these companies, the

---

[12] Coley's explanation for this conflicting evidence—"confusion" about Its Thundertime (DE) and Its Thundertime (NC)—is preposterous.

31

court holds that the Coleys are equitably estopped from asserting she has any membership interest in these LLCs.

Equitable estoppel is similar to judicial estoppel.

> The difference between judicial and equitable estoppel stems from their different purposes. Judicial estoppel exists to "protect the *courts* 'from the perversion of judicial machinery'" through a party's attempt to take advantage of both sides of a factual issue at different stages of the proceedings. [Allen v. Zurich Ins. Co., 667 F.2d 1162, 1166-67 (4th Cir. 1982)] (quoting Edwards v. Aetna Life Insurance Co., 690 F.2d 595, 599 (6th Cir. 1982)) (emphasis added). In contrast, equitable estoppel serves to protect litigants from unscrupulous opponents who induce a litigant's reliance on a position, then reverse themselves to argue that they win under the opposite scenario. See Moser v. United States, 341 U.S. 41, 71 S. Ct. 553, 95 L. Ed. 729 (1951); Edwards, 690 F.2d at 598. . . .

Teledyne Indus., Inc. v. N.L.R.B., 911 F.2d 1214, 1220 (6th Cir. 1990). Of these two concepts, equitable estoppel is the more appropriate to apply given the facts of this particular case.

In these post-judgment proceedings, Coley has taken a position regarding his wife's membership interest in his companies that is flatly inconsistent with the position taken by both Coley and his wife in the underlying case. Both Randy and Kimberli Coley stated under oath and represented to the court numerous times over the course of litigation that Kimberli played no role and had no interest whatsoever in his business ventures. The court never accepted Coley's position on this issue, however. In the underlying case, the court denied Kimberli Coley's motions to dismiss and for summary judgment on personal jurisdiction grounds but declined to rule as a matter of law on the issue of her liability for the § 605 violation, leaving that question to be resolved by a jury. But the court never reached this issue, as DIRECTV elected to voluntarily dismiss its claims against Kimberli Coley. Thus, equitable estoppel, rather than judicial estoppel, is the applicable doctrine. See Teledyne Indus., 911 F.2d at 1217-18; see also Lowery v. Stovall, 92 F.3d 219, 223-24 (4th Cir. 1996).

32

> A party may invoke equitable estoppel to prevent the opposing party from changing positions if (1) the party was an adverse party in the prior proceeding; (2) the party detrimentally relied on the opponent's prior position; and (3) the party would now be prejudiced if the opponent changed positions. Edwards, 690 F.2d at 598; Konstantinidis v. Chen, 626 F.2d 933 (D.C. Cir. 1980). Equitable estoppel may apply regardless of judicial acceptance of the party's original position, because equitable estoppel protects litigants instead of the integrity of the courts. . . .

Teledyne Indus., 911 F.2d at 1220. If what Randy Coley claims now about membership interest is true, he and his wife plainly misled the parties (and the court) about the nature of Kimberli's interest in Coley's LLCs in order to gain unfair advantage in the prior proceedings.[13] DIRECTV detrimentally relied on the Coleys' representations and dismissed its claims against Kimberli, pursuing judgment against Randy Coley and East Coast Cablevision only. DIRECTV would be prejudiced if Randy Coley were able to take the opposite position at this stage of the proceedings and argue his wife, an innocent, third-party half-owner of his companies, would be harmed by any veil piercing. As such, Randy and Kimberli Coley are equitably estopped from asserting in these proceedings that she has a membership interest in his limited liability companies.

Coley also argues this court cannot grant the relief requested by DIRECTV because Coley's LLCs are not parties to this case and their due process rights would be violated. Coley cites EEOC v. Upper Mill Mining Co., No. 96-139-A, 1997 U.S. Dist. LEXIS 24225, at *10-11 (W.D. Va. Oct. 22, 1997) (Jones, J.), for the proposition that the parties must be provided with an opportunity to contest such action before the corporate veil can be pierced. In that case, defendant Upper Mill Mining Company was the subject of a Title VII case brought by the EEOC on behalf of a former employee. The court entered judgment in favor of the EEOC and awarded back pay in the amount of $20,475.31. After Upper Mill failed to pay the judgment, the EEOC moved to join as defendants

---

[13] The timing of Coley's vacillating positions on this issue is not lost on the court. Coley argued his wife had no interest or involvement in his businesses when it served him to shield her from liability. Now, when it serves him to limit his exposure and protect his assets, he casts her as an "innocent" part-owner of his companies.

33

Upper Mill's sole shareholder, Gary Horn, and his 5 other mining companies, asserting, inter alia, an alter ego theory. The court declined to hold Horn personally liable for the judgment against Upper Mill, citing case law that states in an employment action, a plaintiff cannot bring an enforcement action against an individual under an alter ego theory unless the liability of the individual was established in the underlying case. Id. at *10 (citing Roberts v. Air Capitol Plating, Inc., No. 95-1348-JTM, 1997 WL 446266, at *9 (D. Kan. July 22, 1997) (unpublished), and Koblosh v. Adelsick, No. 95 C 5209, 1996 WL 745390, at *3 (N.D. Ill. Dec. 30, 1996) (unpublished)). Judge Jones held in Upper Mill: "[T]o attach liability to Horn without a trial, would effectively deny him his due process right to defend himself and to contest his liability." Id.

Upper Mill is distinguishable. It involves the inverse factual scenario presented in the instant case. There, the plaintiff sought to enforce a judgment against a corporation by joining as a defendant the corporation's sole individual shareholder, Gary Horn, when there had been no finding of liability against him in the underlying Title VII proceeding. Notably, the Upper Mill court found "no evidence of fraud, no failure to observe corporate forms, no transfer or siphoning of funds from the corporate entity, no absence of corporate records, no corporate insolvency at the time of the discriminatory action, and no evidence showing that Upper Mill was merely a façade for [shareholder] Horn." Id. at *12. The same cannot be said in the instant case. Here, we have a judgment against an individual defendant, Randy Coley. Asserting an alter ego theory, DIRECTV seeks to enforce that judgment against Coley's sham LLCs given the ample evidence in the record of "a fundamental unfairness accomplished by the use of the corporate form." Id.

Moreover, case law suggests that proof of an alter ego theory satisfies due process concerns with respect to the exercise of personal jurisdiction. See Brainware, Inc. v. Scan-Optics, Ltd., No. 3:11cv755-REP-DJN, 2012 WL 1999549, at *7 (E.D. Va. May 9, 2012) ("Because the Court finds that Brainware has sufficiently alleged its alter ego theory of liability, Scan-Optics UK's contacts with

34

the forum (and the forum selection clause of the Contract) could be imputed to Scan-Optics USA."
(citing Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 433-34 (4th Cir.
2011))), report and recommendation adopted No. 3:11CV755, 2012 WL 1999636 (E.D. Va. June 4,
2012). As DIRECTV argued at the November 2015 hearing, Its Thundertime, South Raleigh Air,
and East Coast Sales have been part of these proceedings throughout the litigation and were present
at the hearing, embodied in the form of party defendant Randy Coley. There is no due process
violation here.

The court also rejects Coley's argument that DIRECTV has failed to establish that his
corporate entities were formed and capitalized in an effort to avoid liability in this case. Coley
contends "[t]he discrepancy between the dates that these LLCs were formed and when litigation
commenced against the Coleys years later underscores why DIRECTV cannot explain how the
formation and capitalization of these LLCs was pursuant to fraudulent design." Coley Opp. Br.,
ECF No. 277, at 13. Coley need not have created his sham LLCs after the judgment against him
was entered in order for DIRECTV to prove its alter ego theory. Rather, in order to prevail,
DIRECTV must establish by more than a preponderance of the evidence that these corporate
entities are a sham and exist "for no other purpose than as a vehicle for fraud." Wallace ex rel.
Cencom Cable Income Parters II, Inc., L.P v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999). That
DIRECTV has done. In any event, the timing of Coley's LLC formation is rather telling. Coley
formed East Coast Sales and Its Thundertime in 2008, while he was carrying out an illegal scheme to
deprive DIRECTV of $38,000 per month in satellite television programming revenue. It is clear
that Coley has abused the corporate form in an effort to protect himself from the very type of
judgment that has been entered against him in this case.

In sum, Coley's corporate entities are sham entities over which he maintains complete
control and has unity of interest. A finding by the court that upholds the separate existence of these

corporate entities would sanction deception and injustice. See In re Canopy, 477 B.R. 696, 703

(Bankr. N.D. Ill. 2012) (applying Delaware law and Illinois law). Therefore, given the particular facts

of this case, the court holds that Delaware law would recognize the reverse veil-piercing theory and

apply it here, finding Randy Coley is the alter ego of his limited liability companies.[14]

## B. Application of the court's inherent sanction power

Even if Delaware law would not recognize a reverse-pierce theory, however, justice would

still require the court to apply such a theory in the instant case under its inherent sanction power.

> Due to the very nature of the court as an institution, it must and does have an inherent power to impose order, respect, decorum, silence, and compliance with lawful mandates. This power is organic, without need of a statute or rule for its definition, and it is necessary to the exercise of all other powers. See Chambers, 501 U.S. at ——, 111 S. Ct. at 2132. Because the inherent power is not regulated by Congress or the people and is particularly subject to abuse, it must be exercised with the greatest restraint and caution, and then only to the extent necessary. See id.; Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S. Ct. 2455, 2463, 65 L. Ed. 2d 488 (1980) (restraint required because the inherent powers of a court are "shielded from direct democratic controls"). Under the inherent power, a court may issue orders, punish for contempt, vacate judgments obtained by fraud, conduct investigations as necessary to exercise the power, bar persons from the courtroom, assess attorney's fees, and dismiss actions. Since orders dismissing actions are the most severe, such orders must be entered with the greatest caution.

United States v. Shaffer Equip. Co., 11 F.3d 450, 461-62 (4th Cir. 1993). "While a district court

acting under Rule 37(b) of the Federal Rules of Civil Procedure would be constrained by the terms

of that Rule, a court acting under its inherent authority may impose sanctions for any 'conduct

utterly inconsistent with the orderly administration of justice.'" Projects Mgmt. Co. v. Dyncorp Int'l

---

[14] Coley offers no support for his argument that the remedy set forth in 6 Del. Code § 18-703 is the sole available remedy to DIRECTV in this case. While § 18-703 might be an adequate remedy for a judgment creditor who seeks to enforce its judgment against a legitimate corporate entity, it is not adequate under the circumstances of the instant case. See B.A.S.S. Grp., LLC v. Coastal Supply Co., Inc., No. CIV.A 3743-VCP, 2009 WL 1743730, at *7 n.65 (Del. Ch. June 19, 2009) ("Because BASS was unjustly enriched, I do not consider a charging order in favor of BASS on Burkett's units alone to be an adequate remedy.").

LLC, 734 F.3d 366, 375 (4th Cir. 2013) (citations omitted). For example, a court can use its inherent power to dismiss an action "when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process." See Shaffer Equip. Co., 11 F.3d at 462; see also Parker v. N. Carolina Agr. Fin. Auth., 341 B.R. 547, 555 (E.D. Va. 2006) ("Where, as here, the Federal Rules and applicable statutes are insufficient to reach the full measure of a litigant's bad faith conduct, the Court is authorized to proceed under its inherent power to police itself." (citing Chambers, 501 U.S. at 48-49)), aff'd sub nom. Iles v. N. Carolina Agr. Fin. Auth., 249 F. App'x 304 (4th Cir. 2007). The court may act sua sponte and "must consider the whole of the case in choosing the appropriate sanction." Projects Mgmt. Co., 734 F.3d at 375.

From the outset of this litigation, Randy Coley has engaged in deception and utter disregard for the judicial process. This case has been pending for more than five years, and Coley's recalcitrance has only increased with time. The parties to this and the related litigation have been forced to file countless motions in an effort to secure Coley's compliance with court orders. The court has held several show cause hearings, issued sanctions, and held Randy Coley in civil contempt. Yet Coley remains undeterred. Coley's sworn testimony changes with the wind. He has abused the corporate form in order to protect his assets and shield himself from judgment. These proceedings have demonstrated to the court that Randy Coley will go to any lengths to serve his interests to the detriment of opposing parties and contrary to the interests of justice.

In short, "'corporations are not intended to be used to shelter the assets of shareholders from lawful claims of judgment creditors.'" C.F. Trust, Inc. v. First Flight Ltd. P'ship, 306 F.3d 126, 135 (4th Cir. 2002) (quoting Winey v. Cutler, 165 Vt. 566, 678 A.2d 1261, 1262 (1996)), certified question answered 266 Va. 3, 580 S.E.2d 806 (2003). There is simply no other sanction that would

37

be appropriate under the circumstances of this case. Accordingly, the court will reverse-pierce the corporate veil.

## IV.    APPOINTMENT OF RECEIVER

Given Coley's history of deception and efforts to evade judgment in this case, DIRECTV asks the court to appoint a receiver to take possession of Coley's assets, including those held in the name of his limited liability companies. Coley filed no response to this motion. Pursuant to the scheduling order entered in this case, ECF No. 96, the motion is deemed unopposed.

In any event, the court finds the DIRECTV's request to be prudent. Rule 66 of the Federal Rules of Civil Procedure provides for such a remedy, and courts have held that a receivership may be appropriate in aid of execution of a judgment. See Gordon v. Washington, 295 U.S. 30, 37 (1935) (a court may appoint a receiver "of property which a judgment creditor seeks to have applied to the satisfaction of this judgment"); see also Santibanez v. Wier McMahon & Co., 105 F.3d 234, 241 (5th Cir. 1997) ("Courts have held that receivers may be appointed 'to preserve property pending final determination of its distribution in supplementary proceedings in aid of execution.'" (quoting 7 James Moore et al., Moore's Federal Practice ¶ 66.05[1] (2d ed. 1996)). Rule 69 governs procedures on execution of a judgment and provides: "The procedure on execution—and in proceeding supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies." Although Rule 66 qualifies as a federal statute, it is "a general procedural rule." Joe Hand Promotions, Inc. v. Saddeldin, No. 1:09-CV-02197 AWI, 2011 WL 1806919, at *1 (E.D. Cal. May 10, 2011). Thus, the court must look to specific state statutes governing appointment of a receiver when such action is taken in aid of execution of a judgment. See Office Depot, Inc. v. Zuccarini, 596 F.3d 696, 700 (9th Cir. 2010) (quoting In re Merrill Lynch Relocation Mgmt. Inc., 812 F.2d 1116, 1120 (9th Cir. 1987)); Joe Hand Promotions, 2011 WL 1806919, at *1; J & J Sports Prods.,

38

Inc. v. Bachman, No. CIV. S-09-1225 FCD, 2011 WL 1376605, at *2 (E.D. Cal. Apr. 12, 2011); 12 Charles Alan Wright, et al., Fed. Practice & Proc. § 3012 (2d ed. 2016 update). North Carolina law provides for appointment of a receiver in these circumstances. N.C. Gen. Stat. § 1-502.

As with veil piercing, appointment of a receiver is "'an extraordinary remedy that should be employed with the utmost caution' and is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." Netsphere, Inc. v. Baron, 703 F.3d 296, 305 (5th Cir. 2012) (citing 12 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (2d ed. 2012), and Santibanez, 105 F.3d at 241-42); see also Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc., 999 F.2d 314, 316 (8th Cir. 1993) ("A receiver is an extraordinary equitable remedy that is only justified in extreme situations."). But, as detailed supra, this is an extraordinary case. Randy Coley's deception and efforts to evade judgment have plagued this litigation. Based on this history, there is a probability that Coley's deceitful tactics will continue in an effort to frustrate DIRECTV's valid claim as a judgment creditor in this case, and that the corporate assets are in imminent danger of being "concealed, lost, or diminished in value." See Santibanez, 105 F.3d at 242. As such, the court will grant DIRECTV's motion to appoint a receiver and set this matter down for further proceedings concerning that appointment.

## V.    CONCLUSION

The court has a clear picture of what has transpired in this case, notwithstanding Randy Coley's best efforts to convince the world that he is judgment-proof. For years, Coley has abused the corporate form in an effort to protect himself and his assets from the exact scenario that has unfolded in this litigation—entry of a multi-million dollar judgment against him. For these reasons, and those set forth above, the court holds that Randy Coley is the alter ego of his limited liability companies. Thus, it will reverse-pierce the corporate veil and find the assets held in the name of his

39

various corporate entities, Its Thundertime, LLC, East Coast Sales, LLC, and South Raleigh Air, LLC, are subject to execution of the judgment in this case. The court will also appoint a receiver, to be named, in aid of execution of judgment.

An appropriate Order will be entered.

Entered: July 18, 2016

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

40